THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| VINCENT BLACKMORE; and DANYALE BLACKMORE, <br><br> Plaintiffs, <br><br> v. <br><br> JARED CARLSON and ERIC DEMILLE, Hurricane City Police Officers; DEPUTY RAMIREZ; and DOE DEPUTIES 1-4; WASHINGTON COUNTY, by and through its Sheriff's Office; and HURRICANE CITY, by and through its Police Department, <br><br> Defendants. | **MEMORANDUM DECISION AND ORDER DENYING IN PART AND GRANTING IN PART THE HURRICANE DEFENDANTS' [19] MOTION TO DISMISS** <br><br> Case No. 4:21-cv-00026-DN-PK <br><br> District Judge David Nuffer <br> Magistrate Judge Paul Kohler |

This civil rights action under 42 U.S.C. § 1983 involves an incident at a hotel that occurred in the early hours of the morning on January 6, 2020 (the "Incident").[1] An intoxicated[2] hotel guest broke the front door of the hotel and called 911 from the lobby, claiming to have left his key in his room and asking for assistance.[3] Police officers arrived.[4] The officers' visit culminated with the arrest of one of the hotel owners.[5]

---

[1] Complaint and Jury Demand ("Complaint") ¶¶ 17–19 at 5, docket no. 2, filed Mar. 3, 2021.

[2] Plaintiffs allege the hotel guest was "seriously intoxicated." Complaint ¶ 21 at 5. His actions and behavior alleged in the Complaint and especially as viewed in the Officers' bodycam videos strongly suggests that he was under the influence of some substance.

[3] Complaint ¶¶ 21–23 at 5–6.

[4] *Id.* ¶¶ 19, 24 at 5, 6.

[5] *Id.* ¶¶ 19–74 at 5–11.

Plaintiffs Vincent Blackmore and Danyale Blackmore (the "Blackmores"), the hotel owners, filed a Complaint alleging violations of their constitutional rights against Officers Jared Carlson and Eric DeMille, Deputy Sheriff Ramirez, Washington County, and Hurricane City.[6]

Defendant Officers Jared Carlson and Eric DeMille, and Hurricane City ("Hurricane Defendants") filed a motion to dismiss ("Motion")[7] the Blackmores' Complaint based, in part, on the defense of qualified immunity. The Blackmores filed an opposition to the Motion ("Opposition")[8] and the Hurricane Defendants filed a Reply.[9] The Blackmores then filed a notice of supplemental authorities ("Notice"),[10] and the Hurricane Defendants filed a Response to the Notice.[11][12] After careful consideration of the pleadings, the parties' memoranda, and the relevant legal authority, the Hurricane Defendants' Motion is DENIED in part and GRANTED in part.

---

[6] *Id*. ¶¶ 125–215 at 18–33.

[7] Defendants Jared Carlson, Eric DeMille, and Hurricane City's Rule 12(b)(6) Motion to Dismiss ("Motion"), docket no. 19, filed May 27, 2021.

[8] Memorandum in Opposition to Defendants Jared Carlson, Eric DeMille and Hurricane City's 12(b)(6) Motion to Dismiss ("Opposition"), docket no. 29, filed Jul. 12, 2021.

[9] Defendants Jared Carlson, Eric DeMille, and Hurricane City's Reply Memorandum in Support of Rule 12(b)(6) Motion to Dismiss ("Reply"), docket no. 32, filed Aug. 2, 2021.

[10] Notice of Supplemental Authorities in Support of Plaintiffs' Opposition to Defendants' Motion to Dismiss ("Notice"), docket no. 34, filed Aug. 10, 2021.

[11] Response to Notice of Supplemental Authorities ("Response"), docket no. 35, filed Aug. 13, 2021.

[12] The Hurricane Defendants argue in their Response that the Notice is a "prohibited surreply, as it crosses the line from citation and explanation into argument, contrary to what the local rules allow." Response at 1–2. DUCivR 7-1(b)(4) provides "[w]hen pertinent and significant authorities come to the attention of a party after the party's memorandum has been filed . . . a party may promptly file a notice with the court and serve a copy on all counsel, setting forth the citations" and "[t]here must be a reference . . . to the page of the memorandum" and "must state, without argument, the reasons for the supplemental citations" (the "Rule"). The Notice substantially complies with the Rule. The Response is clearly not "similarly limited" as required by the Rule and contains argument. Because the Hurricane Defendants argue that the Notice contains prohibited argument but include argument in their own Response, both the Notice and the Response will be permitted, with the Hurricane Defendants having the last word.

# Table of Contents

Standard of Review....................................................................................................................... 3

    Rule 12(b)(6) Motion to Dismiss Standard in Qualified Immunity Cases ......................... 3

    Use of Video Footage with a Motion to Dismiss................................................................ 4

        Because the Video does not clearly contradict the critical allegations in the
            Complaint, analysis is confined to the Hurricane Defendants' conduct as
            alleged in the Complaint and as shown in the Video................................. 6

Background .................................................................................................................................. 9

Analysis..................................................................................................................................... 19

    The Officers are entitled to qualified immunity for the Excessive Force Claim but no
    other claims because the Blackmores' Complaint alleges a violation of Danyale's
    clearly established constitutional right................................................................................ 20

      1.    Requirements for a civil rights action under 42 U.S.C. § 1983 ................ 20

      2.    The Qualified Immunity Doctrine .......................................................... 20

      3.    The Blackmores' Complaint sufficiently alleges a constitutional violation
          of Danyale's clearly established Fourth Amendment right to be free from
          unlawful seizures. ................................................................................... 23

      4.    The Blackmores' Excessive Force Claim will be dismissed because the
          alleged constitutional violation was not clearly established at the time of
          the Incident............................................................................................. 36

      5.    The Hurricane Defendants' arguments against the Failure to Train Claim
          and Abuse of Process Claim fail because the Blackmores have sufficiently
          pleaded a constitutional violation by the Hurricane Defendants. ............. 48

      6.    Dismissal of the Blackmores' State Law Claims would be premature..... 48

Order  .................................................................................................................................... 54

**STANDARD OF REVIEW**

**Rule 12(b)(6) Motion to Dismiss Standard in Qualified Immunity Cases**

"At the motion-to-dismiss stage, we must accept all the well-pleaded allegations of the complaint as true and must construe them in the light most favorable to the plaintiff."[13] "To survive dismissal, 'a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'"[14] "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully."[15]

---

[13] *Thomas v. Kaven*, 765 F.3d 1183, 1190 (10th Cir. 2014) (citation omitted).

[14] *Id*. at 1190 (citing *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009)).

[15] *Id*. at 1190–91 (citation omitted).

"[D]ismissal under Rule 12(b)(6) is a harsh remedy which must be cautiously studied, not only to effectuate the spirit of the liberal rules of pleading but also to protect the interests of justice."[16] "It is also well established that dismissal of a complaint is proper only if it appears to a certainty that plaintiff is entitled to no relief under any state of facts which could be proved in support of the claim."[17]

"Although qualified immunity defenses are typically resolved at the summary judgment stage, district courts may grant motions to dismiss on the basis of qualified immunity."[18] "Asserting a qualified immunity defense via a Rule 12(b)(6) motion . . . subjects the defendant to a more challenging standard of review than would apply on summary judgment."[19] "In reviewing a Rule 12(b)(6) motion in the context of qualified immunity, a district court should not dismiss a complaint 'for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [the plaintiff's] claim which would entitle [the plaintiff] to relief.'"[20]

### Use of Video Footage with a Motion to Dismiss

Defendant Officers Carlson and DeMille (the "Officers") were each wearing a body camera (the "Video")[21] which recorded the Incident. The Blackmores reference (but do not

---

[16] *Moore v. Guthrie*, 438 F.3d 1036, 1039 (10th Cir. 2006) (internal quotation marks and citations omitted).

[17] *Id.*

[18] *Kaven*, 765 F.3d at 1194.

[19] *Peterson v. Jensen*, 371 F.3d 1199, 1201 (10th Cir. 2004) (internal citation omitted).

[20] *Id.* at 1201–02 (citing *Currier v. Doran*, 242 F.3d 905, 917 (10th Cir. 2001)).

[21] Exhibit A, Officer Carlson Body Camera Footage ("Carlson Video"); Exhibit B, Officer DeMille Body Camera Footage ("DeMille Video") (collectively, the "Video"); s*ee* Notice of Conventional Filing, docket no. 20, filed May 27, 2021.

attach or incorporate[22]) the Video in their Complaint.[23] The Blackmores allege the Video evidence contradicts certain statements made by the Officers in the Video[24] and contains evidence that the Probable Cause Statement filed by Officer Carlson has falsehoods and inaccuracies, effectively "prov[ing] the Officers acted illegally to seize Danyale and detain and arrest her."[25]

The Hurricane Defendants argue the Video should be considered alongside the Complaint because of the Complaint's references to the Video.[26] The Hurricane Defendants argue that the allegations in the Complaint are "inaccurate and self-serving characterization[s]" that are disproved by the Video,[27] so the Hurricane Defendants provide their own version[28] of the facts based on the Video in their Motion.

"[When] evaluating a Rule 12(b)(6) motion to dismiss, courts may consider not only the complaint itself, but also attached exhibits . . . and documents incorporated into the complaint by reference."[29] "[I]f a plaintiff does not incorporate by reference or attach a document to its complaint, but the document is referred to in the complaint and is central to the plaintiff's claim, a defendant may submit an indisputably authentic copy to the court to be considered on a motion to dismiss."[30]

---

[22] A document is incorporated into a complaint "if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim." *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003) (citations omitted). "[T]he mere mention of the existence of a document is insufficient to incorporate the contents of a document." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018) (citation omitted).

[23] *See* Complaint ¶¶ 20, 66, 68, 83–84, 108, 129, 197 at 5, 10–13, 15, 19, 30.

[24] *Id.* ¶¶ 66, 68 at 10–11.

[25] *Id.* ¶¶ 108, 129, 197 at 15, 19, 30.

[26] Motion at 2–3.

[27] Motion at 3.

[28] *See* Motion at 3–15; Reply at 2–5.

[29] *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009) (citations omitted).

[30] *GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997) (citations omitted).

The parties do not dispute the authenticity of the Video. The Video evidence is also clearly central to the Blackmores' claims because their claims arise from the Incident depicted in the Video.

The Blackmores argue: (1) that consideration of the Video evidence is only allowed when it "incontrovertibly contradicts the allegations in the complaint";[31] and (2) that the Hurricane Defendants' version of the facts must be disregarded because the Hurricane Defendants have failed to show where the video evidence "viewed in the light most favorable to the Plaintiffs, 'blatantly,' 'clearly,' or 'incontrovertibly' contradicts [Plaintiffs'] allegations."[32]

"[I]f a defendant attaches to a [Rule] 12(b)(6) motion materials referred to by the plaintiff and central to [the plaintiff's] claim, the court has discretion to consider such materials."[33] Because the authenticity of the Video is not contested and it is central to the Blackmores' claims, the Video will be considered along with the Blackmores' Complaint.

The Blackmores' assertion that the Hurricane Defendants' version of the facts cannot usurp the allegations in the Complaint unless the Video clearly contradicts those allegations is supported by case law as discussed in the following section.

**Because the Video does not clearly contradict the critical allegations in the Complaint, analysis is confined to the Hurricane Defendants' conduct as alleged in the Complaint and as shown in the Video.**

The Blackmores cite to *Scott v. Harris*[34] to support their assertion that the Hurricane Defendants' version of the facts may not usurp the Complaint's allegations unless the Video "blatantly contradicts" those allegations. In *Harris,* the U.S. Supreme Court reversed the

---

[31] Opposition at 4.

[32] Opposition at 6.

[33] *Prager v. LaFaver*, 180 F.3d 1185, 1189 (10th Cir. 1999).

[34] *Scott v. Harris*, 550 U.S. 372 (2007).

Eleventh Circuit's denial of Officer Scott's motion for summary judgment because video evidence "blatantly contradicted" the plaintiff's version of the facts.[35] The Supreme Court explained that while "courts are required to view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion,'" which "usually means adopting . . . the plaintiff's version of the facts" in qualified immunity cases, the available video evidence in this case "quite clearly contradict[ed] the version of the story told by [plaintiff]."[36] The Supreme Court concluded that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."[37]

The Blackmores also cite to three unpublished Tenth Circuit decisions.[38] In *Estate of Ronquillo v. City and County of Denver*,[39] the Tenth Circuit considered the District Court's grant of a motion to dismiss and stated, "we accept as true Plaintiff's allegations except when directly [contradicted] by the attached exhibits—in this case the video of the incident."[40] The Tenth Circuit also cited to a Seventh Circuit case and included this quote in the citation's parenthetical: "When an exhibit incontrovertibly contradicts the allegations in the complaint, the exhibit ordinarily controls, *even when considering a motion to dismiss*."[41]

---

[35] *Id.* at 380.

[36] *Id.* at 378.

[37] *Id.* at 380.

[38] *See* Opposition at 3–4, 7, citing to *Est. of Ronquillo by & through Est. of Sanchez v. City & Cty. of Denver*, 720 F. App'x 434 (10th Cir. 2017) (unpublished); *Cordero v. Froats*, 613 F. App'x 768 (10th Cir. 2015) (unpublished); *Myers v. Brewer*, 773 F. App'x 1032 (10th Cir. 2019), *cert. denied*, 140 S. Ct. 848 (2020) (unpublished).

[39] 720 F. App'x 434.

[40] *Id.* at 437.

[41] *Id.* (emphasis added) (citing *Bogie v. Rosenberg*, 705 F.3d 603, 609 (7th Cir. 2013)).

In *Myers v. Brewer*, the Tenth Circuit affirmed the District Court's denial of a motion to dismiss the plaintiffs' excessive force claim based on qualified immunity.[42] The Tenth Circuit "confine[d] [their] analysis" to "the defendant's conduct *as alleged in the complaint*" because "the video [did] not clearly contradict the allegations in the complaint."[43]

Finally, in *Cordero v Froats*, the Tenth Circuit dismissed an appeal challenging the denial of the defendants' motion for summary judgment because a reasonable jury could believe the version of events the district court found was not blatantly contradicted by the record (which included video evidence), and therefore jurisdiction was lacking over the appeal:

> We agree [the evidence] strongly supports the defendants' position. But we cannot say it "blatantly contradicts" the Plaintiff's witnesses. The standard is a very difficult one to satisfy.[44]

While *Harris* and *Cordero* addressed motions for summary judgment, both *Estate of Ronquillo* and *Myers* address motions to dismiss. And while the Tenth Circuit considered video evidence in their analyses, the opinion's analyses were limited to the allegations in the plaintiffs' complaints because the video evidence did not clearly contradict the complaints' allegations.

The standard of review for defendants asserting a qualified immunity defense in a motion to dismiss "subjects the defendant[s] to a more challenging standard of review than would apply on summary judgment."[45] On a motion to dismiss, "it is the defendant's conduct *as alleged in the complaint* that is scrutinized for 'objective legal reasonableness.'"[46]

---

[42] *Myers*, 773 F. App'x 1032.

[43] *Id.* at 1036.

[44] *Cordero*, 613 F. App'x at 769.

[45] *Kaven,* 765 F.3d at 1194.

[46] *Behrens v. Pelletier*, 516 U.S. 299, 309 (1996).

The Video has been reviewed alongside the Blackmores' allegations and the Hurricane Defendants' version of the facts. As discussed in the footnotes in the Background provided below, the Video does not clearly contradict any of the allegations in the Blackmores' Complaint. While certain factual situations in the Video relevant to the Blackmores' claims are ambiguous, "[o]ur function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted."[47]

Based on the Tenth Circuit cases and the law governing motions to dismiss, and because the Video does not clearly contradict any of the allegations in the Blackmores' Complaint, the Blackmores' allegations are accepted as true for the purposes of the Motion. The Video will be considered alongside the Blackmores' allegations in the analysis of the Motion, and the Hurricane Defendants' version of the facts is rejected for purposes of ruling on the Motion.

**BACKGROUND[48]**

The Blackmores are the owners and managers of the My Place Hotel ("Hotel") in Hurricane, Utah.[49] They stay overnight at the Hotel sometimes "because of the nature of owning and running a hotel" and were staying overnight on January 6, 2020.[50] Officers Carlson and DeMille were dispatched to the Hotel around 1:30 a.m. when an intoxicated hotel guest called

---

[47] *Gilchrist v. Citty*, 71 F. App'x 1, 2–3 (10th Cir. 2003) (unpublished) (internal quotation marks and citations omitted).

[48] This factual background comes from the Blackmores' Complaint. All well-pleaded factual allegations in the complaint are accepted as true when reviewing a motion to dismiss for failure to state a claim. *See Moore,* 438 F.3d at 1039. The factual background also includes citations to the Video and the Hurricane Defendants' Motion to show that the Factual Background in the Hurricane Defendants' Motion either conflicts with the Video or does not clearly contradict the allegations within the Blackmores' Complaint. *See supra* at 4–9. discussing the use of the Video for the purposes of this motion.

[49] Complaint ¶ 18 at 5.

[50] *Id*. ¶¶ 18, 27 at 5, 6.

911, claiming to have left his key in his room and asking for assistance.[51] Both Officers were wearing body cameras which recorded video footage and most of the audio of the incident.[52]

Prior to the 911 call, the hotel guest had "forced his way into the lobby of the Hotel by vandalizing the sliding front door causing damage to the door."[53] When the hotel guest "entered the lobby, he did not call the clearly visible phone number on the lobby desk to contact the Hotel management to open his room door."[54] Instead, he called 911, which "precipitated the police [visit] to the Hotel."[55]

When the Officers arrived at the Hotel and realized that the hotel guest was "heavily intoxicated, Officer Carlson asked [the hotel guest] what he wanted from them."[56] The hotel guest asked for help getting into his room, and the Officers followed the hotel guest into the lobby.[57] "When asked how he got into the lobby, [the hotel guest] explained to the Officers that he had broken into the lobby by kicking in the front door."[58]

After entering the lobby, "Officer Carlson called the number listed for management on the lobby phone."[59] Danyale Blackmore ("Danyale") answered the call, and Officer Carlson

---

[51] *Id*. ¶¶ 19, 21 at 5.

[52] *Id*. ¶¶ 20, 84 at 5, 12–13. The Blackmores allege the Officers "purposefully disabled the audio recording on their body cameras in order to conceal discussions between themselves as well as conversations with . . . the drunk hotel guest." *Id*. ¶ 84 at 12–13. The Officers do not contest this allegation.

[53] *Id*. ¶ 22 at 6.

[54] *Id*. ¶ 23 at 6.

[55] *Id*. ¶ 23 at 6.

[56] *Id*. ¶ 24 at 6. The Hurricane Defendants describe the interaction by saying "[w]hen [the hotel guest] approache[d] too close to Officer Carlson, Officer Carlson put[] out his arm and order[ed] him to 'Just go over there.'" Motion ¶ 3 at 3. This difference in asserted facts is not significant for the purposes of the Motion.

[57] Complaint ¶¶ 24–25 at 6; *see also* Motion ¶ 4 at 3–4.

[58] Complaint ¶ 26 at 6; *see also* Motion ¶ 46 at 9.

[59] Complaint ¶ 25 at 6; *see also* Motion ¶ 5 at 4.

asked Danyale to come downstairs to deal with the hotel guest.[60] Danyale "had been given

training by [the Hotel] to be very cautious about rushing to the front desk after hours" and

"couldn't understand why the Officers would be at the Hotel."[61] The hotel guest spoke briefly to

Danyale on the phone and admitted to her that he had kicked the door in to force his way into the

lobby.[62] Danyale complied with Officer Carlson's request and went downstairs to deal with the

hotel guest.[63]

When Danyale arrived in the lobby, she noticed the damaged sliding door that had been

broken by the hotel guest.[64] Danyale asked the Officers to remove the hotel guest from the Hotel

for breaking the door.[65] The Officers refused her request,[66] even though the Blackmores allege

the Officers knew that Danyale was an owner of the Hotel.[67] "[W]hen Danyale first asked the

Officers to remove [the hotel guest] from the Hotel, [the hotel guest] advanced toward her and

---

[60] Complaint ¶ 29 at 7; *see also* Motion ¶¶ 6–44 at 4–9.

[61] Complaint ¶ 28 at 6.

[62] Complaint ¶ 30 at 7; *see also* Motion ¶ 49 at 10.

[63] Complaint ¶ 31 at 7. The Hurricane Defendants provide the back-and-forth discussion of this phone call, where Danyale asks questions about why the Officers are there and what exactly is going on. Motion ¶¶ 6–44 at 4–9. The Video shows that Officer Carlson says Danyale is "cussing him out" on the phone, but Danyale's responses cannot be heard and were not recorded, and ultimately, as the Complaint alleges, Danyale complied with Officer Carlson's request to come to the lobby to assist the hotel guest. Carlson Video at 0:03:11–0:08:22; DeMille Video at 0:00:00–0:05:35. The Hurricane Defendants' assertion that Danyale failed to comply with Officer Carlson's order because she "argue[d] with and cusse[d] at Officer Carlson for three and-a-half minutes" does not clearly contradict the allegation in the Complaint that Danyale complied with Officer Carlson's order and came to the lobby. Motion ¶¶ 6–44 at 4–9; Reply at 2.

[64] Complaint ¶ 32 at 7.

[65] *Id.* ¶ 33 at 7; Motion ¶¶ 53, 60 at 10, 11. The Hurricane Defendants argue that the allegations "critically omit" Danyale's statement as she comes down the hallway, "I want you gone. Right now." Motion ¶ 51 at 10; Reply at 2; Carlson Video at 0:08:22–24; DeMille Video at 0:05:34–37. The Hurricane Defendants believe her statement is evidence of noncompliance, but the U.S. Supreme Court has said "the First Amendment protects a significant amount of verbal criticism and challenge directed at police officers" and "[t]he freedom of individuals to verbally oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state." *City of Houston, Tex. v. Hill*, 482 U.S. 451, 461, 462–463 (1987). The Blackmores' omission of her statement to Officer Carlson in the Complaint and as seen in the Video does not clearly contradict the Complaint's allegations and does not change the analysis.

[66] Complaint ¶ 34 at 6; Motion ¶ 60 at 11. The Officers provide no reason for refusing Danyale's request.

[67] Complaint ¶¶ 69, 121 at 11, 17.

Danyale had to back away."[68] "Danyale never approached the hotel guest or threatened him in any way"[69] and "[t]he Officers never told Danyale not to approach the hotel guest."[70] Shortly after Danyale came to the lobby and asked the



Officers to remove the hotel guest, Officer Carlson ordered Danyale to go into the nearby hallway so they could talk.[71] Officer Carlson told the hotel guest to "shut up" and "go over there!" directing him into the lobby.[72] Danyale complied with Officer Carlson's order.[73] Officer Carlson followed Danyale into the hallway and the hotel guest remained in the front lobby, where Officer DeMille sat with the hotel guest until he went to assist Officer Carlson in the

---

[68] *Id.* ¶ 36 at 7.

[69] *Id.* ¶ 35 at 7. The Hurricane Defendants assert that the Video shows Danyale approaching the hotel guest and saying "I want him out. Go away. Go get your shit." Motion ¶ 53 at 10; Reply at 3; Carlson Video at 0:08:34–37; DeMille Video at 0:05:48–50. As seen in the Video, it is ambiguous whether her comments to the hotel guest were threatening or not. Because her comments and actions, as seen in the Video, were not clearly threatening, and do not clearly contradict the Complaint's allegations, the allegations are accepted as true for the purposes of the Motion.

[70] Complaint ¶ 39 at 7. The Hurricane Defendants do not contest this allegation.

[71] *Id.* ¶ 40 at 8; Motion ¶¶ 57, 60 at 11. The Hurricane Defendants assert that Officer Carlson repeats the order to Danyale to go into the hallway to talk, but the Video shows that he said to her once "let's go talk over there," and she says, "yeah, ok," and complied, while continuing to try to explain why she wanted the hotel guest escorted out. Carlson Video at 0:08:40–0:08:43; DeMille Video at 0:05:52–55.

[72] Complaint ¶ 41 at 8; Motion ¶ 59 at 11.

[73] Complaint ¶ 40 at 8; Motion ¶ 61 at 12. The Hurricane Defendants assert that the Video shows Danyale refusing Officer Carlson's command and that she "refused to comply with Officer Carlson's repeated commands, eventually trying to charge back into the lobby." Reply at 3; *see also* Motion ¶ 63 at 12. The Video shows that Officer Carlson said once "let's go talk over there," and Danyale moved into the hallway as requested. Carlson Video at 0:08:40–42; DeMille Video at 0:05:52–55. Her response of "No!" to Officer Carlson's "hold on, hold on, hold on," occurs when she is telling the hotel guest to get his things and leave, and Officer Carlson tells her to "hold on" and she says "no." Her response of "no" appears to be an attempt to explain to Officer Carlson that she wanted the hotel guest removed because he broke the front door of the Hotel. Carlson Video at 0:08:35–0:08:40; DeMille Video at 0:05:49–54. Because the Video does not clearly contradict the Complaint's allegations, the allegations are accepted for the purposes of this Motion.

hallway.[74] While in the hallway, Danyale explained to Officer Carlson that the hotel guest was lying about not being able to get into the Hotel.[75] Danyale then told the Officers she had reporting procedures relating to the broken front door and began walking down the hall to enter the lobby.[76]

When Danyale walked toward the lobby, Officer Carlson stepped into her path and said "hold on,"[77] and put out his arm to prevent Danyale from re-entering the lobby area.[78] He made contact with her upper chest and pushed her backwards.[79]



Motion to Dismiss - Exhibit A (Officer Carlson Body Camera Footage)

---

[74] Complaint ¶ 42 at 8; DeMille Video at 00:05:58–00:06:16. The Hurricane Defendants assert that Officer DeMille stayed in the lobby with the hotel guest "until Officer Carlson needed assistance in restraining Danyale." Reply at 3. This assertion does not clearly contradict the allegation in the Complaint that "Officer Carlson followed Danyale into the hallway with Officer DeMille not far behind, leaving [the hotel guest] by himself, unattended, in the front lobby." Complaint ¶ 42 at 8. Nevertheless, this Order assumes, based on the Video, that the hotel guest was attended for about 15 seconds, and then Officer DeMille went to assist Officer Carlson and left the hotel guest unattended at that time.

[75] Complaint ¶ 43 at 8; Motion ¶ 62 at 12.

[76] Complaint ¶¶ 44, 56 at 8, 9; Motion ¶ 63 at 12; Carlson Video at 0:09:01–02; DeMille Video at 0:06:13–14.

[77] Complaint ¶ 45 at 8; Motion ¶ 64 at 12; Carlson Video at 0:09:02–03.

[78] Complaint ¶ 45 at 8; Motion ¶ 64–65 at 12; Carlson Video at 0:09:02–04.

[79] The Blackmores' allege that Officer Carlson "stepped into her path and forcefully assaulted Danyale." Complaint ¶ 45 at 8. The Hurricane Defendants assert that Officer Carlson put out his arm to block Danyale's path. Motion ¶ 64–65 at 12; Reply at 3. The Video shows that Officer Carlson touched Danyale on her chest and pushed her backwards, but it is difficult to make out exactly the nature of the touching because the body camera is blocked briefly. Carlson Video at 0:09:02–0:09:05. It is not possible to determine the force of the push or the nature of the push or whether the push constituted an assault. Whether an assault occurred requires a factual determination and legal conclusion which is improper at the motion to dismiss stage. The Video does not clearly contradict the factual allegations in the Complaint. Therefore, for the purposes of the Motion it is accepted that Officer Carlson touched Danyale and pushed her backwards. The Hurricane Defendants also concede that Officer Carlson pushed Danyale. Motion ¶ 65 at 12.

Danyale verbally objected to being touched and pushed backwards.[80] The Video shows

Officer Carlson backed Danyale into a corner in the small side-hall space.[81] At this point, Officer DeMille was also present in the small side-hall space.[82]



Motion to Dismiss - Exhibit B (Officer DeMille Body Camera Footage)

Motion to Dismiss - Exhibit B (Officer DeMille Body Camera Footage)

In spite of her expressed apprehension about being touched—"Don't fucking touch me!" and "Don't touch me!"—, Officer Carlson made further contact.[83] Without any warning statement, Officer Carlson grabbed hold of Danyale's arm and pushed her against the wall and held her there.[84] Ignoring Danyale's screams,

---

[80] Complaint ¶ 46 at 8. Carlson Video at 0:09:03–0:09:21. The Hurricane Defendants argue that the Complaint critically omits Danyale's screams for the Officers to not touch her—"Don't fucking touch me!" and "Don't touch me!"—and characterizes her objections to being touched and pushed as refusals to comply with Officer Carlson's commands. Motion ¶¶ 66–67 at 13; Reply at 4. The Video does not show any clear command other than Officer Carlson saying "will you stop, just stop, stop," and then "put your hands behind your back." Because the Video does not clearly contradict the Complaint's allegation, the allegation that Danyale verbally objected to being touched is accepted.

[81] Carlson Video at 0:09:06–09; DeMille Video at 0:06:16–0:06:20.

[82] *Id.*

[83] Carlson Video at 0:09:03–09; DeMille Video at 0:06:16–20.

[84] Complaint ¶ 47 at 8–9; Carlson Video at 0:09:08–0:09:21; DeMille Video at 0:06:21–35. The Hurricane Defendants assert, contrary to the Video, that Danyale placed herself against the wall, and that the Officers didn't push her, and that the Officers were "doing the best they [could] to get Danyale to put her hands behind her back." Reply at 4; Motion ¶¶ 69–72 at 13–14. Officer Carlson's Video throughout this encounter goes dark periodically as the body camera is blocked by his movement. It does not clearly show how Officer Carlson handcuffed Danyale. Officer DeMille's Video is a bit clearer, but is also blocked for a few moments, inhibiting a clear view. The Video does not clearly contradict the Blackmores' allegations, so the allegations are accepted. The Hurricane Defendants' assertions are rejected for purposes of the Motion.

Officer Carlson, with the assistance of Officer DeMille, pulled her arms behind her back.[85] About two seconds after grabbing her arm and starting to force her arms behind her back, Officer Carlson tells Danyale to put her hands behind her back.[86] After Danyale's arms were behind her back, Officer Carlson told Danyale that she was under arrest, but did not immediately give a reason.[87] In response, Danyale asked "why am I under arrest?"[88] When Officer Carlson was locking the handcuffs, he said "I told you to stop. I told you not to approach him. I stopped you from going up to him because I was concerned that you were going to confront him."[89] Danyale responded to Officer Carlson's directive "I'm telling you to stop right now," with "ok," and after listening to the rest of his statement, she said, "ok, please stop," to which Officer Carlson said, "no."[90]

The Blackmores allege that Danyale never verbally or physically threatened the Officers nor was she aggressive toward them in any way.[91] The Blackmores also allege that Danyale posed no immediate threat to the Officers because of her relative physical stature compared to

---

[85] Carlson Video at 0:09:09–20; DeMille Video at 0:06:21–32.

[86] Motion ¶ 70 at 13; Carlson Video at 0:09:11–15; DeMille Video at 0:06:23–27.

[87] Complaint ¶ 61 at 10; Carlson Video at 0:09:19–20; DeMille Video at 0:06:31–33. Seventeen seconds pass between the time Officer Carlson touches Danyale in the upper chest and the Officers inform Danyale she is under arrest. *See supra* n. 78–79 for timing of initial touch. Danyale's verbal protests about being touched and being pushed against the wall, and the order to put her hands behind her back, all occur before the Officers tell her she is under arrest.

[88] Complaint ¶ 60 at 10; Carlson Video at 0:09:11–30; DeMille Video at 0:06:21–35.

[89] Complaint ¶ 63 at 10; Carlson Video at 0:09:40–52; DeMille Video at 0:06:54–0:07:05. The Blackmores allege that Officer Carlson said "You were not doing what you were told to." The Hurricane Defendants deny Officer Carlson said those exact words. Reply at 5. The Video shows that Officer Carlson said, "I told you to stop. I told you not to approach him. I stopped you from going up to him because I was concerned that you were going to confront him." Carlson Video at 0:09:40–52; DeMille Video at 0:06:54–0:07:05. The statement made by Officer Carlson in the Video does not clearly contradict the allegation in the Complaint. The general sentiment of what was said is alleged. Therefore, the allegation is accepted for the purposes of the Motion.

[90] Carlson Video at 0:09:39–53; DeMille Video at 0:06:53–7:06.

[91] Complaint ¶ 49 at 9. The Hurricane Defendants argue that Danyale's behavior was "aggressive" but they do not assert that she was aggressive *towards* anyone. Motion at 21. The Video does not clearly contradict the Blackmores' allegation that Danyale did not act aggressively towards the Officers, so the allegation is accepted for the purposes of this Motion.

the Officers.[92] The Blackmores allege Danyale was no threat to herself or any of the hotel

guests.[93] The Blackmores allege, and the Hurricane Defendants do not contradict, that Danyale

was not armed and was not holding anything that could be used as a weapon.[94] She had nothing

in her hands, except for her cell phone.[95] Danyale further alleges she had never threatened or

tried to confront the hotel guest.[96]

Between the time Officer Carlson grabbed her, put her arms behind her back, and told her

she was under arrest, Danyale's actions are limited to verbally objecting to being touched—she

screamed "don't fucking touch me"[97]—and asking "why am I under arrest?" while the Officers

are handcuffing her.[98] The Video does not clearly show Danyale physically resisting the arrest,

especially *after* the Officers told her she was under arrest: instead, she appears to tense up when

the Officers first touch her and continue to touch her during the arrest.[99] The Officers removed

Danyale, handcuffed, from the lobby of her Hotel and put her into the police truck.[100] While

being escorted outside, Danyale continued to ask the Officers why they were arresting her and if

---

[92] Complaint ¶ 50 at 9.

[93] *Id*. ¶ 51 at 9.

[94] *Id*. ¶ 52 at 9.

[95] *Id*. ¶ 52 at 9.

[96] *Id*. ¶ 53 at 9; *see supra* n. 69 addressing Danyale's behavior towards the hotel guest and why this allegation from the Complaint is accepted for the purposes of this Motion.

[97] Motion ¶ 67 at 13; Carlson Video at 0:09:04–06; DeMille Video at 0:06:17–19.

[98] Complaint ¶ 60 at 10; Carlson Video at 0:09:11–30; DeMille Video at 0:06:21–35. Danyale drops her phone while the Officers are handcuffing her, and she does not try to pick it up.

[99] Carlson Video at 0:09:09–22; DeMille Video at 0:06:21–35. *See also* Opposition at 13.

[100] Complaint ¶¶ 70, 73 at 11. The Hurricane Defendants assert that Danyale resisted as the Officers removed her from the Hotel and put her in the police truck. Motion ¶ 77–78 at 15. The Video shows that the Officers quickly moved her through the lobby and to the police truck in under a minute. The Video is ambiguous and unclear, but it appears that Danyale is in socks as the Officers push her through the lobby, and that she is either resisting, or trying to stay upright while in handcuffs and not fall because Officer Carlson was pulling her through the lobby very quickly. Carlson Video at 0:09:55–10:42; DeMille Video at 0:07:08–54. Because the Video is ambiguous regarding whether Danyale was resisting, the Complaint's allegations are not clearly contradicted, and are accepted. The Hurricane Defendants' characterization of the movement through the lobby to the police truck is rejected for purposes of the Motion.

she could have her phone; they ignored her and did not answer.[101] Danyale had difficulty getting into the police truck because of the handcuffs, so Officer Carlson either pushed her or assisted her into the truck.[102]

Officer Carlson returned to the lobby to assist the hotel guest.[103] The hotel guest "had not yet been verified as a legitimate hotel guest, but Officer Carlson, nevertheless, helped him find an open window in the back of the Hotel through which he crawled to enter his alleged Hotel room."[104]

After leaving Danyale by herself in the truck and helping the hotel guest, Officer Carlson returned to the truck.[105] Danyale again asked why she was being detained,[106] and Officer DeMille told Danyale she was "acting like a child" and to stop crying.[107] Officer DeMille then told Danyale she was being detained because she was "acting stupid," that she was "so d---drunk" and that she was "not listening to [the Officers]."[108] Officer Carlson drove Danyale to the Washington County Purgatory Correctional Facility ("Jail") for booking on charges of disorderly conduct, fight, violence, threatening and interfering with arrest.[109] Officer Carlson completed a prisoner questionnaire while at the Jail which stated that Danyale did not "'assault' anyone and

---

[101] Complaint ¶ 72 at 11; Carlson Video at 0:09:57–10:27; DeMille Video at 0:07:09–52.

[102] Complaint ¶ 73 at 11; Carlson Video at 0:10:38–0:10:55; DeMille Video at 0:07:53–0:08:08. The Hurricane Defendants assert that the Video shows Officer Carlson did not forcefully push Danyale into the truck, but "assisted her by lifting her leg and then putting on her seatbelt." Reply at 5; Motion ¶ 78 at 15. The force used to put Danyale in the truck cannot be determined from the Video. Because the Video does not clearly contradict the Complaint's allegations, this Order assumes that Officer Carlson touched Danyale, possibly with some force, when she was placed in the truck.

[103] Complaint ¶ 74 at 11.

[104] Id. ¶ 75 at 11–12.

[105] Id. ¶ 79 at 12.

[106] Id. ¶ 80 at 12.

[107] Id. ¶ 81 at 12.

[108] Id. ¶ 82 at 12.

[109] Id. ¶ 86 at 13.

did not have 'contraband (drugs/weapons)'" and that he "was not aware of any 'excessive or harmful . . . consumption of alcohol' by Danyale."[110]

Based on this incident and additional events that occurred after Danyale's arrest, the Blackmores filed their Complaint against the Hurricane Defendants and additional defendants.[111] Relevant to this Motion, the Blackmores' allege five causes of action against the Hurricane Defendants:

- First Cause of Action: unlawful search and seizure in violation of Danyale's Fourth Amendment rights against the Officers in their individual capacities ("Unlawful Arrest Claim");[112]

- Second Cause of Action: excessive force in violation of Danyale's Fourth Amendment rights[113] against the Officers in their individual capacities ("Excessive Force Claim");[114]

- Fourth Cause of Action: failure to train and/or supervise against Hurricane City ("Failure to Train Claim");[115]

- Fifth Cause of Action: abuse of process in violation of the Fourth Amendment against all Hurricane Defendants ("Abuse of Process Claim");[116] and

---

[110] Id. ¶ 87 at 13.

[111] The Blackmores' Complaint includes a third cause of action against Deputy Ramirez and Doe Deputies 1-4 in their individual capacities, alleging an illegal strip search and outrageous conduct in violation of Danyale's Fourth and Fourteenth Amendment rights. Complaint ¶¶ 156–174 at 23–26. That claim is not addressed in this Motion because it is not asserted against the Hurricane Defendants.

[112] Id. ¶¶ 125–139 at 18–20.

[113] The Blackmores' Second Cause of Action alleges violations of both the Fourth and Fourteenth Amendments for excessive force against Officers Carlson and DeMille, but an excessive force claim during an arrest is properly brought under the Fourth Amendment, not the Fourteenth Amendment. See Graham v. Connor, 490 U.S. 386, 395 (1989) ("[A]ll claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach."). By contrast, a claim against state law enforcement officers for excessive force "in the criminal justice system somewhere between . . . an initial seizure and post-conviction punishment" is analyzed under the Fourteenth Amendment as a due process claim. Est. of Booker v. Gomez, 745 F.3d 405, 423 (10th Cir. 2014) (citation omitted). The Blackmores do not allege that Officers Carlson and DeMille were involved in the post-arrest events at the jail. However, the Hurricane Defendants only address the events of the arrest and the Fourth Amendment claim. Therefore, any Fourteenth Amendment claim within the Second Cause of Action is not subject to the Hurricane Defendants' Motion or this order.

[114] Complaint ¶¶ 140–155 at 20–23.

[115] Id. ¶¶ 175–191 at 26–29.

[116] Id. ¶¶ 192–204 at 29–31.

- Sixth Cause of Action: violation of Danyale's State civil rights under Article I, Sections 7 and 9 of the Constitution of Utah against all Hurricane Defendants ("State Law Claims").[117]

## ANALYSIS

The Hurricane Defendants seek to dismiss all five causes of action against them. The Officers raise the defense of qualified immunity for the Unlawful Arrest Claim and Excessive Force Claim.[118] The Hurricane Defendants also argue that the Unlawful Arrest Claim, Excessive Force Claim, Failure to Train Claim (alleged only against Hurricane City), and Abuse of Process Claim should be dismissed for failure to state a claim upon which relief can be granted because the Officers did not violate Danyale's constitutional rights.[119] And the Officers argue that the State Law Claims should be dismissed because the Officers did not commit any flagrant violations of the Blackmores' state constitutional rights and the existing remedy provided under § 1983 precludes a remedy for any violations of the Blackmores' state constitutional rights.[120]

The Officers' defense of qualified immunity fails on the Blackmores' Unlawful Arrest Claim, but succeeds on the Excessive Force Claim. The Hurricane Defendants' arguments against the Failure to Train Claim and Abuse of Process Claim fail because the Blackmores have sufficiently alleged a constitutional violation. The Hurricane Defendants' arguments against the State Law Claims also fail because dismissal at this stage would be premature. Each of the Hurricane Defendants' arguments will be addressed in turn.

---

[117] *Id.* ¶¶ 205–215 at 31–33.

[118] Motion at 16.

[119] *Id.* at 16–17.

[120] *Id.* at 17.

**The Officers are entitled to qualified immunity for the Excessive Force Claim but no other claims because the Blackmores' Complaint alleges a violation of Danyale's clearly established constitutional right.**

### 1. Requirements for a civil rights action under 42 U.S.C. § 1983

"To state a claim for relief in an action brought under § 1983, [the Blackmores] must establish not only the deprivation of a right secured by the Constitution or laws of the United States, but also a deprivation committed under color of state law."[121]

"[T]he under-color-of-state-law element of § 1983 excludes from its reach merely private conduct, no matter how discriminatory or wrongful."[122] "[S]tate action may be found if, though only if, there is such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself."[123]

The Blackmores' Complaint alleges the Hurricane Defendants were acting under color of state law,[124] and the Hurricane Defendants do not contest this. The analysis of whether the Blackmores have established any deprivation of rights cognizable under § 1983 is provided within the analysis of the first prong of the qualified immunity doctrine below.

### 2. The Qualified Immunity Doctrine

The doctrine of qualified immunity allows government agents to avoid litigation and liability for constitutional violations unless the violation was of clearly established law.[125] "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from

---

[121] *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 757 F.3d 1125, 1143 (10th Cir. 2014) (citing *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49–50 (1999)).

[122] *Id*. (citation omitted).

[123] *Id*. (citing *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n.,* 531 U.S. 288, 295 (2001)).

[124] Complaint ¶¶ 11–12, 15, 150–51 at 3–5, 22–23.

[125] *See Mocek v. City of Albuquerque*, 813 F.3d 912 (10th Cir. 2015); *see also Pearson v. Callahan*, 555 U.S. 223 (2009); William Baude, *Is Qualified Immunity Unlawful?*, 106 CAL. L. REV. 45, 46 (2018).

harassment, distraction, and liability when they perform their duties reasonably."[126] "The protection of qualified immunity applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact."[127] Thus, "[q]ualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions," and "protects all but the plainly incompetent or those who knowingly violate the law."[128] This is a deliberately low standard, favoring protection of law enforcement officers.[129]

The doctrine was created by the U.S. Supreme Court and has been seriously questioned for a number of reasons, including: its uncertain legal basis; the difficulty it creates for plaintiffs to vindicate any violations of their constitutional rights; and the disproportionate effect it has on minorities.[130] Because attempts to abolish or curtail the doctrine through legislation have failed, it remains the law and courts must continue to apply the law as it is.

Qualified immunity provides that "[i]ndividual government actors are immune from suit under § 1983 . . . unless a plaintiff demonstrates '(1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged

---

[126] *Pearson*, 555 U.S. at 231.

[127] *Id.* (internal quotations omitted).

[128] *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (internal quotations omitted).

[129] *See Jamison v. McClendon,* 476 F. Supp. 3d 386, 391 (S.D. Miss. 2020).

[130] *See* Baude, *supra* n. 125 at 46; *see also Jamison,* 476 F. Supp. 3d 386; Opinion, *How the Supreme Court Lets Cops Get Away With Murder*, N.Y. TIMES, May 29, 2020, https://www.nytimes.com/2020/05/29/opinion/Minneapolis-police-George-Floyd.html [hereinafter N.Y. TIMES Opinion]; James A. Wynn Jr., Opinion, *As a judge, I have to follow the Supreme Court. It should fix this mistake*, WASH. POST, June 12, 2020, https://www.washingtonpost.com/opinions/2020/06/12/judge-i-have-follow-supreme-court-it-should-fix-this-mistake/; Radley Balko, Opinion, *The ugly origins of qualified immunity,* WASH. POST, Oct. 26, 2021, https://www.washingtonpost.com/opinions/2021/10/26/ugly-origins-qualified-immunity/.

conduct.'"[131] When defendants raise the qualified immunity defense, the burden shifts to the plaintiff, who must satisfy this "heavy two-part burden."[132]

There is no mandatory sequence to the two-prong test.[133] Judges are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."[134] "[I]f the plaintiff fails to establish either prong of the two-pronged qualified-immunity standard, the defendant prevails on the defense."[135]

Analysis by courts of the first prong creates case law which provides notice to government officials of what acts are constitutional violations, a prerequisite to finding such violations are clearly established. When courts skip the first prong and go directly to the second prong, the opportunity—and perhaps obligation—to establish the law is missed. This results in an absence of decisions on the applicable law. This prevents officers from being properly trained and impairs courts' ability to determine whether a set of facts constitute violations of plaintiffs' rights. When fewer rights are considered clearly established in the evolving factual situations of a developing society, plaintiffs can face a nearly insurmountable hurdle to overcome the qualified immunity defense.[136]

---

[131] *Mocek*, 813 F.3d at 922 (citing *al–Kidd,* 563 U.S. at 735).

[132] *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001) (internal quotation marks and citation omitted).

[133] *Pearson*, 555 U.S. at 236 (overturning rule from *Saucier v. Katz*, 533 U.S. 194 (2001) that required courts to find the official's conduct was clearly established before moving on to the second prong of the test).

[134] *Id*.; *see also al-Kidd,* 563 U.S. at 735.

[135] *A.M. v. Holmes*, 830 F.3d 1123, 1134–35 (10th Cir. 2016) (internal citations omitted).

[136] *See Jamison,* 476 F. Supp. 3d at 408; *see also* N.Y. TIMES Opinion, *supra* n. 130.

In this order, as each claim is examined, both prongs of the test will be addressed, beginning with the first prong, to assist with the development of a body of qualified immunity case law that will allow courts to find what factual situations result in constitutional violations.

3. **The Blackmores' Complaint sufficiently alleges a constitutional violation of Danyale's clearly established Fourth Amendment right to be free from unlawful seizures.**

   *First Step: Danyale asserts an actionable violation of her Fourth Amendment right to be free from unlawful seizures.*

The Fourth Amendment to the United States Constitution establishes a constitutional right for people to be "secure in their persons . . . against unreasonable . . . seizures[.]"[137] Arrests are a variety of seizure,[138] and the Hurricane Defendants do not contest that Danyale was arrested. The Fourth Amendment requires that "[a]n arrest . . . must be reasonable under the circumstances."[139]

"Fourth Amendment reasonableness is predominantly an objective inquiry."[140] The question is "whether the circumstances, viewed objectively, justify [the challenged] action,"[141] and courts "look to whether the arrest is objectively justified, rather than to the motive of the arresting officer."[142] "Even law enforcement officials who 'reasonably but mistakenly conclude that probable cause is present' are entitled to immunity."[143]

---

[137] U.S. CONST. amend. IV.

[138] *Fogarty v. Gallegos*, 523 F.3d 1147, 1155 (10th Cir. 2008).

[139] *al-Kidd*, 563 U.S. at 735–36 (citations omitted).

[140] *Id.* at 736 (internal quotation marks and citations omitted).

[141] *Id.*

[142] *Id.* at 740.

[143] *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (citation omitted).

"[A] warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed."[144] "To determine whether an officer had probable cause for an arrest, we examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause."[145] The "arresting officer's state of mind (except for the facts that [the officer] knows) is irrelevant to the existence of probable cause."[146]

"Probable cause to arrest exists only when the facts and circumstances within the officers' knowledge, and of which they have reasonably trustworthy information, are sufficient in themselves to warrant a [person] of reasonable caution in the belief that an offense has been or is being committed."[147] "Probable cause is based on the totality of the circumstances[.]"[148]

An arrest is often preceded by an investigative detention, which must be supported by reasonable suspicion to be lawful under the Fourth Amendment.[149] "[T]he police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause."[150]

---

[144] *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004) (citations omitted).

[145] *D.C. v. Wesby*, 138 S. Ct. 577, 586 (2018) (internal quotation marks and citations omitted).

[146] *Devenpeck*, 543 U.S. at 153 (citations omitted).

[147] *Cortez v. McCauley*, 478 F.3d at 1116 (citation omitted).

[148] *Id*.

[149] *Id*. at 1123 (citation omitted).

[150] *Oliver v. Woods*, 209 F.3d 1179, 1186 (10th Cir. 2000) (citation omitted).

"Central to this analysis is determining which crime, or crimes, [the Officers] could objectively and reasonably have believed that [Danyale] committed."[151] The Hurricane Defendants argue that Danyale committed the crimes of disorderly conduct and interference with a peace officer.[152]

### ***Disorderly Conduct***

The Officers argue that they had reasonable suspicion to detain Danyale[153] and probable cause to arrest her[154] for the misdemeanor offense[155] of disorderly conduct.[156]

Utah's Disorderly Conduct statute provides, in relevant part:

> (2) An individual is guilty of disorderly conduct if:
> (a) the individual refuses to comply with the lawful order of a law enforcement officer to move from a public place . . . , or knowingly creates a hazardous or physically offensive condition, by any act that serves no legitimate purpose; or
> (b) . . . recklessly creating a risk of public inconvenience, annoyance, or alarm, the person:
> (i) engages in fighting or in violent, tumultuous, or threatening behavior.[157]

The Officers raise three ways Danyale violated the Disorderly Conduct Statute. First, they argue that Danyale refused to comply with their lawful orders to move from a public place.[158] The Officers argue that Danyale refused to comply with Officer Carlson because she refused to come down to the lobby to help the hotel guest. But Danyale complied with the order

---

[151] *Fogarty*, 523 F.3d at 1156.

[152] Motion at 19–23.

[153] Motion at 19.

[154] Motion at 21.

[155] The crime of disorderly conduct is an infraction if the violating conduct does not continue after the person has been asked to cease conduct, and the person has no previous disorderly conduct convictions. *See* UTAH CODE ANN. § 76-9-102(4)(a).

[156] Motion at 19.

[157] Motion at 19–20, citing UTAH CODE ANN. § 76-9-102.

[158] UTAH CODE ANN. § 76-9-102(2)(a).

to come to the lobby, and her movement from a private room in the Hotel does not constitute movement from a public place, but movement *to* a public place. The Officers also argue that Danyale refused to move from the lobby to separate herself from the hotel guest, but the Blackmores allege and the Video shows that when Officer Carlson said "let's go over there," Danyale said, "ok," and she followed him into the hallway.[159] Finally, the Officers argue that Danyale complied with Officer Carlson's command to go into the hallway, but "she almost immediately changed her mind and attempted to charge back past Officer Carlson and into the lobby . . ." [160] Neither the Video nor the Complaint's allegations show that Officer Carlson gave her any command to not go into the lobby.[161] Danyale began to walk into the lobby to initiate reporting procedures for the broken door,[162] and Officer Carlson physically stopped her from entering the lobby.[163]

The second way the Officers say Danyale committed the crime of disorderly conduct was by creating a hazardous or physically offensive condition by an act that serves no legitimate purpose.[164] This argument is based on the Officers' belief that Danyale would fight with the hotel guest if she were to enter the lobby.[165] But Danyale did not fight with the hotel guest or threaten him at any point prior to her arrest.[166] Her only interaction with him was to tell him he had to leave and to get his things and go.[167]

---

[159] *See supra* n. 71, 73.

[160] Motion at 20.

[161] *See supra* at 10–18.

[162] *See supra* at 13.

[163] *See supra* at 13–14.

[164] Motion at 21; *see* UTAH CODE ANN. § 76-9-102(2)(a).

[165] *See* Motion at 20–21; *supra* at 15.

[166] *See supra* at 12, n. 69.

[167] *Id.*

Finally, the Officers argue that Danyale committed the crime of disorderly conduct because she "recklessly create[ed] a risk of public . . . alarm" by "engag[ing] in . . . violent, tumultuous, or threatening behavior."[168] This argument also fails because Danyale's actions as shown in the Video and alleged in the Complaint were not clearly violent, tumultuous or threatening.[169]

The parties dispute whether the Incident occurred in a public place, but do not cite to any case law to support their respective positions.[170] The Disorderly Conduct statute defines "public place" as:

> (b) . . . a place to which the public or a substantial group of the public has access, including:
> (i) streets or highways; and
> (ii) the common areas of schools, hospitals, apartment houses, office buildings, public buildings, public facilities, transport facilities, and shops.[171]

The question here is whether a hotel lobby around 1:30 in the morning should be considered a public place. The Blackmores' assert that the lobby was locked at 1:30 a.m.[172] The Hurricane Defendants argue that for a place to be public, it does not have to "be open to the public 24 hours a day, seven days a week."[173]

"When interpreting a statute, [courts] look first to its plain language to determine its meaning."[174] "Only when [courts] find that a statute is ambiguous do [they] look to other

---

[168] Motion at 21.

[169] *See supra* at 12–16, n. 69, 91, 96.

[170] Opposition at 10; Reply at 7–8.

[171] UTAH CODE ANN. § 76-9-102(1)(b).

[172] Opposition at 10.

[173] Reply at 8.

[174] *State v. Anderson*, 2007 UT App 304, ¶ 11 (citation omitted).

interpretive tools."[175] There is no need to go beyond the plain language of the Disorderly Conduct statute because the Hotel lobby during the time of the Incident was clearly not "a place to which the public or a substantial group of the public has access."[176] While the lobby is a "common area" of a "public building,"[177] the lobby was locked to the public at the time of the Incident. The Blackmores argue that the Incident occurred around 1:30 a.m. and that just four people (the Officers, Danyale, and the hotel guest) do not constitute a "substantial group of the public."[178] It is unnecessary to address whether the four people involved constitute a "substantial group of the public," because the lobby was not a public place at the time of the Incident. The statute provides no instruction on *when* the public (or a substantial group of the public) must have access to the place, just that they must have access.[179] The public had *no* access to the Hotel at the time of the Incident. The Officers and hotel guest were only able to enter the lobby because the hotel guest broke the front door to gain entry. The Hurricane Defendants' argument that a place doesn't have to be open 24/7 to be considered a public place is not an effective response to the Blackmores' argument: if the public does not have access to a place, it is not a public place, per the statute. "When the words [of a statute] are clear . . . [courts] will interpret them as written . . ."[180]

Even if the Hotel lobby was a public place under the Disorderly Conduct statute, the Hurricane Defendants still have not shown that the facts and circumstances were sufficient to warrant a person of reasonable caution to believe that Danyale was engaged in disorderly

---

[175] *Id.*

[176] UTAH CODE ANN. § 76-9-102(1)(b).

[177] UTAH CODE ANN. § 76-9-102(1)(b)(ii).

[178] Opposition at 10.

[179] UTAH CODE ANN. § 76-9-102(1)(b).

[180] *Anderson*, 2007 UT App at ¶ 11.

conduct. The facts also do not support reasonable suspicion that Danyale was about to commit the crime of disorderly conduct. Danyale's prior compliance with Officer Carlson's order to come to the lobby and then to move into the hallway showed that she was complying and not acting disorderly. Danyale communicated that she had procedures,[181] signaling what could be considered her reason for moving towards the lobby. And the Blackmores allege that she did not express any hostility or intent to harm or confront the hotel guest.[182] Because this allegation is not clearly contradicted by the Video, her allegation is accepted for the purposes of the Motion.

The case law also does not support such facts constituting disorderly conduct. In *Oliver v Nielsen*, the Tenth Circuit affirmed the district court's grant of summary judgment to officers on Oliver's unlawful arrest claim based on qualified immunity.[183] Oliver had engaged in "an intense verbal altercation with a [social worker] . . . in [a] parking lot outside of [a] courthouse in the presence of several people."[184]

In *Layton City v. Tatton*, the defendant was convicted for disorderly conduct in part for yelling at a person in a pizza parlor "in a full-on scream . . . using her best scream voice, top of her lungs."[185]

And in the unpublished opinion *State v. Lambeth*, the defendant had yelled profanities at two police officers at a convenience store "causing visible alarm to other people in the immediate vicinity," and the defendant admitted that his "actions affected not just the officers but also 'the people around.'"[186]

---

[181] *See supra* at 13.

[182] Complaint ¶¶ 51–54 at 9.

[183] *Oliver v. Nielsen*, 806 F. App'x 632 (10th Cir. 2020) (unpublished).

[184] *Id*. at 634.

[185] *Layton City v. Tatton*, 2011 UT App 334, ¶ 15.

[186] *State v. Lambeth*, 2005 UT App 289, ¶ 1 (unpublished).

Danyale did not engage in any such behavior: she did not yell prior to the arrest and the Blackmores allege she was not, and had not, engaged in any verbal altercation with the hotel guest. Danyale began yelling only after Officer Carlson pushed her. If the Officers are arguing that Danyale became disorderly after Officer Carlson pushed her, it is a fair inference that Danyale's behavior was provoked by Officer Carlson's own actions, which escalated the encounter and led to Danyale's responsive behavior. Therefore, based on the Blackmores' allegations and the Video, the Hurricane Defendants fail to establish that the Officers had a reasonable suspicion to detain Danyale for disorderly conduct or probable cause to arrest Danyale for disorderly conduct.

### *Interference with a Peace Officer*

The Officers also argue that they had probable cause to arrest Danyale for the misdemeanor of interference with a peace officer.[187] The Officers argue that Danyale refused to put her arms behind her back when they were arresting her, in part because she verbally protested the arrest, and that she further resisted arrest by "refusing to walk out of the hotel to the squad car but [*sic*] instead dragging her feet."[188]

The Blackmores assert that when Officer Carlson advanced towards her, Danyale was given "scant seconds to comply" and that out of fear from his advance, "she tightened up."[189] The Blackmores also assert that it is difficult to walk when handcuffed.[190]

---

[187] Motion at 22.

[188] Motion at 23.

[189] Opposition at 13. Tightening up or some other form of automatic physical response is not an unusual reaction to being handcuffed. *See Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1310 (10th Cir. 2002) ("Officer King then attempted to handcuff Appellant, whose 'muscles automatically tensed up' at the physical confrontation."); *see also York v. City of Las Cruces*, 523 F.3d 1205, 1209 (10th Cir. 2008) (When Officer Gallegos attempted to arrest plaintiff without explaining he was under arrest, plaintiff "reflexively drew back his arm when Officer Gallegos grabbed him without warning.")

[190] Opposition at 14.

Utah's statute prohibiting interference with a peace officer ("Interference Statute")

provides:

> (1) A person is guilty of a class B misdemeanor if the person knows, or by the exercise of reasonable care should have known, that a peace officer is seeking to effect a lawful arrest or detention of that person or another person and interferes with the arrest or detention by:
>> (b) refusing to perform any act required by lawful order:
>>> (i) necessary to effect the arrest or detention; and
>>> (ii) made by a peace officer involved in the arrest or detention; or
>> (c) refusing to refrain from performing any act that would impede the arrest or detention.[191]

The Interference Statute clearly specifies what is prohibited: the refusal to perform acts

required by a lawful order or the refusal to refrain from performing acts that impeded the arrest

or detention.[192] It does not prohibit verbal protests against a police officer. Utah case law shows

that convictions under the Interference Statute involve physical resistance[193] or both verbal and

physical refusals to obey direct orders.[194]

---

[191] UTAH CODE ANN. § 76-8-305.

[192] UTAH CODE ANN. § 76-8-305.

[193] *State v. Trane*, 2002 UT 97, ¶ 9 (defendant physically resisted an order to submit to a frisk "with some struggle and some thrashing," with the officers and Trane ending with all three of them on the ground "ten to twelve feet from where the struggle commenced"); *see also Salt Lake City v. Smoot*, 921 P.2d 1003, 1005 (Utah Ct. App. 1996) (defendant physically struggled with officers trying to serve warrants and was convicted for interfering with an officer under Salt Lake City ordinance); *State v. Gardiner*, 814 P.2d 568, 575 (Utah 1991) (defendant's conviction for interfering with an officer affirmed on facts where officer informed defendant he was under arrest and defendant responded "that he was not and then proceeded to hit [the officer] again in the face"); *State v. Lucero*, 2012 UT App 202, ¶ 11 (defendant fled on a bicycle and refused to stop, and when defendant fell off the bike and officers approached, defendant "continued to resist the officer's attempts to subdue him and take him into custody" and "actively hit[] the officer who had pursued [the officer]"); *State v. Hamilton*, 2003 UT 22, ¶ 51 (defendant shot an officer who was on duty while trying to avoid arrest); *State v. Griego*, 933 P.2d 1003, 1005 (Utah Ct. App. 1997) (defendant kicked at the officer, was placed under arrest and put in the police car where defendant yelled and kicked inside the car, damaging the vehicle, exited the car, tried to escape, and kicked the officers again when they try to subdue him).

[194] *Am. Fork City v. Robinson*, 2012 UT App 357, ¶ 5 (trial court verdict not clearly erroneous when defendant refused four requests from officers to return to the courthouse); *Am. Fork City v. Pena-Flores*, 2002 UT 131, ¶ 11 (defendant's actions agitated those around him and when he was directly told to "keep quiet and to step back," he "stepped forward again and continued to encourage noncompliance with the police"); *Woods*, 209 F.3d at 1189 (qualified immunity case where probable cause was found for interference violation when defendant refused to present identification, told officer he was leaving in his car, was told by the officer he was not free to leave, and left the parking lot anyway); *Griego*, 933 P.2d at 1006 (officer told defendant to calm down and stop kicking, but defendant did not comply and kicked the officer again).

As shown in the Video and alleged in the Complaint, Danyale did not refuse to perform any act or refuse to refrain from performing any act as ordered by the Officers. While she verbally protested being touched and arrested, the Video does not clearly show physical resistance by Danyale.[195]

Based on the Video and the Blackmores' allegations: (1) the Officers called Danyale to come to the lobby to speak with a guest who had broken the front door; (2) Danyale came to the lobby as requested; (3) Officer Carlson told her to go into the hallway to talk and she complied; (4) no other clear orders were given to Danyale before she began moving to the lobby to initiate procedures to deal with the broken door; (5) Officer Carlson pushed Danyale back into a corner in the small side-hall space; (6) Danyale reacted to Officer Carlson's actions and verbally objected to being touched; (7) the Officers cornered and handcuffed Danyale without any warning or explanation; and (8) she did not physically resist. These allegations do not support either reasonable suspicion or probable cause for a charge of interference with a peace officer.

It is worth noting that the Blackmores allege the Officers had prior knowledge that Danyale was an owner of the Hotel.[196] The Officers' knowledge of the facts at the time of the Incident is relevant to the probable cause inquiry. As an innkeeper[197] under Utah's Innkeeper's Rights Act, passed in its current form over twenty years ago,[198] Danyale had a right to eject the hotel guest under certain circumstances.[199] Danyale asked the Officers to remove the hotel guest

---

[195] *See supra* at 15–16, n. 87, 100.

[196] Complaint ¶¶ 69, 121 at 11, 17. The Officers do not contest this allegation.

[197] The Innkeeper's Right Act defines "innkeeper" as the proprietor or designated employee of a proprietor of a lodging establishment. UTAH CODE ANN. § 29-2-102.

[198] HOTELS—INNKEEPER'S RIGHTS ACT, 1995 Utah Laws Ch. 231 (H.B. 103).

[199] "An innkeeper may eject a person from a lodging establishment for any of the following reasons: . . . visible intoxication of the guest; disorderly conduct of the guest resulting in a public nuisance; or the innkeeper reasonably believes that the person has violated . . . any federal, state, or local law or regulation relating to the lodging establishment . . ." UTAH CODE ANN. § 29-2-103(1)(g)(ii–iv).

twice,[200] but they refused. Instead of assessing whether the situation met the statutory requirements to allow Danyale to lawfully eject the hotel guest, the Officers arrested her when she tried to initiate Hotel procedures to deal with the broken door.

Based on the Blackmores' allegations and the Video, a reasonable officer, with the knowledge that Danyale was an owner of the Hotel, and exercising reasonable caution, would not have interpreted Danyale's behavior as indicative of criminal intent or criminal behavior. The Officers' actions as alleged in the Blackmores' Complaint, and not clearly contradicted by the Video, were not reasonable.

A number of Tenth Circuit cases confirm the finding of a Fourth Amendment constitutional violation by law enforcement officers who lacked probable cause for an arrest. In *Courtney v. Oklahoma ex rel.,* the Tenth Circuit reversed and remanded the district court's grant of qualified immunity for a warrantless arrest because the facts showed the plaintiff had not violated the relevant statutes, so there was no probable cause for the arrest.[201]

In *Fogarty v. Gallegos*, the Tenth Circuit affirmed the district court's denial of qualified immunity, finding no probable cause for the plaintiff's arrest under the New Mexico disorderly conduct statute for his participation in a drum circle during a protest.[202] The New Mexico disorderly conduct statute requires that the conduct be disorderly and that the conduct disturbs the peace.[203] Based on New Mexico case law and the statute as applied to the district court's

---

[200] Carlson Video at 0:08:34–35, DeMille Video at 0:05:47–48 (Danyale says, "I want him out."); Carlson Video at 0:08:47–48 (Danyale says, "Get rid of him.").

[201] *Courtney v. Oklahoma ex rel., Dep't of Pub. Safety*, 722 F.3d 1216, 1225–7 (10th Cir. 2013).

[202] *Fogarty*, 523 F.3d at 1158.

[203] *Id*. at 1156.

summary of the facts, the Tenth Circuit held that the plaintiff was arrested without probable cause.[204]

And in *Morris v. Noe*, the Tenth Circuit agreed with the district court that there was no probable cause for the arrest of the plaintiff's spouse, Morris.[205] The police were called to a domestic disturbance.[206] The plaintiff was with her adult daughter-in-law who had been arguing with a former boyfriend, and Morris arrived shortly after the police.[207] Morris did not approach the former boyfriend, but asked the former boyfriend why he was speaking negatively towards the plaintiff.[208] The police officers grabbed Morris and threw him to the ground without any warning.[209] The officer charged Morris with public intoxication only after Morris's arrest when the officer noticed alcohol on Morris's breath.[210]

In this case, Danyale, like Morris, did not encounter law enforcement based on a call to dispatch complaining about her behavior. Instead, she encountered law enforcement because the hotel guest had left the Hotel in the middle of the night and left his key in his room, and the hotel guest, instead of calling the number displayed in the lobby, called the police for assistance. When the Officers arrived, they called Danyale to come to the lobby. Danyale asked the Officers to remove the hotel guest. When the Officers refused her request, she took action to implement procedures the Hotel had put in place to address the broken door. In response, the Officers arrested her. These allegations in the Complaint (which are not clearly contradicted by the

---

[204] *Id.* at 1158.

[205] *Morris v. Noe*, 672 F.3d 1185, 1193 (10th Cir. 2012).

[206] *Id.* at 1189.

[207] *Id.*

[208] *Id.* at 1190.

[209] *Id.*

[210] *Id.*

Video) demonstrate that "[Danyale's] behavior up to the point of the arrest was not threatening, loud, or disorderly. Nor did [Danyale] fail to comply with any orders. Thus, [the Officers] had no reason to arrest [Danyale] for any offense."[211] Because the Blackmores' allegations and the Video demonstrate that the Officers did not have probable cause to arrest Danyale for either disorderly conduct or interference with a peace officer, the Blackmores have sufficiently alleged violations of Danyale's Fourth Amendment right to be free from an unlawful arrest.

> _Second Step: Danyale's right to be free from an unlawful arrest was clearly established at the time of her arrest._

Once plaintiffs show their constitutional rights have been violated, they must next show that the violation is clearly established, so that a reasonable officer is on notice of the unlawfulness of the officer's actions.[212] "In the context of an unlawful arrest [the] analysis is simple, for '[t]he law was and is unambiguous: a government official must have probable cause to arrest an individual.'"[213] Equally unambiguous are the cases discussed above regarding Utah's disorderly conduct and interference with a peace officer statutes. As discussed above, based on the Blackmores allegations and the Video, the Officers did not have probable cause to arrest Danyale.

Because it is clearly established that a warrantless arrest without probable cause is a violation of the Fourth Amendment, and the Officers allegedly arrested Danyale without probable cause, the Officers are denied qualified immunity on the Blackmores' Unlawful Arrest Claim at this time.

---

[211] _Id._ at 1193.

[212] _See Emmett v. Armstrong,_ 973 F.3d 1127, 1137 (10th Cir. 2020); _see also Tolan v. Cotton,_ 572 U.S. 650, 656 (2014).

[213] _Fogarty,_ 523 F.3d at 1158–59 (citing _Cortez,_ 478 F.3d at 1117 (citing _Tennessee v. Garner,_ 471 U.S. 1, 7, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985))).

**4.  The Blackmores' Excessive Force Claim will be dismissed because the alleged constitutional violation was not clearly established at the time of the Incident.**

*First Step: Whether the Blackmores' have alleged an excessive force claim actionable under the Fourth Amendment cannot be determined at this time.*

When an action involves claims of both unlawful arrest and excessive force, the "two inquiries are separate and independent, though the evidence may overlap."[214] A "plaintiff might succeed in proving the unlawful arrest claim, the excessive force claim, both, or neither."[215] Therefore, finding that the Blackmores have sufficiently alleged an unlawful arrest claim does not affect the analysis of the Blackmores' Excessive Force Claim.

The Blackmores allege that the Officers' use of force on Danyale was "unreasonable and excessive," and "directly and proximately caused her injuries."[216] The force the Blackmores allege was unreasonable includes: (1) "forcing [Danyale] into a corner, provoking a confrontation, grabbing her, pushing her against a wall and wrenching her arms and hands causing her great pain and bruising";[217] (2) aggressively shoving Danyale and intimidating her;[218] and (3) pushing her into the police truck with unnecessary force.[219]

"In order to recover on an excessive force claim, a plaintiff must show: (1) that the officers used greater force than would have been reasonably necessary to effect a lawful seizure; and (2) some actual injury caused by the unreasonable seizure that is not de minimis, be it physical or emotional."[220]

---

[214] *Cortez*, 478 F.3d at 1127.

[215] *Id.*

[216] Complaint ¶ 153 at 23.

[217] *Id.* ¶ 143 at 21.

[218] *Id.* ¶¶ 148–149 at 22.

[219] *Id.* ¶ 73 at 11.

[220] *Maresca v. Bernalillo Cty.*, 804 F.3d 1301, 1315 (10th Cir. 2015) (citation omitted).

"A Fourth Amendment excessive-force claim is governed by a purely objective standard: A police officer violates an arrestee's . . . Fourth Amendment right to be free from excessive force during an arrest if the officer's actions were not 'objectively reasonable' in light of the facts and circumstances confronting [the officer]."[221] While "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it,"[222] "a court must scrutinize whether the totality of the circumstances justified a particular sort of search or seizure."[223]

"To determine the objective reasonableness of the use of force, [courts] must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake."[224] "Factors relevant to this inquiry include: (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight" (the "*Graham* factors").[225] The second factor, whether there is an immediate threat to the safety of the officers or others, is the most important of the three factors.[226]

---

[221] *McCowan v. Morales*, 945 F.3d 1276, 1283 (10th Cir. 2019) (internal quotation marks and citations omitted).

[222] *Cortez*, 478 F.3d at 1125 (citing *Graham,* 490 U.S. at 396).

[223] *Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179, 1188 (10th Cir. 2001) (internal quotation marks and citation omitted).

[224] *McCowan*, 945 F.3d at 1283 (internal quotation marks and citations omitted).

[225] *Est. of Redd by & through Redd v. Love*, 848 F.3d 899, 907 (10th Cir. 2017) (quoting *Graham*, 490 U.S. at 396 (internal quotation marks omitted) (punctuation and numbering added to clarify the three factors).

[226] *Pauly v. White*, 874 F.3d 1197, 1215–16 (10th Cir. 2017) (*vacated and remanded on other grounds* by *White v. Pauly*, 137 S. Ct. 548 (2017).

"The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."[227]

### ***Reasonableness of the Force Used***

The first *Graham* factor considers the severity of the crimes Danyale was allegedly committing. The Hurricane Defendants concede that the severity of the crimes "were not especially severe."[228] When the crime or crimes involved are misdemeanors, the level of force considered reasonable is reduced.[229] The crimes of disorderly conduct and interference with a peace officer are both misdemeanors. This factor weighs in Danyale's favor.

The second and most important *Graham* factor assesses the level of threat Danyale posed to the Officers or the hotel guest. The Blackmores' allege (and the Video does not clearly contradict the allegations) that Danyale did not pose an immediate threat to the safety of the Officers or the hotel guest.[230] The Officers do not dispute that Danyale was not an immediate threat to the Officers or the hotel guest. Rather, the Officers assert that Danyale was trying to get past Officer Carlson to head back into the lobby where the hotel guest was, which would have created an "untenable and unsafe situation."[231] The Officers have not provided a sufficient basis for a belief that there was any action threatened other than expelling the hotel guest. Danyale never threatened the hotel guest.[232] If there was an actual risk of a confrontation, the Officers do not explain why they did not neutralize the allegedly intoxicated hotel guest so Danyale could

---

[227] *Graham*, 490 U.S. at 396–97.

[228] Motion at 26.

[229] *See Casey v. City of Fed. Heights,* 509 F.3d 1278, 1281 (10th Cir. 2007); *see also Fogarty*, 523 F.3d at 1160.

[230] Complaint ¶¶ 50–53 at 9.

[231] Motion at 26.

[232] *See supra* at 12, n. 69.

take care of her reporting duties, purportedly at the lobby desk. There were also two Officers; one could have been watching the hotel guest who had broken the door to make sure he did not break anything else or attack Danyale while she took care of the Hotel's procedures. Instead, Officer DeMille moved to assist Officer Carlson with Danyale's arrest, leaving the intoxicated hotel guest unattended in the lobby.[233]

The Officers' assertion that they were concerned about a possible confrontation between Danyale and the guest has shallow contemporaneous support. Officer Carlson does say, while handcuffing Danyale, that he was concerned she might confront the hotel guest.[234] But when Danyale is in the police truck after her arrest, Officer DeMille gives entirely different reasons for arresting her.[235] Officer DeMille says nothing about feeling threatened, or about concerns for his or Officer Carlson's safety or the safety of the hotel guest. Instead, Officer DeMille says she was arrested because she was acting stupid, childish, and drunk.[236] Such alleged behavior is not a threat to safety. This second factor weighs heavily against the Officers.

The third *Graham* factor considers whether Danyale was resisting arrest or attempting to evade arrest by flight. The Officers argue that Danyale was actively resisting her detention and arrest.[237] The Officers further argue that the amount of force used was the direct result of Danyale's refusal simply to stay in the hallway and by her active resistance.[238] The Officers specifically argue that Danyale resisted arrest because she refused to put her arms behind her back when she was arrested without warning, verbally protested the arrest by asking why she

---

[233] *See supra* at 13, n. 74.

[234] *See supra* at 15, n. 89.

[235] *See supra* at 17.

[236] *Id*.

[237] Motion at 26.

[238] Motion at 26.

was being arrested, and dragged her feet on her way out of the Hotel.[239] The Blackmores argue that Danyale's actions do not constitute resistance.[240] As discussed in the Unlawful Arrest Claim above and as shown in the Video, Danyale did not clearly physically resist the arrest.[241] Because the Blackmores' allegations are not clearly contradicted by the Video, they are accepted for the purposes of this Motion. Ultimately, whether Danyale was resisting arrest requires a factual determination and legal conclusion, which is not an appropriate inquiry in a motion to dismiss. Because the analysis is confined to the Hurricane Defendants' conduct as alleged in the Complaint, and the Video does not clearly contradict the Blackmores' allegations,[242] this preliminary record does not show Danyale resisted arrest. This means the third *Graham* factor also weighs in Danyale's favor.

Based on the allegations in the Complaint (which are not clearly contradicted by the Video), all three *Graham* factors weigh heavily in Danyale's favor.

### **Injury Caused by the Force Used**

For the injury prong of an excessive force claim, Tenth Circuit precedent "requires a showing in a handcuffing case of an actual, non-de minimis physical, emotional, or dignitary injury to succeed on a claim."[243] "This is because [h]andcuffing claims, in essence, concern the manner or course in which a petitioner is handcuffed, and [b]ecause handcuffing itself is not necessarily an excessive use of force in connection with an arrest."[244]

---

[239] *See supra* at 30.

[240] Opposition at 12–15.

[241] *See supra* at 16, 30–32, n. 100.

[242] *Myers v. Brewer*, 773 F. App'x 1032, 1036 (10th Cir. 2019), *cert. denied,* 140 S. Ct. 848 (2020) (unpublished).

[243] *Holmes,* 830 F.3d at 1151–52 (citations omitted).

[244] *Id*. (internal quotation marks and citation omitted).

Danyale's claim is a handcuffing claim. She alleges that, based on the arrest and later events at the jail which did not involve the Officers, she "suffered severe bruising and great physical pain, mental and emotional damage, humiliation . . . and now suffers from PTSD."[245] At this stage, these allegations of Danyale's injuries, including evidence of a diagnosis of PTSD caused by the Officers' actions, are sufficient allegations of a more than de minimis injury,[246] even though the alleged injuries are not specifically allocated to the actions of the Hurricane Defendants or the other defendants.

The *Graham* factors weigh in favor of Danyale, and the Blackmores have alleged a more than de minimis injury, but the inquiry does not end here.

The Officers argue that the force used by the officers did not exceed "what was objectively needed to restrain Danyale."[247] The Blackmores argue that "it was objectively unreasonable for [the Officers] to use any force on Danyale,"[248] but that is not the law. Some level of force is allowed during an arrest,[249] and as explained above, an excessive force claim is analyzed independently of an unlawful arrest claim.[250] A plaintiff who succeeds on an unlawful arrest claim "is entitled to damages for the unlawful arrest, which includes damages resulting from any force *reasonably* employed in effecting the arrest."[251] Finding an unlawful arrest occurred does not result in an automatic finding that any force used during the unlawful arrest

---

[245] Complaint ¶ 220 at 33.

[246] *See Maresca,* 804 F.3d at 1315 n. 7 (The Tenth Circuit said the emotional injuries of the family member plaintiffs, including PTSD, night terrors, and screams and cries of fear during the encounter showed more than *de minimis* injury sufficient to create a triable question for the jury.)

[247] Motion at 26.

[248] Opposition at 18.

[249] *See Cortez*, 478 F.3d at 1125 (citing *Graham,* 490 U.S. at 396).

[250] *See supra* at 36.

[251] *Romero v. Story*, 672 F.3d 880, 890 (10th Cir. 2012) (citation omitted).

was excessive.[252] The level of force used must be analyzed separately to determine whether it was unreasonable.

In this case, the level of force allegedly used against Danyale cannot be determined at this stage. As noted in the Background of this order, it is not clear from the Video what level of force was actually used against Danyale.[253] Determining what level of force was used will require a factual determination and a legal conclusion, which is not an appropriate inquiry for a motion to dismiss.[254]

At this stage, the Blackmores have alleged a violation of Danyale's right to be free from excessive force, which is not clearly contradicted by the Video. However, the next section concludes that the level of force used by the Officers was not clearly established as excessive at the time of the Incident, so the Blackmores' Excessive Force Claim will be dismissed.

### *Second Step: It was not clearly established at the time of the Incident that the Officers' used excessive force when they arrested Danyale.*

The Blackmores must show that the level of force used by the Officers exceeded that permitted by clearly established law at the time of the Incident. The clearly established prong requires identification of precedent where an officer acting under similar circumstances as Officer Carlson or DeMille was held to have violated the Fourth Amendment.[255] "For a violation to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the

---

[252] *See id*.

[253] *See supra* n. 79, 102.

[254] *See supra* text accompanying n. 47.

[255] *White v. Pauly*, 137 S. Ct. 548, 552 (2017).

plaintiff maintains."[256] "The need for specificity is especially important in Fourth Amendment excessive force cases because

> it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts. Use of excessive force is an area of the law in which the result depends very much on the facts of each case, and thus police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue.[257]

"Nonetheless, even in the Fourth Amendment context, there need not be a prior case directly on point, so long as there is existing precedent that places the unconstitutionality of the alleged conduct beyond debate."[258] A body of case law is usually necessary to 'clearly establish' that certain conduct violates a plaintiff's constitutional rights.[259]

The Tenth Circuit has adopted a sliding scale approach to excessive force cases: "The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation."[260]

In *McCowan v. Morales,* an officer handcuffed McCowan behind his back, despite McCowan's request that the officer handcuff him in the front of his body to avoid exacerbating an existing shoulder injury.[261] McCowan remained compliant and the officer put McCowan in back of the patrol car without buckling him in, and then proceeded to drive fast and in a jerky manner, which caused McCowan to slam around the backseat, re-injuring his shoulder.[262] The

---

[256] *Mocek*, 813 F.3d at 922 (internal quotation marks and citations omitted).

[257] *McCowan*, 945 F.3d at 1285 (quoting *City of Escondido, Cal. v. Emmons*, 139 S. Ct. 500, 503 (2019)).

[258] *Id.* at 1285 (quoting *Wesby*, 138 S. Ct. at 590 (internal quotation marks omitted)).

[259] *See Wesby*, 138 S. Ct. at 590.

[260] *Becker v. Bateman*, 709 F.3d 1019, 1023 (10th Cir. 2013) (quoting *Morris v. Noe*, 672 F.3d 1185, 1196 (10th Cir. 2012)).

[261] *McCowan*, 945 F.3d at 1280.

[262] *Id.*

Tenth Circuit affirmed the district court's denial of qualified immunity for the officer, holding that prior case law, specifically *McCoy v. Meyers,*[263] *Weigel v. Broad,*[264] *Casey v. City of Federal Heights,*[265] and *Dixon v. Richer*[266] had clearly established that "gratuitous application of force to . . . a fully subdued, compliant, and non-threatening misdemeanant arrestee, violate[s] the Fourth Amendment."[267]

In *McCoy*, an officer pulled McCoy to the ground and put him in a carotid restraint while other officers hit him in the head, shoulders, back, and arms.[268] After becoming unconscious, the officers handcuffed McCoy and zip-tied his feet together.[269] Another officer then slapped McCoy to revive him, and when he regained consciousness, he was struck again by other officers more than 10 times and began yelling for help.[270] An officer again put him in a carotid restraint, rendering him unconscious a second time.[271] McCoy experienced severe long-term pain in his back and neck from the incident.[272]

In *Weigel,* an officer tackled Weigel and wrestled him to the ground.[273] Once on the ground, Weigel continued to struggle, even after being handcuffed, so officers lay across Weigel's legs and applied pressure to his upper body, keeping Weigel in a facedown position.[274]

---

[263] *McCoy v. Meyers*, 887 F.3d 1034 (10th Cir. 2018).

[264] *Weigel v. Broad*, 544 F.3d 1143 (10th Cir. 2008).

[265] *Casey*, 509 F.3d 1278.

[266] *Dixon v. Richer*, 922 F.2d 1456 (10th Cir. 1991).

[267] *McCowan*, 945 F.3d at 1289.

[268] *McCoy*, 887 F.3d at 1040.

[269] *Id*. at 1041.

[270] *Id*. at 1040–42.

[271] *Id*. at 1042.

[272] *Id*. at 1043.

[273] *Weigel*, 544 F.3d at 1148.

[274] *Id*. at 1149.

Weigel went into cardiac arrest and died from asphyxiation caused by the pressure on his upper body.

In *Casey,* Casey had unsuccessfully challenged a traffic ticket in court, and he took his file out to his truck (against the wishes of the court clerk, and possibly a misdemeanor) to grab money to pay for an appeal.[275] An officer accosted him about the file and put him in an arm-lock, and then tried to tackle him.[276] Another officer tased him, and then more officers brought him to the ground, handcuffed him, and repeatedly banged his face into the concrete, and tased him again.[277]

And finally, in *Dixon,* an officer pulled a gun on Dixon, other officers began to pat him down, and one officer kicked Dixon, and as he fell, another officer hit him in the stomach with a metal flashlight.[278] Once on the ground, officers got on top of Dixon and began to beat and choke him.[279] When Dixon's spouse saw him being beaten, she screamed at them to stop hurting him, and one officer pushed her to the ground, stepped on her leg and twisted her arm and hand behind her back, and when she resisted, another officer helped handcuff her.[280]

The "gratuitous application of force"[281] used in the cases discussed in *McCowan* is not present here. The Officers assert, and there are no allegations to the contrary, that no weapons

---

[275] *Casey,* 509 F.3d at 1279–80.

[276] *Id*. at 1280.

[277] *Id*.

[278] *Dixon*, 922 F.2d at 1458.

[279] *Id*.

[280] *Id*.

[281] *McCowan*, 945 F.3d at 1289.

were used, no punches were thrown, no one was tackled, and no special restraints were used besides ordinary handcuffs.[282]

The Blackmores cite to just one case, *Fogarty v. Gallegos*,[283] "for the proposition that application of the *Graham* factors show that Defendants' use of force was both unnecessary and excessive."[284]

In *Fogarty,* Fogarty participated in an anti-war protest by joining a drum circle in front of a bookstore.[285] While Fogarty was drumming, police made announcements for protestors to disperse, but Fogarty couldn't understand the "garbled and unintelligible" warnings, and the police never told the drummers to stop playing.[286] The police deployed tear gas, and Fogarty moved onto the steps of the bookstore to avoid the gas. At some point, Fogarty was shot with a projectile by an officer.[287] Officers were told to remove the drums, and four or five officers approached Fogarty on the steps. They picked him up and began leading him down the steps. Fogarty had difficulty walking because the drum was attached to his belt. As the officers took him closer to the tear gas, Fogarty suffered an "acute broncospasm" because of his asthma and could not walk further. The officers then forced him to the ground, pulled his arms back and forced the palm of his hand toward his forearm in a "hyperflexion position," handcuffed him, ripped the drum off his belt, and dragged him down the street. Fogarty had an asthma attack and was taken into custody in a police van and then transported by ambulance to a hospital. Fogarty

---

[282] Motion at 26.

[283] 523 F.3d 1147 (10th Cir. 2008).

[284] Opposition at 19.

[285] *Fogarty*, 523 F.3d at 1150–51.

[286] *Fogarty*, 523 F.3d at 1151.

[287] *Id*. at 1152.

was not charged with any crime and no report was filed. Fogarty suffered a torn tendon in his wrist and was treated at the hospital for asthma.

The Tenth Circuit determined that the level of force used on Fogarty was excessive.[288] The crime at issue was disorderly conduct, a petty misdemeanor.[289] Fogarty posed no threat to the officers or others. And Fogarty neither actively resisted arrest nor attempted to evade arrest by flight. The Tenth Circuit also determined that it was clearly established that the use of a pain-inflicting compliance technique (the projectile and tear gas) constitutes excessive force, and that "the use of force adequate to tear a tendon is unreasonable against a fully restrained arrestee."[290]

The force and injuries that occurred in *Fogarty* and in the cases discussed in *McCowan* are not present in this case. The Blackmores have cited no cases that clearly establish that pushing a person against a wall, roughly handcuffing that person, intimidating and provoking that person is excessive force in violation of that person's constitutional right. The Tenth Circuit has held that "a small amount of force, like grabbing [a person] and placing [that person] in [a] patrol car, is permissible in effecting an arrest under the Fourth Amendment."[291] Because it was not clearly established at the time of the Incident that pushing a person against a wall, handcuffing that person, and taking them to a police vehicle constitutes excessive force in violation of the Fourth Amendment, the Officers are entitled to qualified immunity for the Blackmores' Excessive Force Claim.

---

[288] *Id.* at 1161.

[289] *Id.* at 1160.

[290] *Id.* at 1161–62.

[291] *Cortez*, 478 F.3d at 1128.

5. **The Hurricane Defendants' arguments against the Failure to Train Claim and Abuse of Process Claim fail because the Blackmores have sufficiently pleaded a constitutional violation by the Hurricane Defendants.**

The Hurricane Defendants' only argument against the Blackmores' Failure to Train Claim is their assertion that "a municipality may not be held liable where there was no underlying constitutional violation by any of its officers."[292] Because the Blackmores' Complaint sufficiently alleges facts demonstrating a constitutional violation by the Officers, the Hurricane Defendants' argument fails.[293]

Similarly, the Hurricane Defendants argue that the Blackmores' Abuse of Process Claim fails because no constitutional violations related to her arrest occurred.[294] Because the Blackmores' Complaint sufficiently alleges facts demonstrating a constitutional violation by the Officers,[295] the Hurricane Defendants' argument fails again. Both the Failure to Train Claim and Abuse of Process Claim against the Hurricane Defendants will not be dismissed.

6. **Dismissal of the Blackmores' State Law Claims would be premature.**

Utah law requires a plaintiff seeking damages for a Utah constitutional violation to "clear two hurdles."[296] "First, the plaintiff must prove that the constitutional provision violated is self-executing."[297] "Next, a plaintiff must establish the following three elements: (1) the plaintiff suffered a flagrant violation of his or her constitutional rights; (2) existing remedies do not

---

[292] Motion at 27, quoting *Graves v. Thomas*, 450 F.3d 1215, 1218 (10th Cir. 2006) (quoting *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986)).

[293] *See supra* at 23–35.

[294] Motion at 27.

[295] *See supra* at 23–35.

[296] *Jensen ex rel. Jensen v. Cunningham*, 2011 UT 17, ¶ 58.

[297] *Id.* (internal quotation marks and citation omitted).

redress his or her injuries; and (3) equitable relief, such as an injunction, was and is wholly inadequate to protect the plaintiff's rights or redress his or her injuries."[298]

The Hurricane Defendants concede that the Blackmores' State Law Claims under Sections 7 and 9 of Article 1 of the Utah Constitution are "self-executing and therefore beyond the reach of the [Governmental Immunity Act of Utah]."[299] But the Hurricane Defendants argue that money damages are not appropriate for any violations of the Blackmores' State civil rights because: (1) "Danyale did not suffer a flagrant violation of her constitutional rights;" and (2) "there are existing remedies under § 1983 that redress her alleged injuries."[300] The Hurricane Defendants do not address the inadequacy of equitable relief.

Relying on their prior arguments that the Blackmores fail to show any violation of Danyale's federal constitutional rights, the Hurricane Defendants argue there can also be no violation of Danyale's state constitutional rights because "Danyale's state constitutional rights . . . essentially mirror her federal constitutional rights."[301]

However, the Utah Supreme Court has stated that "the legal standards for state and federal constitutional violations are different."[302] The Hurricane Defendants' argument relies on an incorrect statement of law and an incorrect conclusion that the Blackmores failed to allege underlying federal constitutional violations. It necessarily fails.

---

[298] *Id.*

[299] Motion at 28.

[300] Motion at 29.

[301] Motion at 30.

[302] *Cunningham*, 2011 UT 17, ¶ 39.

The Hurricane Defendants also argue that because the Blackmores' State Law Claims are the same as the federal law claims (which is incorrect), the remedies for their federal law claims will redress any injuries, and so their State Law Claims cannot stand.[303]

The Blackmores argue that state constitutional claims are stronger and broader than federal constitutional claims, and so such claims should be considered separately.[304] The Blackmores also argue that dismissing their State Law Claims at this stage in the proceedings would be premature.[305]

The Blackmores cite to *Finlinson v. Millard County*, a case involving § 1983 claims and state constitutional claims against police officers and medical personnel.[306] In *Finlinson*, the district court determined that courts in the District of Utah generally allow § 1983 claims and state constitutional claims to proceed at the motion to dismiss stage. Dismissal is "premature . . . because a court at the motion to dismiss stage has limited information about any overlap between a plaintiff's state and federal claims."[307]

The Hurricane Defendants argue that the pattern found in *Finlinson* applies only where there is "limited information" about the claims. They further argue that this case is more similar to *Coronado v. Olsen,*[308] a District of Utah case which relied on video evidence at the motion to dismiss stage to dismiss the plaintiffs' state constitutional claims for failure to establish that existing remedies would not provide redress for the plaintiff's injuries.[309] The Hurricane

---

[303] Motion at 31.

[304] Opposition at 23–24.

[305] Opposition at 26.

[306] *Finlinson v. Millard Cty.*, 455 F. Supp. 3d 1232 (D. Utah 2020).

[307] *Id*. at 1244 (citations omitted).

[308] *Coronado v. Olsen*, No. 2:18-CV-83, 2019 WL 652350 (D. Utah Feb. 15, 2019).

[309] Reply at 11–12.

Defendants also note that Judge Waddoups issued both the *Coronado* opinion and *McCubbin v. Weber County*,[310] another case involving the qualified immunity defense.[311] Judge Waddoups dismissed the plaintiff's state law claims in *Coronado* but declined to do so in *McCubbin*. The Hurricane Defendants argue that this was because *Coronado* had video evidence and *McCubbin* did not.[312] Likening this case to *Coronado*, the Hurricane Defendants argue that the Blackmores' state law claims must be dismissed.[313] They are incorrect.

In *Coronado,* the plaintiff's state law claim was an excessive force claim based on Section 14 of Article I of the Utah Constitution.[314] The district court determined that the plaintiff's state law claim "mirrors his federal claim for excessive force" under § 1983, and so he could not "establish that existing remedies do not provide redress for his injuries."[315]

*McCubbin* involved complex allegations regarding a gang injunction that allegedly violated the plaintiffs' federal and state due process rights and First Amendment rights.[316] The district court concluded that at the motion to dismiss stage, it could not determine with certainty whether damages from the plaintiffs' § 1983 claims would fully redress their injuries or if damages for the state constitutional claims would be necessary as well.[317]

The Blackmores have alleged state constitutional claims for violation of due process and unnecessary rigor.[318] Neither of these claims mirror the Blackmores' federal claims. The Utah

---

[310] *McCubbin v. Weber Cty.*, No. 1:15-CV-132, 2017 WL 3394593 (D. Utah Aug. 7, 2017).

[311] Response at 2.

[312] Response at 3.

[313] *Id*.

[314] *Coronado*, 2019 WL 652350 at *7.

[315] *Id*.

[316] *McCubbin*, 2017 WL 3394593, at *4–5.

[317] *Id*. at *23.

[318] Complaint ¶¶ 207–208, 210 at 31–32.

Supreme Court has explained that state due process claims differ from federal due process claims,[319] and that the unnecessary rigor claim "has no federal counterpart."[320]

The Hurricane Defendants further argue that "[a]t least one other opinion from this District has ruled that state constitutional law claims may be dismissed on the face of the complaint in light of the remedies available under § 1983" and cite to *Hoggan v. Wasatch Cty.*[321] However, in *Hoggan*, the plaintiff pleaded in her complaint that her state constitutional rights "match and exceed the protections provided by the federal Constitution," and the plaintiff failed to "even attempt to explain, why or how § 1983 fails to fully redress her injuries."[322] Unlike the plaintiff in *Hoggan,* the Blackmores have asserted that federal and state constitutional claims "must be addressed differently,"[323] not conceding their State Law Claims "match" their federal claims. The Blackmores also argue that the existing remedies under federal and state claims are different and that dismissing the State Law Claims on this Motion would be premature.[324] The district court in *Hoggan* also relied on two district court decisions[325] that dismissed state constitutional law claims at the summary judgment stage, not at the motion to dismiss stage. The

---

[319] *See Cunningham,* 2011 UT 17, ¶ 46 ("While some of the language of our state and federal constitutions is substantially the same, similarity of language does not indicate that this court moves in 'lockstep' with the United States Supreme Court's [constitutional] analysis or foreclose our ability to decide in the future that our state constitutional provisions afford more rights than the federal Constitution."). *See also supra* n.113, addressing the Blackmores' alleged Fourteenth Amendment excessive force claim against the Officers.

[320] *Dexter v. Bosko,* 2008 UT 29, ¶ 7.

[321] *Hoggan v. Wasatch Cty.,* No. 2:10CV01204-DS, 2011 WL 3240510 (D. Utah July 28, 2011).

[322] *Id.* at *2.

[323] Opposition at 23.

[324] Opposition at 24–25.

[325] *Hoggan,* 2011 WL 3240510, at *2 (citing to *Nielson v. City of South Salt Lake,* No. 2:06–CV–335–CW, 2009 WL 3562081 at *9 (D. Utah Oct. 22, 2009) (motion for summary judgment granted to defendant, dismissing state constitutional law claims "because § 1983 provides an adequate remedy at law"); *Id.* (citing to *Cavanaugh v. Woods Cross City,* No. 1:08–CV–32–TC–BCW, 2009 WL 4981591 at *6 (D. Utah Dec. 14, 2009), *aff'd,* 625 F.3d 661 (10th Cir.2010) (motion for summary judgment granted to defendant, dismissing state constitutional law claims "because their injuries can be fully redressed through their 42 U.S.C. § 1983 claim").

*Hoggan* case is therefore distinguishable from this case and does not support dismissal of the State Law Claims.

The court's analysis in *Finlinson* is supported by the case law and applies in this case.[326] At this early stage in the proceedings prior to discovery, there is "limited information" about the Blackmores' claims. The Videos are not the only evidence relevant to the Blackmores' claims. The Blackmores' Complaint refers to Officer Carlson's Probable Cause Statement and Prisoner Questionnaire,[327] which have not been provided for review. The Blackmores also allege abuse of process by the Hurricane Defendants based in part on alleged animus by Hurricane City officials against the Blackmores for filing a separate lawsuit against Hurricane City just two weeks prior to the events of January 6, 2020.[328] The Blackmores further allege post-Incident ongoing harassment by the Hurricane City Police Department.[329] There is clearly additional evidence that will provide insight into whether there is overlap of the Blackmores' federal and state constitutional claims.

At this stage, the Hurricane Defendants' request for dismissal of the Blackmores' State Law Claims is denied.

---

[326] *Ostler v. Harris*, No. 2:18-CV-00254, 2019 WL 2409633, at *4 (D. Utah June 7, 2019) ("Because the case is only at the motion-to-dismiss stage, paring the Utah constitutional claims at this stage would be premature"); *McCubbin*, 2017 WL 3394593, at *23 ("At this stage . . . the court cannot say with certainty that damages for claims will fully redress the Plaintiffs' injuries and that damages under the state constitution would be inappropriate."); *Am. W. Bank Members v. Utah*, No. 2:16-CV-326-CW-EJF, 2018 WL 734401, at *16 (D. Utah Feb. 6, 2018) ("At this stage of the proceedings, where the court takes all well-pleaded allegations to be true and makes all reasonable inferences in AWBM's favor, sufficient allegations exist to conclude that existing remedies and equitable relief were inadequate to redress AWBM's injuries" and "[f]urther factual development will greatly assist the court in resolving the state constitutional claims while avoiding premature dismissal."); *but cf. Coronado*, 2019 WL 652350 at *7 ("Because Mr. Coronado's state law claim for excessive force under . . . the Utah Constitution mirrors his federal claim for excessive force . . . and he claims the same damages for the state causes of action as he does for his § 1983 claim[,] he cannot establish that existing remedies do not provide redress for his injuries . . . [and so] Mr. Coronado's state-law claim for excessive force must be dismissed.")

[327] Complaint ¶¶ 196, 199 at 30.

[328] *Id*. ¶ 217 at 33.

[329] *Id*. ¶¶ 109–10 at 15–16.

# ORDER

IT IS HEREBY ORDERED that Defendants Jared Carlson, Eric DeMille, and Hurricane City's Rule 12(b)(6) Motion to Dismiss[330] is GRANTED in part and DENIED in part.

The Motion is DENIED as to the First, Fourth, Fifth, and Sixth Causes of Action:

The Blackmores' Unlawful Arrest Claim in their First Cause of Action survives the Hurricane Defendants' Motion because the Blackmores have sufficiently alleged a constitutional violation of Danyale's clearly established right to be free from unlawful arrests.

Because the Unlawful Arrest Claim survives, so do the Failure to Train (Fourth Cause of Action) and Abuse of Process (Fifth Cause of Action) Claims, because the Hurricane Defendants argument that there were no constitutional violations fails.

The Hurricane Defendants' arguments against the Blackmores' State Law Claims (Sixth Cause of Action) also fail at this stage of the proceedings, but those arguments may be raised again after discovery.

The Motion is GRANTED as to the Second Cause of Action:

The Blackmores' Excessive Force Claim under the Fourth Amendment (Second Cause of Action)[331] is dismissed with prejudice because the Officers are entitled to qualified immunity on that claim.

Signed December 1, 2021.

BY THE COURT

David Nuffer
United States District Judge

---

[330] Docket no. 19, filed May 27, 2021.

[331] *But see supra* n. 113 regarding any remaining Fourteenth Amendment claim.