BLACKMORE

vs

CARLSON


KENNON TUBBS, M.D.

February 25, 2025





250 E 200 S. Suite 350
Salt Lake City, Utah 84111
www.DepoMaxMerit.com

Toll Free 800-337-6629
Phone 801-328-1188
Fax 801-328-1189

1

UNITED STATES DISTRICT COURT

DISTRICT OF UTAH

--oo0oo--

VINCENT BLACKMORE and          )
DANYALE BLACKMORE,             )
                               )Deposition of:
          Plaintiffs,          )KENNON TUBBS, M.D.
                               )
vs.                            )
                               )Case No.
JARED CARLSON and ERIC         )4:21-CV-00026-DN-PK
DEMILLE, Hurricane City        )
Police Officers; DEPUTY        )Judge David Nuffer
RAMIREZ and DOE DEPUTIES       )
1-4, Washington County         )Magistrate Judge
Sheriff's Deputies;            )Paul Kohler
WASHINGTON COUNTY, by and      )
through its Sheriff's          )
Office; and HURRICANE CITY,    )
by and through its Police      )    **COPY**
Department,                    )
                               )
          Defendants.          )
                               )
                               )

February 25, 2025
10:40 a.m.

LOCATION:
SYKES McALLISTER LAW OFFICES
311 South State Street, Suite 240
Salt Lake City, UT 84111-5222


*  *  *


REPORTER:
Karen Christensen, RPR, RMR, RDR,
Nevada CSR #1015



**2**

```
 1           A P P E A R A N C E S
 2  FOR THE PLAINTIFFS:      Robert B. Sykes, Esq.
                            SYKES McALLISTER LAW OFFICES
 3                          311 South State Street, Suite 240
                            Salt Lake City, UT 84111-5222
 4                          (801) 533-0222
                            Bob@sykesinjury.com
 5
    FOR THE DEFENDANTS:      Frank D. Mylar, Esq.
 6                          MYLAR LAW, P.C.
                            2494 Bengal Boulevard
 7                          Salt Lake City, UT 84121
                            (801) 858-0700
 8                          Office@mylarlaw.com
 9  ALSO PRESENT:           Eric Jergensen
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**3**

```
 1              I N D E X
 2  EXAMINATION                             PAGE
 3  BY MR. SYKES                              4
    BY MR. MYLAR                             97
 4  BY MR. SYKES (Further Examination)      104
 5
 6
 7
 8
                 E X H I B I T S
 9
    NUMBER          DESCRIPTION             PAGE
10
    Exhibit 50   Expert Report                5
11
    Exhibit 51   Curriculum Vitae             5
12
    Exhibit 52   Defendants' Expert Witness   5
13              Disclosure
14  Exhibit 53   Posttraumatic Stress Disorder 20
                Diagnostic Criteria
15
    Exhibit 54   Excerpt from Emily Blackmore's 25
16              deposition
17  Exhibit 55   Excerpt from La-Norma        44
                Ramirez's deposition
18
    Exhibit 56   List of depositions and court  92
19              appearances
20
21
22
23
24
25
```

**4**

```
 1  February 25, 2025              10:25 a.m.
 2            P R O C E E D I N G S
 3         KENNON TUBBS, M.D.,
 4  called as a witness by and on behalf of the
 5  plaintiffs, having been first duly sworn, was
 6  examined and testified as follows:
 7              EXAMINATION
 8  BY MR. SYKES:
 9      Q.  Well, welcome back.  It's good to see
10  you again.  It's been a while.  A year and a half, I
11  think.
12      A.  What?
13      Q.  A year and a half, the Paugh case.
14         Okay.  Why don't you state your full
15  name and professional address for the record,
16  please.
17      A.  Kennon Christopher Tubbs.  Do you want
18  me to spell it?
19      Q.  Yeah, you better, because --
20      A.  K-E-N-N-O-N; Christopher,
21  C-H-R-I-S-T-O-P-H-E-R; Tubbs, T-U-B-B-S.  Address is
22  134- -- I'm sorry -- 13584 South Carolina Hill
23  Court, Draper, Utah 84020.
24      Q.  I was out there two weeks ago for a
25  wedding reception.  I haven't been there for a long
```

**5**

```
 1  time.  Boy, that place has developed out there on
 2  that East Bench.
 3      MR. SYKES:  All right.  Let's see here.
 4  Do we know what the next numbered exhibit is?
 5      MR. JERGENSEN:  50, 5-0.
 6      MR. SYKES:  50.  Why don't you mark
 7  that?
 8         (Deposition Exhibit 50 was
 9          marked for identification.)
10      MR. SYKES:  And did he have the other
11  the vitae?
12      MR. JERGENSEN:  Yeah.
13         (Deposition Exhibit 51 was
14          marked for identification.)
15      Q.  (BY MR. SYKES)  Okay.  Doctor, we
16  received a notice --
17      MR. SYKES:  Do you have that notice?
18  This is going to be 52.
19         (Deposition Exhibit 52 was
20          marked for identification.)
21      Q.  (BY MR. SYKES)  There was a deadline to
22  give notice of witnesses.  Mr. Mylar gave you --
23  look at 52 for a minute.
24         He said, "Dr. Tubbs' expertise will be
25  in critiquing" -- this is page 2 -- "the testimony
```

6

1  of the Plaintiffs' experts and the Plaintiff as it
2  relates to PTSD and all treatment of the Plaintiff
3  as it relates in any way to her booking on
4  January 6, 2020."
5      Is that an accurate statement of what
6  you're retained to do?
7      A.  Yes.
8      Q.  Okay.  So you're critiquing only the
9  plaintiffs' experts?
10      You're not opining on what actually
11  happened, whether there was a strip search or not,
12  right?
13      A.  Well, in my report, I think I actually
14  indicated that that's a question of fact.
15      Q.  It is?
16      A.  There's factual information on both
17  sides, and I indicate in my report that I thought
18  that that was something the jury needed to decide.
19  There was evidence for and against --
20      Q.  Okay.
21      A.  -- whether a strip search actually
22  happened.
23      I can opine on what I believe the
24  results would be if the person was not
25  strip-searched or if they were strip searched.  You

7

1  know, that's kind of a fork in the road.  But I
2  don't know whether that actually happened.
3      Q.  Okay.  So you're not going to be
4  offering any opinions on whether or not Danyale was
5  actually strip searched on the morning of
6  January 6th, 2020?
7      A.  Again, I'm not going to be offering an
8  opinion as to whether that happened or did not
9  happen.
10      I would be offering an opinion -- if the
11  jury believes it did happen, then this would be my
12  opinion.  And if the jury believes it didn't happen,
13  this would be my opinion.
14      Q.  Okay.  And what's your --
15      A.  But I do have opinions -- if that event
16  actually happened?
17      Q.  Yeah.
18      A.  Then it could have -- you know, the
19  outcome could have been different than if the event
20  didn't happen.
21      Q.  I'm not sure I understand that.  Why
22  don't you explain that to me?
23      A.  Well, if you're hit by a car -- if two
24  cars collided, there would be damage to the cars.
25  If the cars never hit each other, there wouldn't be

8

1  any damage to the cars.
2      Q.  Right.
3      A.  If she was strip searched, there could
4  have been damages for that.
5      Q.  What would be the damages for that, do
6  you think?
7      A.  Well, emotional trauma.
8      Q.  Okay.
9      A.  There would be emotional trauma -- or
10  could be emotional trauma if a female was forced to
11  undress or disrobe in front of five males -- four
12  males.
13      Q.  Three, probably.  Three or four, but
14  who's counting.
15      A.  There could be emotional trauma
16  associated with that.  If that never happened --
17  there would be no emotional trauma if that never
18  happened.
19      Q.  From that.  Okay.
20      So if, in fact, Danyale was strip
21  searched in front of three men on January 6th, 2020,
22  at approximately 2:15 or 2:10 a.m., okay, you're
23  telling me as a physician -- family practice, right?
24      A.  Correct.
25      Q.  Yeah.  And correctional medicine, right?

9

1      A.  Correct.
2      Q.  You're telling me that as a physician
3  specializing in those areas, a woman could actually
4  be psychologically damaged by that?
5      A.  I'm not using the word "damaged."
6      Q.  Injured?
7      A.  I'm not using the word "injured."
8      Q.  What word are you using?
9      A.  Emotional trauma.
10      Q.  Okay.  She could have emotional trauma
11  from that?
12      A.  It's possible.
13      Q.  And isn't it possible also -- I mean,
14  you understand Danyale's background, don't you?
15      A.  As far as it's been explained to me.  I
16  don't know her entire background.
17      Q.  Well, did you read her deposition?
18      A.  Yes.
19      Q.  And a very expert, competent, humble
20  lawyer took that deposition, named Frank Mylar.
21      Are you aware of that?
22      A.  I am aware of that.
23      Q.  And he asked her about her background,
24  right?
25      A.  Yes.

10

1    Q.  You understand that she's a fairly
2  wealthy woman.
3        I mean, they own -- they built hundreds
4  of homes down in the Hurricane area, right?
5    A.  Define "wealthy."
6    Q.  Well, have a lot of money.
7    A.  Define "a lot."
8    Q.  Well, millions of dollars.
9    A.  Okay.
10   Q.  Would that be wealthy or not?
11   A.  In -- in my opinion or your opinion?
12   Q.  In your opinion.
13   A.  If you are worth more than $10 million,
14  you're a very wealthy person.
15   Q.  Do you understand that they own the
16  hotel down there, a 40-, 45-bed hotel called My
17  Place Hotel?
18   A.  Okay.
19   Q.  Were you aware of that?
20   A.  I was not aware they owned the hotel.
21   Q.  Yeah, they own it.
22   A.  Okay.
23   Q.  And it was her hotel the night
24  this -- or the morning this thing happened.
25       Are you aware of that now?

11

1    A.  I'm aware -- now that -- I am aware that
2  she owned it.  I did not know she owned the hotel.
3  I thought she managed it.
4    Q.  She and her husband own it.
5    A.  Correct.
6    Q.  It was fairly new.  And she gets a call
7  from Jared Carlson, a Hurricane City Police officer,
8  to come down because some guest has been locked out.
9       Are you aware of that?
10   A.  I'm aware of that.
11   Q.  Are you aware that she has no -- she had
12  no criminal record?  Are you aware of that?
13   A.  I'm not aware of any criminal record
14  that she had.
15   Q.  Okay.
16   A.  But I was not aware she had no criminal
17  record.
18   Q.  I'll stipulate to you that she had no
19  criminal record, zero.
20   A.  Okay.
21   Q.  Okay.  So she's -- I don't know.  How
22  old was she?  About 45, 50, around there.  I
23  consider that young nowadays, as I'm getting older,
24  but a fairly middle-aged woman with no criminal
25  record.  Okay?

12

1        Do you accept those as a true statement?
2    A.  Sure.  Yes.
3    Q.  All right.  And that night she says for
4  the crime of disorderly conduct in her own locked
5  hotel lobby, allegedly, okay, and for allegedly
6  resisting arrest as they shoved her -- you saw the
7  video, right?
8    A.  I did review the video.
9    Q.  They shoved her against the wall, and
10  she's resisting arrest.  Now, I'm not asking you to
11  comment on whether she was or wasn't, but that's the
12  charge, right?
13   A.  Correct.
14   Q.  And as a correctional doctor, you
15  certainly know those are fairly mild charges, right?
16   A.  Yes, they are.
17   Q.  Yeah.  She had no weapon.
18       Are you aware of that?
19   A.  I'm not aware that she had a weapon.
20   Q.  Yeah.  Well, you're aware that she had
21  no weapon, aren't you?
22   A.  Again, I did not see or hear or have
23  reviewed any evidence of a weapon.
24   Q.  Yeah.  You saw the video, and she had no
25  weapon, right?

13

1    A.  Yes.
2    Q.  Okay.  She comes down in her sweats --
3    A.  Yes.
4    Q.  -- essentially?  And she has a cell
5  phone in her hand, right?
6    A.  Yes.
7    Q.  Are you aware that Officer Jared Carlson
8  in his testimony said, "That's a weapon," a cell
9  phone?
10       Were you aware that's a weapon?
11   A.  A pencil can be a weapon in prison.
12   Q.  Okay.
13   A.  I mean, I've seen people stabbed with,
14  you know, all kinds of things that I wouldn't
15  consider a weapon, but they can be used as a weapon.
16   Q.  All right.
17   A.  And I'm sure in the right hands -- a
18  cell phone could cause some significant trauma to
19  people in the right hands.
20   Q.  All right.  So she gets taken to jail.
21  And I'm not -- you won't be asked at trial, I'm
22  sure.  Frank may try to slip it in somehow, but he
23  won't get away with it.  But I'm not going to be
24  asking you, you know, whether or not the arrest was
25  justified or not.

14

1        That's not really your bailiwick, is it?
2    A.  I will not be making an opinion on
3  whether the arrest was justified.
4    Q.  All right.  Okay.  So she's taken to
5  jail, never having been to jail.  Okay?  And she
6  said she's taken in, and she's strip searched.
7  Okay?
8        Now, if that happened to a woman with no
9  prior criminal history, never been to a jail before,
10  you know, is that more likely or less likely to
11  cause emotional trauma?
12       MR. MYLAR:  Objection.  That calls for
13  speculation and misstates facts, and...
14       THE WITNESS:  More or less trauma than
15  what?  What are you comparing this to?
16    Q.  (BY MR. SYKES)  Is it more likely or
17  less likely to cause emotional trauma if a person
18  who's never been to jail gets strip searched in
19  front of three men?
20    A.  So it's certainly not likely to cause
21  less trauma than just staying at home and not ever
22  having interaction whatsoever.  So, yes, it would be
23  a memorable event for a patient.
24    Q.  Well, wouldn't you agree that -- I mean,
25  you know, your specialty on your vitae, Exhibit 51,

15

1  is correctional medicine, you know.  I mean, you've
2  talked about that.  You've written about it.
3        You're the doctor for, I don't know, 15
4  jails around the state and Wyoming, right?
5    A.  11.  Well, in Wyoming -- sorry.  In
6  Wyoming, four jails; and in Utah, seven jails.
7    Q.  Four and seven is 11, right?
8    A.  Correct.
9    Q.  All right.  I've got to use my fingers
10  to count up that high.
11       All right.  So 11 jails, plus Utah State
12  Prison?
13    A.  I worked at the Utah State Prison for
14  15 years.  I no longer work at the Utah State
15  Prison.
16    Q.  So the only correction medicine -- or
17  medical assignments you have now are the 11 jails?
18    A.  That's correct.
19    Q.  All right.  But you worked there for
20  15 years, right?
21    A.  At the Utah State Prison.
22    Q.  Yeah.
23    A.  And then I stopped.  And for the last
24  ten years, I've been doing jails.
25    Q.  So the kind of people that come in and

16

1  out of jail, they're -- many of them are used to
2  being in jail.  They've been -- it's not their first
3  rodeo, right?
4        They've been to jail before, many of
5  them?
6    A.  Is that a question?
7    Q.  Yeah, it's a question.
8    A.  Recidivism is a huge problem in Utah.
9  The majority of patients have been incarcerated
10  previously.
11    Q.  So you would agree that from what you
12  know, what you've read, Danyale Blackmore was not a
13  recidivist?
14       She had never been to jail before?
15    A.  I don't know that as a fact, but if
16  you're telling me this is her first time in jail, I
17  believe that.
18    Q.  You can ask Frank later.
19    A.  Okay.
20    Q.  He'll tell you.  He never lies.  Okay.
21  So --
22    A.  I have no reason to discredit you on
23  that.
24    Q.  All right.  And you admit that a person
25  like Danyale who's never been to jail before,

17

1  doesn't know what to expect, going in and being
2  strip searched could cause significant emotional
3  trauma, correct?
4        MR. MYLAR:  Objection.  Calls for
5  speculation.
6        But go ahead.
7        THE WITNESS:  Well, I wouldn't agree
8  with the word "significant."  People -- everyone
9  experiences a different amount of emotional memories
10  when they are faced with that kind of situation.
11       And, you know, I've dealt with over
12  10,000 people who have been booked into jail over
13  25 years of correctional medicine, and they all have
14  different views as to how emotionally traumatic that
15  was.
16    Q.  (BY MR. SYKES)  Okay.  Could that cause
17  significant emotional trauma to a woman like
18  Danyale?
19    A.  It's possible.
20    Q.  It's possible.  Okay.
21       If it happened, do you think the trauma
22  she had is a result from that strip search?
23       MR. MYLAR:  Objection.  Calls for
24  speculation.
25       THE WITNESS:  You need to talk about the

18

1  word "trauma."  Are you talking about emotional
2  memories?  Because being booked into jail is an
3  emotional event, an emotional memory for every
4  patient who's booked into jail.
5          Almost every person that I've talked to
6  that's been booked into jail, which is all my
7  patients, they all remember their booking process.
8  It's, you know, written into their memory for a long
9  period of time.
10      **Q.  (BY MR. SYKES)  Yeah.**
11      A.  And if you're forced to be naked, that's
12  probably going to be even more memorable than if you
13  weren't forced to be naked.
14      **Q.  Assume, hypothetically, that Danyale**
15  **was, your term, "forced to be naked" -- I use the**
16  **term "strip searched."**
17          **Let's say she was stripped searched.**
18  **All of her clothes were removed, packed into a bag.**
19  **Her bra, her panties, everything were removed.**
20  **Okay?  And that's never happened to her before,**
21  **hypothetically.**
22          **Could that cause emotional trauma to**
23  **Danyale?**
24      MR. MYLAR:  Objection.  Misstates facts.
25  Incomplete hypothetical.  And calls for speculation.

19

1      **Q.  (BY MR. SYKES)  Ignore that, and answer**
2  **the question.**
3      A.  So again, there's no evidence
4  that -- I'm not opining on whether or not that
5  happened.
6      **Q.  I said, hypothetically it happened.**
7      A.  I'm simply saying that some women get
8  naked for fun.  Other women would never take their
9  clothes off in front of some people.  So I don't
10  know the type of trauma it would cause Danyale
11  specifically.  I've never met her.
12      **Q.  I didn't ask for that.  I said, could it**
13  **hypothetically cause --**
14          MR. MYLAR:  Objection.  Calls --
15      **Q.  (BY MR. SYKES)  -- significant trauma?**
16          MR. MYLAR:  Objection.  Calls for
17  speculation.  And incomplete hypothetical.  And
18  misstates facts.
19          THE WITNESS:  There are women who would
20  experience emotional trauma from that event.
21      **Q.  (BY MR. SYKES)  Okay.  Could it cause**
22  **posttraumatic stress disorder?**
23      A.  No.
24      **Q.  Why not?**
25      A.  Because posttraumatic stress disorder

20

1  has specific diagnostic criteria, and a strip search
2  is not -- does not meet that criteria.
3      **Q.  Which criteria doesn't it meet?**
4      A.  Well, it's not a lethal event.  It's not
5  a deadly event.
6      **Q.  Does it have to be lethal or deadly?**
7      A.  It doesn't have to be, but that's part
8  of the criteria.
9          MR. SYKES:  Let me have the -- we
10  printed this yesterday from DSM-5.  We've got it
11  here if you want to look at it.
12          What are we on?  54, or what is it.
13          (Deposition Exhibit 53 was
14          marked for identification.)
15      **Q.  (BY MR. SYKES)  Okay.  Which of the --**
16  **let's say the strip search occurred, and you say**
17  **that it wouldn't cause posttraumatic stress**
18  **disorder.  You said it doesn't meet the criteria.**
19          **Which of these doesn't it meet?**
20      A.  So in order to be diagnosed with
21  posttraumatic stress disorder, you have to meet
22  Criteria A.
23      **Q.  "Exposure," right?**
24      A.  "Exposure" --
25      **Q.  Yeah.**

21

1      A.  -- "to actual or threatened death,
2  serious injury, or sexual violence."
3      **Q.  What about sexual violence?**
4          **I mean, stripping someone naked in front**
5  **of men, you don't consider that sexual violence?**
6      A.  No.
7      **Q.  Okay.**
8      A.  Rape is sexual violence.  Sexual assault
9  is sexual violence.  If a strip search was sexual
10  violence, then those three individuals would be on
11  trial right now for committing the crime.
12      **Q.  Yeah.  That's not a bad idea.  I wonder**
13  **if anybody suggested that.**
14      A.  I'm suggesting it.
15      **Q.  Yeah.  Well, why don't you give the**
16  **sheriff a call, and tell him to prosecute them?**
17      A.  I just said that my testimony was that I
18  don't believe that's a crime.
19      **Q.  B, "intrusion symptoms."  Did you read**
20  **her deposition where it said it intrudes on her**
21  **thoughts, she remembers it?**
22      A.  In order to be diagnosed with
23  posttraumatic stress disorder, you have to meet
24  Criteria A.
25      **Q.  Yeah.**

22

1     A.  Regardless of B, C and D, it is required
2  to meet Criteria A to have the diagnosis.  So
3  without Criteria A, the rest of the symptoms are
4  what we consider PTSD-like symptoms.
5     **Q.  Okay.**
6     A.  But not PTSD itself.
7     **Q.  So you're saying if she doesn't meet**
8  **Criteria A, "Exposure," the exposure criteria --**
9     A.  If there was no event that meets the
10  criteria, she cannot be diagnosed with PTSD.
11    **Q.  Some people call that the exposure**
12  **criteria, right?**
13    A.  I consider it Criteria A.
14    **Q.  Criteria A.  All right.  Criteria A.**
15       **And if she didn't meet that, she can't**
16  **have, in your opinion, PTSD?  But it could be**
17  **PTSD-like, right?**
18    A.  No.  You can have PTSD-like symptoms.
19    **Q.  Yeah.**
20    A.  So the symptoms of B, C and D.  But
21  you're not diagnosed with PTSD if you don't have
22  exposure.
23    **Q.  If she has PTSD-like symptoms -- your**
24  **terminology, okay -- could those symptoms be serious**
25  **and lasting?**

23

1     A.  Well, there's many mental disorders that
2  have PTSD-like symptoms.
3     **Q.  Yeah.**
4     A.  Depression, anxiety, bipolar disease,
5  mania.  Many of the PTSD symptoms are also related
6  to other mental health diseases.  Substance abuse.
7  So you could simply say that...
8     **Q.  Do you need to take that?**
9     A.  Sorry.
10    **Q.  It's okay.  All right.  We can take a**
11  **break any time you want.**
12    A.  It goes through my hearing aid.  Sorry.
13    **Q.  No.**
14    A.  So you could say that they have
15  depression-like symptoms or anxiety-like symptoms
16  or, you know, schizophrenic-like symptoms.  That's
17  just a catchall phrase to say these symptoms they're
18  experiencing can be related to these other mental
19  disorders, such as anxiety, depression and mania.
20       Her symptoms that she reported are like
21  the symptoms that you would experience in PTSD, but
22  she doesn't have PTSD because she never had the
23  criteria to be diagnosed with that.
24    **Q.  So she has symptoms like PTSD?**
25    A.  And like depression and like anxiety.

24

1     **Q.  Yeah.  But she doesn't have PTSD?**
2     A.  That's correct.
3     **Q.  Okay.  So it wouldn't -- I got the**
4  **impression it wouldn't surprise you if she was, in**
5  **fact, strip searched -- a housewife, a businesswoman**
6  **with no prior jail experience, it wouldn't surprise**
7  **you if that caused PTSD-like symptoms, then?**
8     MR. MYLAR:  Objection.  Calls for
9  speculation.  Lack of foundation.  And incomplete
10  hypothetical.
11    THE WITNESS:  It wouldn't surprise me
12  that that was a memorable event for her.
13    **Q.  (BY MR. SYKES)  It wouldn'0t surprise**
14  **you that it would cause PTSD-like symptoms, right?**
15    A.  It wouldn't surprise me that it would
16  cause emotional distress and...
17    **Q.  Anxiety?**
18    A.  -- anxiety, depression and worry, lack
19  of sleep.
20    **Q.  God bless America in these latter days.**
21  **How about that.**
22    MR. SYKES:  All right.  Let me have
23  Emily's deposition.
24    MR. MYLAR:  Whose deposition?
25    MR. SYKES:  Emily Blackmore.  You know,

25

1  I've got this as 50, but it's not 50.
2     MR. JERGENSEN:  Of course.  That's just
3  because we did that as 54.
4     MR. SYKES:  What is this?  54?
5     MR. JERGENSEN:  54.
6     (Deposition Exhibit 54 was
7       marked for identification.)
8     MR. SYKES:  This is the daughter of --
9     MR. JERGENSEN:  There's a marked up copy
10  you had.  Dr. Tubbs has your marked up copy.  Can we
11  swap?
12    MR. SYKES:  Can we swap that, and let me
13  have that one back?  This is 54.  Use this one.
14    (Deposition Exhibit 54 was
15       marked for identification.)
16    **Q.  (BY MR. SYKES)  I'll represent to you**
17  **that Emily Blackmore, I think, was 15 or 16 when**
18  **this happened.  She got a call from her dad at the**
19  **hotel, said her mother had been arrested and to go**
20  **get some bail money.**
21       **They had a safe -- $10,000 or so in the**
22  **safe, and they went and -- so Emily went down and**
23  **woke up her brother and her brother's boyfriend**
24  **[sic], and they got the money, and the brother and**
25  **the -- and the girlfriend went down to the jail.  So**

26

1  anyway, that's the background.
2      And then this is page 12 of her
3  deposition, and then line 5, on page 12.  "And the
4  other -- actually, Maddie said that and, actually,
5  McKenna and Tristan said that your mom didn't say
6  anything about being searched at the jail at all
7  until at least a week or two after the incident.
8  Was that your recollection?"
9      Answer, "Not for me.  She told me the
10  morning after" -- meaning -- I think that means the
11  same morning -- "after she had been arrested.  I
12  went to go check on her and she was laying down and
13  I asked if she was all right and she" said -- "and
14  she completely was crying, she was upset and was
15  telling me about how awful it was to be strip
16  searched and how embarrassing it was for her to be
17  strip searched."
18      Question, "So she used the word" strip
19  search then -- or "stripped searched then?"
20      Answer, "Yes."
21      Question, "Because, you know, your
22  siblings said that she didn't even use the word
23  strip searched until a couple weeks later."  And
24  this is Frank's question.
25      Answer, "She said directly to me that

27

1  she had been stripped down."
2      Question, "To what?"
3      Answer, "Nude, stripped nude."
4      Okay.  That's a teenager talking to her
5  mom the morning of the event.
6      Now, does that give you any important
7  information about how it might have affected her?
8      MR. MYLAR:  Objection.  Again, calls for
9  speculation.  Lack of foundation.
10      Q.  (BY MR. SYKES)  Go ahead and answer.
11      A.  I wouldn't consider this any important
12  information.  What information would you expect me
13  to gain from this?  Because this is just the story
14  of a mother telling a daughter that she was
15  strip-searched in the jail.
16      Q.  Yeah.  Line 13.  "She completely was
17  crying, she was upset and was telling me about how
18  awful it was to be strip-searched and how
19  embarrassing it was for her to be strip-searched."
20      Does that give you any important
21  information as to how this affected Danyale?
22      A.  Well, when I viewed the video of her
23  arrest, she was also completely crying and was very
24  upset and appearing to think it was awful to be put
25  in the police car, so...  And...

28

1      Q.  She's not talking about the arrest;
2  she's talking about being strip-searched, right?
3      A.  I understand what she's talking about,
4  but --
5      Q.  She used the word "strip-searched."
6      A.  So it's my opinion that Danyale is a
7  very emotional person, and she was intoxicated that
8  evening --
9      Q.  How do you know that?
10      A.  -- contributing to her emotion.
11      Q.  How do you know she was intoxicated?
12      A.  It's in the record.
13      Q.  It's not in the record.  Where is it in
14  the record?
15      MR. MYLAR:  Objection.  Argumentative.
16      Q.  (BY MR. SYKES)  Go ahead.
17      A.  I reviewed records that the nurse
18  thought that she was intoxicated and put her in
19  detox -- or placed her in detox.
20      The officers, when they arrested her,
21  smelled alcohol on her breath, and they indicated
22  that she'd been drinking.  And she had stated that
23  she was drinking that evening.
24      Q.  Well, does --
25      A.  In her deposition, she stated that she

29

1  had some wine.
2      Q.  Does a person's drinking mean they're
3  intoxicated?
4      A.  Yes.  That's what makes you intoxicated;
5  you drink.
6      Q.  Well, but does everybody who drinks --
7  are they all intoxicated?
8      A.  Yes.  When you drink alcohol, you become
9  intoxicated.  That's what happens.
10      Q.  Every time?
11      A.  Well, the more you drink, the more
12  alcoholic you are, the more alcohol it takes to
13  become intoxicated.
14      You know, severe alcoholics can drink a
15  lot of alcohol, but they're still becoming
16  intoxicated.  The definition of intoxicated means
17  you have alcohol in your system.
18      Q.  Let's continue with this deposition on
19  page 13.
20      Question:  "Did she ever say all her
21  clothes were put in a locker?"
22      Answer:  "No, she just said that she had
23  been stripped down nude."
24      And that kind of completes the -- so
25  that's what happened to her, according to what her

30

1 daughter remembers her being told the morning of the
2 event. Now, let's talk about alcohol again.
3         MR. SYKES: Let me have those.
4         THE WITNESS: Was there a question that
5 you were asking me there or just telling me --
6         MR. SYKES: Well, I just wanted to
7 finish so you understood.
8         THE WITNESS: Oh, okay. Okay.
9         MR. SYKES: Now, this is Exhibit 5.
10 Now, it's already been admitted into the record, so
11 I don't know if we need to mark this again, but --
12 do we need to mark it again?
13         MR. MYLAR: You don't need to mark it
14 again.
15         MR. SYKES: Should we mark it again or
16 not?
17         MR. MYLAR: Nope. It's right here.
18     Q. (BY MR. SYKES) Let me show you Exhibit
19 5.
20         MR. MYLAR: It bogs down the record.
21         MR. SYKES: Thanks for the help there,
22 Frank.
23         MR. MYLAR: Yep.
24     Q. (BY MR. SYKES) You got it right there.
25 This is the report filed by Officer Jared Carlson,

31

1 otherwise known as world traveler Jared Carlson,
2 went to Palau shortly after this happened.
3         And anyway, have you read this report?
4     A. I have.
5     Q. Yeah. Do you see anywhere in there
6 where he said that she was intoxicated?
7     A. On page 2.
8     Q. Okay.
9     A. The third line down it states, "I
10 observed the very strong odor of alcoholic beverage
11 coming from Danyale's breath when she yelled."
12     Q. Okay.
13     A. "She also admitted to consuming an
14 alcoholic beverage after work."
15     Q. Does that say she was intoxicated?
16     A. In my professional opinion. Danyale
17 admitted to consuming alcohol, and the officers
18 smelled alcohol on her breath.
19         And the inference as a physician is when
20 someone tells you that they've been drinking and you
21 smell alcohol on their breath, that they do
22 indeed -- they are intoxicated.
23     Q. Okay.
24     A. They have alcohol in their system.
25     Q. You know, don't you think -- an

32

1 officer working probably six or seven years as an
2 officer, don't you think that if he thought she was
3 intoxicated, he'd say it?
4         MR. MYLAR: Objection. Calls for
5 speculation.
6     Q. (BY MR. SYKES) Isn't that normally what
7 they do, is they say the person was intoxicated?
8         MR. MYLAR: It calls for speculation,
9 and lack of foundation, and calls for a mental
10 impression.
11         THE WITNESS: I don't write probable
12 cause statements, so I don't know what the proper
13 thing to chart in this particular incidence would
14 be.
15         But he did chart that she was drinking
16 alcohol -- or that she smelled of alcohol, and she
17 admitted that she was drinking alcohol.
18     Q. (BY MR. SYKES) Okay. Let's look at
19 Exhibit 6.
20         MR. SYKES: Do you want another copy, or
21 are you okay?
22         MR. MYLAR: No. I'm good.
23     Q. (BY MR. SYKES) This is the "PRISONER
24 QUESTIONNAIRE." Question 7, "Are you aware of any
25 excessive" -- "excessive," the word on the

33

1 form -- "or harmful consumption" --
2     A. Yes, that's the word on the form.
3     Q. -- "of alcohol or drugs?" He checked
4 "No."
5         Don't you think that if he was -- if he
6 was aware that she was intoxicated, he would have
7 put "yes" on that?
8         MR. MYLAR: Objection. Calls for
9 speculation. Incomplete hypothetical. And calls
10 for mental impression. And lack of foundation.
11     Q. (BY MR. SYKES) Go ahead and answer the
12 question.
13     A. No. I believe that this question is
14 intended -- it's a prisoner questionnaire for
15 booking someone into jail, and the intent is that if
16 someone has -- is significantly under the influence
17 or alcohol of drugs that's excessive and could be
18 harmful to their health, that they need to notify
19 medical professionals, and possibly take them to the
20 hospital. So it does not appear that Danyale was
21 under the -- under the --
22     Q. Influence?
23     A. -- influence of excessive or harmful,
24 meaning that she was going to die of that. Because
25 I saw the booking video -- or the arrest video, and

34

1  she was able to walk, and she was able to talk,
2  so...
3      **Q.  Her speech wasn't mixed up or muddled,**
4  **was it?**
5      A.  Well, she was certainly aggravated and
6  angry and had pressured speech, and --
7      **Q.  You know, if you want --**
8      MR. MYLAR:  Can you let him finish,
9  please?
10     **Q.  (BY MR. SYKES)  Okay.  Go ahead.**
11     A.  Well, so her -- she was acting
12  erratically, and her speech was inconsistent with
13  normal speaking or normal talk, which is part of the
14  arrest.
15         But when we talk about excessive or
16  harmful consumption of alcohol or drugs, we're
17  talking about someone who is falling down when
18  they're walking, someone who can't stand up, someone
19  who on a roadside alcohol test would fail that
20  miserably by -- couldn't even walk a straight line.
21         That's someone who should be RTF.  And I
22  do not think that Danyale was excessively or
23  harmfully intoxicated that evening, but she was
24  intoxicated.
25     **Q.  Well, they didn't give her a BAC, blood**

35

1  **alcohol test, did they?**
2      A.  I did not review any record that
3  indicated that.
4      **Q.  So it's your opinion, by watching the**
5  **arrest video, that she was intoxicated.**
6  **Is that what you're telling me?**
7      A.  It's my opinion that she had alcohol on
8  her breath and admitted to drinking and, therefore,
9  she was intoxicated.
10     **Q.  What that sounds like, though -- and**
11  **maybe -- I'm just a simple country lawyer, not very**
12  **smart, just kind of muddling my way through life,**
13  **being with people like Frank Mylar all the time.**
14     A.  Barely making it.
15     **Q.  Yeah, barely making it.  But I can read.**
16  **Thank goodness I can read, you know, being a simple**
17  **country lawyer that I am.**
18         **What it sounds like you're saying is**
19  **that if someone smells alcohol -- if an officer**
20  **smells alcohol on somebody, that they're**
21  **intoxicated, is what it sounds like you're saying.**
22     A.  No, that's not what I'm saying.
23     **Q.  Okay.**
24     A.  I'm saying --
25     **Q.  Clarify for a simple country lawyer,**

36

1  **would you?**
2      A.  I'm saying that when an officer smells
3  alcohol on someone's breath and that person admits
4  to drinking that evening, then it's likely that
5  they're intoxicated.  If an officer just smells
6  alcohol, it could be a beer that's spilled on the
7  floor over in the corner.
8         But when the person says, "Oh, I drank
9  that beer, and then spilled some over in the
10  corner," yeah, I would think it's a fair assumption
11  that she's actually intoxicated.
12     **Q.  Well, a lot of people that go into jail**
13  **are intoxicated, right?  That's common?**
14     A.  Yes.  We book a lot of intoxicated
15  individuals into jail.
16     **Q.  Let's take a look at the intake -- let's**
17  **look at Exhibit 2, filled out by Lori Jardine, a**
18  **nurse at the jail, page 1, third box down.  It says,**
19  **"Alcohol."**
20         **Do you see that, on the right?**
21     A.  Are you speaking of the --
22     **Q.  Right here.**
23     A.  -- the fifth box down?
24     **Q.  One, two, three.**
25     A.  Yes.

37

1      **Q.  The big one there.**
2      A.  The one that's checked --
3      **Q.  It says, "Alcohol."**
4      A.  Yes.
5      **Q.  And it's checked, but it says, "patient**
6  **denies daily drinking."**
7         **Do you see that?**
8      A.  I see that.
9      **Q.  Now, there are no notes in there**
10  **indicating she was drunk, are there, that she was**
11  **intoxicated?**
12         **I didn't see one.  Did you see anything**
13  **in there about intoxication?**
14     A.  The question is, "Have you used drugs or
15  alcohol in the past 7 days."  And she indicated,
16  "Yes, alcohol."
17     **Q.  Yeah.**
18     A.  And then the nurse is trained -- all of
19  our nurses are trained -- when a person indicates
20  that they are -- that they use alcohol, they're
21  trained to find out what their drinking history is,
22  for fear of withdrawal seizures and delirium tremens
23  from them being an alcoholic.
24         So you get a history of, "Do you drink
25  every single day," because that is a person who is

38

1  going to go into withdrawals in jail.
2      Q.  This is a three-page form.  Is there
3  anywhere on here where the nurse says she observed
4  Danyale being intoxicated?
5      A.  It says that she's using alcohol.
6      Q.  But you're not saying that everybody
7  using alcohol is intoxicated, though?  You're not
8  saying that?
9      A.  I am saying that.  I'm saying when you
10  drink alcohol, you become intoxicated.  I have said
11  that --
12      Q.  Every time?
13      A.  -- multiple times.
14      Q.  Every time?
15      A.  When you drink alcohol, that is what
16  causes you to become intoxicated.  You can become
17  intoxicated by other substances, but alcohol
18  specifically causes intoxication.
19      Q.  But you don't have any knowledge about
20  Danyale that night, about how much she drank, do
21  you?
22      A.  In her deposition, I believe -- I don't
23  remember exactly, but I believe she said she was
24  drinking wine.
25      Q.  Yeah.  You don't know how much or that

39

1  she was over the legal limit, which was .08 at the
2  time?
3      A.  So I don't know how much or what her
4  blood alcohol content was, but I do believe she was
5  intoxicated.
6      Q.  And there's nothing on here that says
7  she was intoxicated, is there?
8      A.  So the word "intoxicated" does not
9  appear on this form anywhere, but because the word
10  "alcohol" appears in this form, alcohol means
11  intoxicated.  Just like if they checked heroin, it
12  wouldn't say high.
13          You could say -- if they've checked
14  positive for heroin, you would say to me, "Does it
15  say anywhere on this form that says the patient was
16  high?" And I would say, "No.  But she checked
17  heroin."
18      Q.  Okay.  I think I understand your
19  position.  All right.  Let's go to a few other
20  questions here.
21          How often do you diagnose PTSD?
22      A.  At least -- in prison and correctional
23  medicine, I deal with a patient population that lead
24  extremely rough lives.
25      Q.  No kidding.

40

1      A.  These patients experience gang violence.
2  They experience rape.  They experience drug lives
3  and horrific things that the rest of us don't even
4  know exist.  And those patients frequently have PTSD
5  from gunshots from drug deals gone bad, from -- they
6  live in a world of incest and rape and sexual
7  violence.
8      Q.  That wasn't my question.  How often do
9  you diagnosis PTSD?
10      A.  I'm guessing that 20 percent of patients
11  have some form of PTSD in prison.
12      Q.  Do you diagnose them with that?
13      A.  Yes.
14      Q.  So 20 percent of the time of
15  your regular --
16      A.  Not all 20 percent of them, but, yeah, I
17  see at least -- PTSD at least two times a week in
18  patients.  Horrific stories.
19      Q.  Okay.  Let's take a look at --
20          MR. SYKES:  Let's see.  Is this 50, or
21  what is this?
22          MR. JERGENSEN:  It's 50.
23      Q.  (BY MR. SYKES)  Your report.  Is it
24  Exhibit 50?
25      A.  It's right here.  Yes, it's 50.

41

1      Q.  This is identical to the one we
2  received, except I've added numbers -- paragraph
3  numbers on the left.  Okay.  So we can get there
4  quickly.  Okay.  I'm going to ask you about -- going
5  to page 2, paragraph 3, right at the top there.
6          Now, you say here that you "specifically
7  reviewed these records in order to determine, within
8  a reasonable degree of medical certainty, if the
9  arrest and booking procedures were appropriate and
10  consistent with the standard of care with respect to
11  Danyale Blackmore while detained in the Washington
12  County Jail."
13          Now, you said earlier you're not trying
14  to give us an opinion about whether or not she was
15  strip searched, right?  You're aware of that?
16      A.  Correct.  I indicate in my report that I
17  don't know whether that was a yes or a no, whether
18  she was strip searched.
19      Q.  Okay.  And you say that the arrest and
20  booking procedures were consistent and appropriate.
21  But you're aware -- as a corrections physician,
22  you're aware, I assume, that you can't strip-search
23  everybody.
24          Are you aware of that?
25      A.  Not every person booked into jail is

42

1  strip-searched.
2      Q.  Right.  But you're aware that it would
3  be improper and illegal to strip-search everybody,
4  right?
5      A.  I don't know the legality of strip
6  searching, whether it would be illegal, but I would
7  certainly think it would be improper to strip search
8  everyone.
9      Q.  The courts have held that if you're
10  arrested for a minor violation and you're going to
11  get bail and be bailed out, you cannot be
12  strip-searched.
13      Are you aware of that?
14      A.  That is not a -- strip-searching a
15  person of who you just hypothetically told me would
16  not be strip-searched.  That person would not be
17  strip-searched.
18      Q.  It would be inappropriate to
19  strip-search someone for a disorderly conduct
20  violation, right?
21      MR. MYLAR:  I'm just going to object
22  that these are, like, the fourth legal questions in
23  a row.
24      Q.  (BY MR. SYKES)  Go ahead and answer.
25      A.  Again, I'm not a lawyer, and I don't

43

1  know what the legality of the strip search is.  I
2  just know what happens in the jails that I provide
3  care at, and those patients are not strip searched,
4  to the best of my knowledge.
5      Q.  And so when you say that -- I'm sorry.
6  Were you --
7      A.  I was just going to say I'm not here to
8  offer a legal opinion about that.
9      Q.  And in that paragraph 3, line 5, you say
10  that they "provided objectively reasonable care in
11  regards to arresting, booking, and releasing
12  Blackmore."
13      That's what you say there?
14      A.  That's correct.
15      Q.  And by that, you don't mean that -- you
16  don't mean, one way or the other, that she was
17  strip-searched or not strip-searched, do you?
18      A.  No.
19      Q.  Okay.
20      A.  I don't know whether she was
21  strip-searched or not.
22      MR. SYKES:  Do we have the
23  deposition -- I had a folder with Ramirez.  Is that
24  it?
25      MR. JERGENSEN:  It's right there.

44

1      (A discussion was held off the record.)
2      Q.  (BY MR. SYKES)  Okay.  Let me ask you if
3  you read the deposition of the defendant, La-Norma
4  Ramirez?
5      MR. MYLAR:  Do you have a copy of that?
6      MR. JERGENSEN:  I can make copies.
7      THE WITNESS:  I read the Declaration of
8  La-Norma Ramirez.
9      MR. SYKES:  Okay.  Let's take a short
10  break.  I've got them copied.  Let me just stop
11  recording.
12      (A recess was taken.)
13      Q.  (BY MR. SYKES)  I was going to show
14  you --
15      MR. SYKES:  What's the number of this
16  exhibit?
17      REPORTER:  55.
18      (Deposition Exhibit 55 was
19      marked for identification.)
20      Q.  (BY MR. SYKES)  This is La-Norma
21  Ramirez.  I wondered if -- you know, since you were
22  commenting here about procedures of booking, if
23  you'd go to page 67 and 68.
24      Are you aware that at the jail, the
25  people I deposed claimed that there's only two

45

1  searches, a rubdown search and a visual body cavity
2  search?
3      Are you aware of that?
4      MR. MYLAR:  Objection.  Misstates --
5      MR. SYKES:  Absolutely not.
6      MR. MYLAR:  -- misstates completely.
7  What do you mean, two searches?  What they do on
8  every inmate?
9      Q.  (BY MR. SYKES)  Let me go to
10  page -- well, page 67 here.  I asked her -- let's
11  see.  Line 10.  I'm saying that she was
12  strip-searched.  "Did you strip off her clothes?
13  Okay.  Forget the visual body for a minute."  You
14  asked -- "We asked you if you had her take off her
15  pants, shirt," et cetera.
16      And line 18.  And then I say, in line
17  16, "But you don't actually remember the event, so
18  how can you say 'no' if you don't know?"
19      Her answer was -- line 18 -- "Because it
20  would have been logged."
21      Okay.  19, "It was logged.  Were you
22  aware of that?  Were you aware that all that stuff
23  was logged in?"
24      21, "In the visual body cavity search?"
25      22, "No.  All these things in admission

46

1  here were actually logged in.  Do you know that?"
2      Answer, "No visual body cavity search
3  was done because there's no log of that."
4      Do you recall reading that?
5      A.  Again, I did not read this deposition.
6  I read La-Norma Ramirez's Declaration, but I did not
7  read this deposition.
8      Q.  Yeah.  The Declaration's sanitized.
9  This is the real thing.
10     MR. MYLAR:  Objection.
11     Q.  (BY MR. SYKES)  Look at page 68, line 1.
12  "How about a strip search?  Was there a strip search
13  done?"
14     Answer, "There was no strip search."
15     Question, "How do you know, if you don't
16  remember?"
17     MR. MYLAR:  Objection.  Asked and
18  answered.  Actually, you read this.  This is the
19  second --
20     Q.  (BY MR. SYKES)  And then 5, "Washington
21  County does not use the language of strip search.
22  It uses visual body cavity search."
23     Were you aware of that?
24     A.  Yes, I was aware of that.
25     Q.  Yeah.  So they don't use "strip search"?

47

1      A.  They use the term "visual body cavity
2  search."
3      Q.  Well, visual body cavity search is what
4  they use, right?
5      A.  Correct.
6      Q.  All right.  Let's go on to your report.
7  Page 2 you have an overview.
8      Do you see that?
9      A.  Yes.
10     Q.  Do you see in line 5 where it says --
11  I'm sorry -- paragraph 5, line 5, "she was met by
12  Carlson and was aggressive toward the officers and
13  Brangham."
14     Do you see that?
15     A.  Yes.
16     Q.  Okay.  Do you know --
17     MR. SYKES:  Let me have the --
18     Q.  (BY MR. SYKES)  This is the Court's
19  opinion, document 159, filed June 7th, 2024.  Okay?
20  I'm going to read to you from page 30.
21     "A reasonable jury could make factual
22  findings that Blackmore did not have a weapon; did
23  not shout, threaten, assault, or act tumultuously;
24  and did not appear to be out of control or on the
25  verge of physical confrontation of anyone."

48

1      That's the Judge's --
2      MR. MYLAR:  Objection.
3      Q.  (BY MR. SYKES)  -- assessment.
4      MR. MYLAR:  I'm going to object.  That's
5  giving deference to the pleading standard.  That
6  isn't the Judge's opinion.
7      Q.  (BY MR. SYKES)  Were you aware that the
8  Judge had written that?
9      MR. MYLAR:  Again, I'm going to object.
10  It's a legal context that is not making any findings
11  of fact.
12     Q.  (BY MR. SYKES)  Are you aware the Judge
13  had written that?
14     A.  I'm aware now that the Judge had written
15  that.
16     Q.  Okay.  "A reasonable jury could likewise
17  find there were no circumstances that raised safety
18  concerns at the time Carlson asked Blackmore to move
19  down that hall that would have transformed that
20  request into an order."
21     Are you aware of that?
22     MR. MYLAR:  Same objections.  This is an
23  inappropriate legal standard.
24     MR. SYKES:  Okay.
25     MR. MYLAR:  Motion to dismiss.

49

1      Q.  (BY MR. SYKES)  Are you an expert on
2  Spillman forms?
3      A.  I have used a Spillman.  I've looked at
4  their forms.  But I do not write them or edit them
5  in any way.
6      Q.  Do we have those?
7      A.  When you say, "Are you an expert on
8  Spillman forms," I know how to use them, and I know
9  what they're for.  But I didn't make them.
10     Q.  Let's take a look at them.
11     (Phone rings.)
12     MR. SYKES:  I put that on silent.  Sorry
13  about that.
14     Q.  (BY MR. SYKES)  This is Exhibit 16.
15  Now, I don't know if this is a Spillman form or just
16  one that they -- that they developed on their own.
17  The other two are Spillmans.  This says, "Prebooking
18  Take."
19     Do you see that, line 2?
20     A.  Yes.
21     Q.  Is Danyale Blackmore's name in there?
22     A.  Yes.
23     Q.  Has the date and time?
24     A.  Yes.
25     Q.  January 6th, 2020, 02:09 p.m.?

50

1    A.  Yes.
2    Q.  And then it says here a list of items.
3        Do you see that?
4    A.  Yes.
5    Q.  Okay.  And at the bottom down there, the
6  bottom left, about 2 inches up, all the items listed
7  on this form were taken during the booking --
8  prebooking process on the date and time recorded on
9  this form; no other items were taken.
10        Now, do you think that means that these
11  things were taken or not taken?
12        MR. MYLAR: Objection. Lack of
13  foundation. It's also beyond the scope of his
14  report to be able to opine as to what the jail meant
15  by this form.
16    Q.  (BY MR. SYKES) Go ahead and answer.
17        MR. MYLAR: And it calls for
18  speculation.
19    Q.  (BY MR. SYKES) Go ahead and answer.
20    A.  Can you repeat the question?
21    Q.  Yeah.  Very simple.  Let me -- I'm a
22  simple country lawyer.
23        Does "take" mean take on this form?
24        Does this form say that those items were
25  taken?

51

1        MR. MYLAR: Objection.  Again, same
2  objections that I asserted before.
3    Q.  (BY MR. SYKES) Taken.
4    A.  So this says, "Prebooking Take."
5    Q.  Yeah.
6    A.  That's what it says.
7    Q.  Yeah.
8    A.  I have seen other types of forms like
9  this in the jails that I oversee.  They don't say
10  "Prebooking Take" on them, but they indicate the
11  items that the patient brought into the jail and
12  were put in their property.
13        And usually it says -- instead of saying
14  "Prebooking Take," the forms I'm familiar with would
15  say "property" or "inmate property" or "property
16  retention form."
17    Q.  This one says "take," right?
18    A.  This one does say "take," but when I
19  look at this, I think this is a property form.
20    Q.  It says "take" more than once, doesn't
21  it?
22        At the top it says, "Prebooking Take"?
23    A.  It says "taking" twice and "take" once.
24    Q.  And then down at the bottom, it says all
25  the items on this form were taken.

52

1        See that?
2    A.  I see that.
3    Q.  Yeah.  During the prebooking process,
4  and no other items were taken.
5        Do you see that?
6    A.  Yes.
7    Q.  All right.  So are we to -- I mean,
8  as -- do you have a medical opinion on whether
9  "take" means not taken, or does it mean taken?
10        MR. MYLAR: Objection. Calls for
11  speculation.
12    Q.  (BY MR. SYKES) More likely than not.
13    A.  Again, my --
14        MR. MYLAR: Objection. Calls for
15  speculation. Lack of foundation. And beyond the
16  scope of his opinion and report.
17        THE WITNESS:  This is the first time
18  I've ever seen this type of form in my practice.
19  Normally it's a property form.
20    Q.  (BY MR. SYKES) Okay.
21    A.  This is not consistent with the property
22  forms that I see at other jails.
23    Q.  I didn't ask you that.  I'm just asking
24  you if -- in your medical opinion, does "take" mean
25  takes, or does it mean not taken?

53

1        MR. MYLAR: Objection. Again, lack of
2  foundation. Calls for speculation. And incomplete
3  hypothetical.
4        THE WITNESS:  I don't have a medical
5  opinion on what "take" means.
6    Q.  (BY MR. SYKES) Okay.  Now, I'm going to
7  show you this one here.  This is Exhibit 14.  These
8  should have been in a different order, but they
9  weren't, so it's 16, 14, 15.
10        MR. MYLAR: What are we on?
11        MR. SYKES: 14.
12        MR. MYLAR: 14.
13    Q.  (BY MR. SYKES) Okay.  Take a look at
14  that one.  I'm going to mark this up here.  One
15  second.  This says --
16    A.  It's the property form.
17    Q.  Yeah.  It says, "Stored."  See at the
18  top, second line down, "Stored"?
19    A.  Yes.
20    Q.  "Receipt for Property Stored."  Now, do
21  you think that means stored or not stored?
22        MR. MYLAR: Objection. Calls for
23  speculation. Beyond the scope of his medical
24  report. And lack of foundation as to interpreting
25  this form.

54

1         THE WITNESS:  It says, "Stored."
2      Q.  (BY MR. SYKES)  It means stored.  Good.
3  Good answer.
4         So then it lists the same things that
5  are on Exhibit 16, right, that were taken?
6         You can compare them.  Here is the other
7  one right here.
8      A.  So the interesting -- can I make a
9  comment about this form?
10     Q.  Well, I'm asking you, first of all:
11  Does it have the same property typed in that is
12  listed on that exhibit, including her bra?
13     A.  Socks.
14     Q.  Her underwear?
15     A.  Pants, shirt.  I believe that's
16  consistent.
17     Q.  And then right down here where it says,
18  "I DANYALE BLACKMORE" --
19        Do you see that, where my thumb is?
20     A.  Yeah.
21     Q.  The end of that sentence says, "was
22  accepted into storage."
23        Do you see that?
24     A.  Um-hmm.
25     Q.  Okay.

55

1      A.  But she didn't sign the form --
2      Q.  And then down below --
3      A.  -- where she's supposed to sign it.
4      Q.  -- it says here -- yeah.  Right above
5  there it says, "property stored for Danyale
6  Blackmore."
7         Do you see that?
8      A.  Yeah.  If you see over on the right it
9  says, "Property Received By" Jesse Fitting.  And
10  Jesse Fitting signed it, but it doesn't have Danyale
11  Blackmore's signature as to whether she gave her
12  property up.
13     Q.  There is a location there, isn't it,
14  "Locker 168"?
15        See that under "Location," "Locker 168"?
16        MR. MYLAR:  Again, objection.  Lack of
17  foundation.
18        THE WITNESS:  It does say, "Locker 168,"
19  yes.
20     Q.  (BY MR. SYKES)  Okay.  Good.  And then
21  let's look at Exhibit 15, which is the -- that's the
22  return form.
23     A.  Okay.
24     Q.  See that?  And the second line down
25  says, "Receipt For Property Returned."

56

1      Q.  Do you see that?
2      A.  Yes.  Yes.
3      Q.  And then it says here, oh, about 3
4  inches down there, "I, DANYALE BLACKMORE, certify."
5         Do you see that?
6      A.  Yes.
7      Q.  That "the following personal property
8  items were returned to me."
9         Do you see that?
10     A.  Yes.
11     Q.  And that includes her bra and her
12  underwear, right?
13     A.  Yes.
14     Q.  And they were in Locker 168, apparently?
15     A.  Yes.
16     Q.  Okay.  And then it says, "Property
17  returned," and Jesse Fitting signs that.  And then
18  "Property Received By," Danyale signs that --
19     A.  Yes.
20     Q.  -- correct?
21     A.  Yes.
22        MR. MYLAR:  Again, objection to all
23  those questions for lack of foundation.
24     Q.  (BY MR. SYKES)  Okay.  Now --
25     A.  And --

57

1      Q.  -- do you think that that should really
2  read not "property returned" but "property not
3  returned"?
4         Is that a better way to put it?
5         MR. MYLAR:  Objection.  Lack of
6  foundation.
7         THE WITNESS:  Can you repeat that
8  question?  It was like a double negative.
9      Q.  (BY MR. SYKES)  Well, yeah, really.
10     A.  What did you say there?
11     Q.  Do you think that -- do these indicate
12  that she was strip-searched, her clothes were taken
13  and stored?
14        MR. MYLAR:  Objection --
15        THE WITNESS:  No, it does not indicate
16  that she was strip-searched.
17     Q.  (BY MR. SYKES)  It doesn't indicate that
18  at all?
19     A.  No, because the majority of patients who
20  are booked into the jails, they're asked to change
21  into jail clothing.  And their property is taken,
22  but they are allowed to change behind a curtain or a
23  room specifically designed for them, to allow them
24  to change clothes in that room.
25        That does not mean -- nowhere in here

58

1  does it indicate that three male officers were
2  watching her change her clothes.  It simply says
3  that her clothes were put in Locker 168.
4          MR. MYLAR:  Objection.  Lack of
5  foundation.
6      Q.  (BY MR. SYKES)  Do you think if she's
7  required to disrobe -- now, I know you're not a
8  lawyer.  Okay.  I know you're not a lawyer.  You
9  told me that several times.
10     A.  I'm just a country doctor.
11     Q.  Country doctor.  But you don't have a
12  house in Huntsville.
13     A.  Draper is very country.
14     Q.  Yeah, I noticed that.  Anyway, so
15  if -- you've been in jail medicine for a long time,
16  prison medicine, corrections medicine, I guess.
17         If you're required to disrobe, do you
18  know if that's a strip search?
19         MR. MYLAR:  Objection.  Calls for a
20  legal conclusion.  Beyond the scope of his report.
21     Q.  (BY MR. SYKES)  Go ahead.
22         MR. MYLAR:  And lack of foundation.  And
23  calls for speculation.
24     Q.  (BY MR. SYKES)  Go ahead.
25     A.  The answer is no, I do not think that is

59

1  a strip search.
2      Q.  Well, the Court of Appeals disagrees
3  with you.
4          MR. MYLAR:  Objection.  Legal argument.
5      Q.  (BY MR. SYKES)  If you have to disrobe,
6  it's a strip search.
7          MR. MYLAR:  Objection.  Legal argument.
8          MR. SYKES:  All right.
9          MR. MYLAR:  Never mind.
10     Q.  (BY MR. SYKES)  If you give me your
11  email, I'll send you the case later.  Frank knows
12  that.  All right.  So --
13     A.  Well, so what are you --
14         MR. MYLAR:  Don't -- just --
15     Q.  (BY MR. SYKES)  No.  Go ahead.  I'm
16  interested.
17         MR. MYLAR:  There is no question.  Don't
18  answer unless there is a question posed.
19     Q.  (BY MR. SYKES)  So do you agree from
20  what you've read here -- forget the word "strip
21  searched."  You know, that's a lightning rod issue
22  for Frank over there.  But forget that.
23         In your opinion, from what you've read
24  here, was Danyale Blackmore asked to disrobe?
25         MR. MYLAR:  Objection.  Lack of

60

1  foundation.  Calls for speculation.  Beyond the
2  scope of his report.
3          THE WITNESS:  I don't have an opinion on
4  that.
5      Q.  (BY MR. SYKES)  You have no opinion on
6  that?
7      A.  On whether she was asked to disrobe or
8  not.
9      Q.  Even though you've seen these three
10  forms now, a take form, a store form and a return
11  form with her clothing, all of it, on there, you
12  have no opinion as to whether she was asked to
13  disrobe?
14         MR. MYLAR:  Same objections.
15         THE WITNESS:  Well, there's a difference
16  between -- in my opinion, there is a difference
17  between being asked to disrobe and being
18  strip-searched.
19     Q.  (BY MR. SYKES)  Okay.  But was she asked
20  to disrobe?
21         MR. MYLAR:  Objection.  Lack of
22  foundation.
23     Q.  (BY MR. SYKES)  Based on what you know.
24  Now, I want your opinion as an honest country doctor
25  here.

61

1      A.  This doesn't tell me whether she was
2  asked to disrobe.  It just says that that's what she
3  was wearing when she came into jail.
4      Q.  In your opinion, was she asked to
5  disrobe --
6          MR. MYLAR:  Objection.  Lack of
7  foundation.  Calls for speculation.
8      Q.  (BY MR. SYKES)  -- based on what you see
9  here?
10     A.  I don't have an opinion as to whether
11  she was asked to disrobe.
12     Q.  You see in these three documents, take,
13  store and return --
14     A.  I'm not offering an opinion on whether
15  she was strip-searched or not.
16     Q.  I didn't say that.  I said, "disrobe."
17     A.  I'm not offering an opinion on whether
18  she was asked to disrobe or not.  I don't have the
19  knowledge base to do that.
20     Q.  Okay.  Okie-dokie.  Let's go on, then.
21  Okay.
22         Look at your report.  This is Exhibit 50
23  again, page 3, paragraph 13.  Elizabeth York
24  indicates that she, I think, saw Danyale at least
25  three times, I think, April -- paragraph 11,

62

1  April 2022; April 12th, 2022; May 18th, 2022; and
2  May 31, 2022; paragraph 14.
3        Do you see that?
4     A.  Yes.
5     Q.  I don't know if there are any others or
6  not.  I think that was it, but -- and Elizabeth
7  York -- are you aware that no one referred her, no
8  one from our office?  We didn't even know it was
9  with York.  No one referred her there.
10        Are you aware of that?
11        MR. MYLAR:  Objection.  Lack of
12  foundation.  Calls for speculation.
13        THE WITNESS:  I'm not aware of that.
14     Q.  (BY MR. SYKES)  She found Elizabeth York
15  on her own.
16        And are you aware Elizabeth York
17  diagnosed PTSD?
18     A.  That's her opinion.
19     Q.  Right.  Her opinion was that Danyale
20  suffered PTSD from the strip search.
21        Are you aware of that?
22     A.  That's her opinion, yes.
23     Q.  And you read her deposition?
24     A.  I read her deposition.  Well, no, I did
25  not read -- are you talking about Elizabeth York?

63

1     Q.  York, yeah.
2     A.  I did not see a written copy of
3  Elizabeth York's deposition.
4     Q.  Did you watch her video?
5     A.  I did.
6     Q.  Okay.
7     A.  Well, I listened to the audio.  There
8  was no visual.
9     Q.  Look at paragraph 15.  "York testified
10  that Blackmore was shaking, trembling, and holding
11  herself when describing the events of having to
12  undress in front of multiple male officers."
13        Your words, right?
14     A.  Yes.
15     Q.  Page 3, paragraph 15.
16        MR. MYLAR:  Objection.
17        THE WITNESS:  That's York's words, not
18  my words.
19     Q.  (BY MR. SYKES)  Well, you wrote this?
20     A.  This is York's words.  Yes.
21     Q.  Well, they're your words describing what
22  York said, right?
23     A.  That's correct.
24     Q.  All right.  And that she appeared to be
25  truthful, right?

64

1        MR. MYLAR:  Objection.  Lack of
2  foundation.
3        THE WITNESS:  York stated that she
4  appeared to be truthful.
5     Q.  (BY MR. SYKES)  Do you have anything
6  that would contradict that, that she appeared to be
7  truthful to York?
8     A.  Are you asking my opinion as to whether
9  she was strip-searched?
10     Q.  No.  I'm saying --
11     A.  Or are you saying is there information
12  that is available that is contrary to her report
13  that she was strip-searched?
14     Q.  Do you have any information that --
15     A.  Yes.
16     Q.  -- that would show that she appeared to
17  be truthful to York?
18     A.  Well, York stated that she was -- she
19  thought that she was truthful, that she believed
20  her.  But I have no other information whether or
21  not...
22     Q.  Okay.
23     A.  That's just hearsay from York.
24     Q.  And this was about, oh, roughly two and
25  a half years after the event, close to?

65

1     A.  27 months.
2     Q.  Yeah.  All right.  May 31st, paragraph
3  14.  So June 6th would have been two years and five
4  months, right?
5        All right.  So York describes her as
6  shaking and trembling, right?
7     A.  Yes.
8     Q.  And puts similar language in her report,
9  right?
10     A.  That she was trembling and shaking?
11     Q.  Yeah.
12     A.  What specifically are you referring to?
13     Q.  Didn't she write a report?  York?
14     A.  Her expert testimony?
15     Q.  No.
16     A.  Her expert report?
17     Q.  She had a report.
18     A.  Yeah, her expert report.  Okay.  I
19  thought you meant her medical notes.
20     Q.  I mean her medical notes.  Did her
21  medical notes talk about the emotional upset of her
22  patient, Danyale Blackmore?
23     A.  Okay.
24     Q.  Did they, or did they not?
25     A.  Are you talking about the May 31st,

66

1  2022 --
2      Q.  Any of them.
3      A.  The other ones did not indicate that she
4  was shaking and trembling when talking about the
5  event, the progress notes.
6      Q.  By the way, is avoidance a consequence
7  sometimes of PTSD, you avoid?
8      A.  Patients would like to avoid situations
9  because it triggers them to remember the event.
10     Q.  Yeah.  And so sometimes people that have
11 had a traumatic event -- like in Danyale's case,
12 being strip-searched in front of three men,
13 allegedly, okay, a person might not be anxious to
14 talk about that in front of others, right?
15     A.  That's correct.  They typically --
16 "avoidance" means that they --
17     Q.  Avoid?
18     A.  -- avoid, at all costs, reliving that
19 situation.
20     Q.  Okay.  Now, you also mentioned Dr. Allen
21 here in paragraph 17, page 3 of your report at the
22 bottom.  You said that -- and did you listen to
23 his --
24     A.  I watched his video.
25     Q.  -- deposition?  You watched it, or --

67

1      A.  I watched it.
2      Q.  Okay.  And your report here says that
3  the medical literature for use of ketamine for PTSD
4  is not well-supported?
5      A.  That's correct.
6      Q.  Yeah.  Are you aware that he's an
7  anesthesiologist?
8      A.  I am.
9      Q.  And that anesthesiologists frequently
10 treat with ketamine?
11         Are you aware of that?
12     A.  No, because I don't believe they
13 frequently treat with ketamine.
14     Q.  Okay.
15     A.  I have known hundreds of
16 anesthesiologists who do not use ketamine treatments
17 for depression.
18     Q.  Do you know anybody that does?
19     A.  Dr. Allen.
20     Q.  He has -- he had a clinic down there at
21 the time.  I think it was called Satori.
22     A.  Yes.
23     Q.  And he would treat patients with anxiety
24 with ketamine, right?
25     A.  That's what he testified to.

68

1      Q.  Is that a black box use of ketamine?
2      A.  Define "black box."
3      Q.  Well, it's in the black box for the
4  drug.
5          You can use it to treat depression,
6  correct?
7          You can use it to treat anxiety,
8  correct?
9      A.  Wait.  What is your definition of "black
10 box"?
11     Q.  Can you use ketamine to treat
12 depression?
13     A.  So ketamine is an unproven, but there's
14 some evidence that ketamine helps depression, yes.
15     Q.  Okay.  Is there some evidence that it
16 can help anxiety?
17     A.  Yes.
18     Q.  Are you aware that there's medical
19 literature that supports that, published?
20     A.  There's some evidence.
21     Q.  Okay.
22     A.  It is not a mainstay treatment or a
23 first-line treatment.  It's not even a second-line
24 treatment.
25     Q.  You've never examined Danyale Blackmore,

69

1  have you?
2      A.  No.
3      Q.  Okay.  Do you think examining someone
4  like that can be helpful in coming to an opinion?
5      A.  Typically, as an expert witness, I don't
6  examine those types of patients.  But it could be
7  helpful, yes.
8      Q.  Okay.  And you agree that PTSD can be
9  caused by a sexual assault?
10     A.  Yes.  A criminal act of violence of a
11 sexual nature would be -- meet the criteria.
12     Q.  Okay.  Let's look at your paragraph 21.
13 Now, look and see if the statements you made here
14 are correct.
15         Paragraph 21 you've got labeled as
16 "Criterion A:  Traumatic event," and you say here
17 that -- line 3 of that -- "I have reviewed the
18 materials of the Blackmore booking and I concluded
19 that there was no evidence of severe trauma,
20 physical harm, or chance of death."
21         That's what you wrote, right?
22     A.  That's correct.
23     Q.  But you said earlier, when I asked you
24 in the first part of this deposition that
25 strip-searching somebody like Danyale -- a

70

1  housewife, a businesswoman -- could cause severe
2  trauma --
3        MR. MYLAR:  Objection.  Misstates his
4  testimony.
5        THE WITNESS:  I didn't use the word
6  "severe trauma."
7        Q.  (BY MR. SYKES)  What word did you use?
8        A.  Emotional trauma.
9        Q.  Okay.  Could cause emotional trauma,
10  right?
11        A.  Um-hmm.
12        Q.  Is that yes?  Is that --
13        A.  No.
14        Q.  -- a yes?
15        A.  That's not a severe trauma, so --
16        Q.  No.  But, I mean, it could cause
17  emotional trauma.
18        Is that what you said?
19        A.  That's what I said, emotional trauma.
20        Q.  Can that emotional trauma be severe with
21  some people?
22        A.  Well, the criteria for Criteria A,
23  traumatic event, we're -- in this text here, we're
24  talking about the traumatic event.
25        Q.  Okay.

71

1        A.  And severe trauma means physical harm to
2  yourself; amputation of an arm; you know, brain
3  injury; chest -- chest trauma, where you have
4  fractured ribs; or you're in a motor vehicle
5  accident, and you have significant severe trauma.
6        Q.  Could Danyale's strip search, if it
7  occurred, cause extreme emotional trauma to her?
8        A.  No.
9        Q.  Really?
10        A.  No.  That does not meet the criteria.
11        Q.  No.  I'm not asking about that.  I'm
12  asking:  Could it cause significant emotional trauma
13  to someone?
14        A.  Well, "extreme" is a very nebulous term.
15  What is the legal definition for "extreme," in your
16  opinion?  I don't understand your question.  It's
17  vague.
18        Q.  Let me ask you this.  I think you said
19  this earlier already.  I'm just coming back to this
20  because it's important.
21        If she -- if Danyale was strip-searched,
22  okay, could that cause a very significant emotional
23  trauma to her?
24        A.  It would be a memorable event for her,
25  but I wouldn't say very significant.  It wouldn't

72

1  meet the criteria of posttraumatic stress disorder.
2        Q.  I understand that.  Could it cause
3  emotional trauma?
4        A.  I can't opine on whether it would
5  cause --
6        Q.  It could?
7        A.  -- the severity -- it could.
8        Q.  Okay.  That's all I'm asking.
9        A.  Women are emotional when it comes to
10  those types of events, and they all experience it
11  differently.
12        Q.  Okay.  You say here, line 4, line 5,
13  "Blackmore alleges that she was forced to disrobe in
14  front of several male officers in a strip search
15  type fashion.  However, I have seen no evidence that
16  a strip search was completed other than the
17  testimony of Blackmore, who was intoxicated at the
18  time."
19        Now, that's a false statement, isn't it?
20        A.  Well, my statement that she was
21  intoxicated at the time --
22        Q.  No.
23        A.  -- I believe that's true.
24        Q.  There's no evidence of a strip search.
25  It says --

73

1        A.  Right.
2        Q.  -- "I have seen no evidence that a strip
3  search was completed, other than the testimony of
4  Ms. Blackmore."
5        A.  Yeah.
6        MR. SYKES:  Let me have those.
7        Q.  (BY MR. SYKES)  What about these three
8  documents that said that her property -- her
9  clothing was taken, stored and returned --
10        MR. MYLAR:  Objection.  Again, lack of
11  foundation.
12        Q.  (BY MR. SYKES)  -- Exhibits 14, 15, and
13  16?
14        MR. MYLAR:  Objection.  Objection.  Lack
15  of foundation.  Calls for speculation about the
16  reports.  And is beyond the scope of his expert
17  opinions.
18        THE WITNESS:  I said --
19        Q.  (BY MR. SYKES)  That's evidence.
20        A.  I said earlier it doesn't show that
21  she's been disrobed in any way.  It doesn't say that
22  she was disrobed.
23        Just like on the previous form where you
24  were saying that it doesn't say on here that she was
25  intoxicated, it doesn't say on here that she was

74

1 asked to disrobe.
2    Q.  But, Dr. Tubbs, all of her clothing was
3 taken, according to these forms, and stored.
4       MR. MYLAR: Objection. Argumentative.
5    Q.  (BY MR. SYKES)  Taken and stored, and
6 yet you say --
7    A.  But it doesn't say --
8       MR. MYLAR: Objection. Lack of
9 foundation. There's actually no question pending.
10    Q.  (BY MR. SYKES)  Go ahead and say what
11 you want to say.
12       MR. MYLAR: Ask the question.
13       THE WITNESS: I have nothing further.
14    Q.  (BY MR. SYKES)  And yet, despite these
15 forms, you say, quote, I have seen no evidence that
16 a strip search was completed. Really?
17       MR. MYLAR: Other than Blackmore, it
18 says.
19    Q.  (BY MR. SYKES)  How can you say that,
20 given these forms?
21       MR. MYLAR: Objection. Lack of
22 foundation --
23    Q.  (BY MR. SYKES)  Explain that.
24       MR. MYLAR: -- an argumentative
25 question. And asked and answered.

75

1    Q.  (BY MR. SYKES)  Explain that to a simple
2 country lawyer, how that happens, please.
3    A.  These forms say -- indicate that her
4 clothing was stored. It does not indicate how she
5 was asked to disrobe or if she was disrobed or what
6 happened with that, it simply -- or whether a strip
7 search was done. My definition of a strip search is
8 asking a woman to take off her clothes in front of
9 three men.
10    Q.  Yeah.
11    A.  And this statement here doesn't say
12 whether she changed clothes or not. It says -- the
13 statement is I don't see any evidence where she was
14 asked to disrobe in front of three men, be naked,
15 other than her testimony. This just says that her
16 clothes were swapped out.
17       MR. MYLAR: Objection. Lack of
18 foundation on opinions about the forms.
19    Q.  (BY MR. SYKES)  If what she says is
20 true -- and you read her deposition -- was she
21 strip-searched, in your opinion?
22    A.  You read my opinion. I don't have an
23 opinion on that.
24       MR. MYLAR: Are we going to go a lot
25 longer?

76

1       MR. SYKES: Not a lot.
2       MR. MYLAR: Should we take a lunch right
3 now, or what?
4       MR. SYKES: Let's see. What time is it?
5 We're not even two hours yet.
6       MR. MYLAR: Well --
7       MR. SYKES: 10:30 to 12:30.
8       MR. MYLAR: All right. I don't want to
9 go too long without lunch. Should we --
10       MR. SYKES: Do you want something to
11 eat? I've got peanuts and stuff right here.
12       MR. MYLAR: That's okay. Shall we break
13 at 12:30?
14       MR. SYKES: Yeah, let's break at 12:30.
15       MR. MYLAR: Actually, I'm going to need
16 a restroom break.
17       MR. SYKES: What?
18       MR. MYLAR: I'm going to need a restroom
19 break now.
20       (A recess was taken.)
21    Q.  (BY MR. SYKES)  You answered a lot of
22 these questions that I had written down.
23       You don't consider yourself a mental
24 health professional, do you?
25    A.  I'm a family physician. I provide an

77

1 enormous amount of mental health in jails and
2 prisons. More than 50 percent of my work is mental
3 health.
4    Q.  So do you consider yourself a mental
5 health professional?
6    A.  I consider myself a family physician.
7    Q.  Okay. But you don't consider yourself a
8 mental health professional?
9    A.  What is your definition of "mental
10 health professional"? I consider myself a
11 physician, a mental health provider, like a licensed
12 therapist or a social worker, or -- there are many
13 mental health providers that are below a physician.
14 But a family physician certainly is in charge of
15 mental health treatment.
16    Q.  You're not a licensed mental health
17 professional, are you?
18    A.  I have a license to practice medicine in
19 the state of Utah --
20    Q.  Yeah.
21    A.  -- and the state of Wyoming, and I do
22 that. And I provide mental health medications. I
23 provide mental health treatment. I opine to the
24 court on the mental health of patients in the jail.
25 And, yes, I consider myself a mental health

78

1 professional.
2     Q.  It took a while to get there.
3     A.  I guess so.
4     Q.  All right.  You're a mental health
5 professional.
6         Okay.  And are you a licensed mental
7 health professional?
8     A.  I have a license to practice medicine in
9 the state of Utah.
10     Q.  Is that a yes answer to my question?
11     A.  I'm a licensed physician.  My license is
12 a doctor of medicine.  I am not a licensed counselor
13 or a social worker.
14     Q.  Okay.  Take a look at your report,
15 paragraph 41.
16         You say, "In comparison to other
17 physicians, anesthesiologists have a high rate of
18 drug addiction.  In his testimony, Dr. Allen
19 admitted to receiving ketamine injections as well."
20         Are you suggesting that Dr. Allen is
21 drug addicted?
22     A.  No.
23     Q.  That's what it sounds like.
24     A.  Dr. Allen admitted to receiving ketamine
25 injections in his deposition, and I'm suggesting

79

1 that's why he did.
2     Q.  Your suggestion is he took ketamine
3 because he's addicted?
4     A.  I didn't say anywhere in here about
5 addiction.  I simply said that "Dr. Allen admitted
6 to receiving ketamine injections."
7     Q.  Yeah.  But just prior to that sentence,
8 you say -- the first sentence, "In comparison to
9 other physicians, anesthesiologists have a high rate
10 of drug addiction."
11     A.  That's true.
12     Q.  It sounds like you're suggesting that
13 Dr. Allen is drug addicted to ketamine, is what it
14 sounds like.
15     A.  I didn't say that.
16     Q.  But you imply it, don't you?
17     A.  I didn't say that.  I said he's at
18 risk -- that anesthesiologists are at risk of
19 becoming addicted to drugs, traditionally, as
20 physicians.
21     Q.  But why would you put that in a --
22     A.  Because of the fact --
23     Q.  Let me finish my sentence.  Why would
24 you put that in a medical report having to do with
25 Danyale Blackmore?  What difference does it make if

80

1 they are or they're not?
2         The question is the treatment he
3 provided for her, isn't it?
4     A.  Well, it's my opinion that Dr. Allen is
5 an expert in this case.
6     Q.  He's an expert or not an expert?
7     A.  He has been named as an expert in this
8 case.
9     Q.  Yeah.
10     A.  And he is touting ketamine as an
11 excellent treatment, when, in fact, ketamine doesn't
12 have a clear indication as a first-line treatment
13 for depression, for what Danyale has.
14         And I feel it's convenient that
15 Dr. Allen is not only a proponent of giving that
16 medication to Danyale, but also gives it to himself
17 -- or undergoes treatments himself.
18     Q.  How do you know he gives it to himself?
19     A.  Well, he testified he doesn't give it to
20 himself.  He receives them.
21     Q.  Yeah.  Well --
22     A.  And I think I stated that he does not
23 give it to himself.  He receives it.
24     Q.  Why did you say in 47 -- you say that --
25 paragraph 47, page 7, that "It is also a conflict of

81

1 interest that Dr. Allen self-treats himself with
2 ketamine."
3         Self-treats means he gives it to
4 himself, doesn't it?
5     A.  Well, he himself is treated with
6 ketamine.
7     Q.  Well, you didn't say that.  You said he
8 self-treats himself.  I mean, aren't you saying
9 here -- actually accusing him of a crime, basically?
10         I mean, a physician can't prescribe
11 himself medicines like ketamine, can he?
12     A.  I did not say that he prescribes himself
13 ketamine.
14     Q.  Well, your words, now, not mine.  Again,
15 I'm just a simple country lawyer, not very smart.
16         But you're saying here "It is also a
17 conflict of interest that Dr. Allen self-treats" --
18 self, hyphen, treats -- "himself with ketamine."
19 You're saying here that he's treating himself with
20 ketamine, self-treats himself.  Your words.
21     A.  Well, I'm indicating that he indicated
22 in his deposition that he has undergone ketamine
23 treatments himself.
24     Q.  That's right.  But you're not saying
25 that.

82

1    You're saying he treats himself, aren't
2  you?
3    A.  It does say, "self-treats himself."  I'm
4  trying to look at it from your point of view.  I
5  think I intended something different when I wrote it
6  than how you're reading it.
7       It is a statement that Dr. Allen
8  admitted to using ketamine himself.  He did not
9  inject himself with ketamine.
10    Q.  But you're suggesting that he did when
11  you say he self-treats himself?
12    A.  I just testified that I do not believe
13  he injected himself with ketamine.  I'm not saying
14  that he did.
15    Q.  But why would you write in here, in a
16  report regarding Danyale Blackmore, that
17  anesthesiologists have a high rate of drug
18  addiction, and he self-treats himself, if you're not
19  suggesting that he is abusing ketamine?
20    A.  I am suggesting that any
21  anesthesiologist who uses ketamine is at risk, or
22  placing themself at risk, and it's a very bad idea
23  because you're in a high-risk -- I don't think that
24  the majority of anesthesiologists would recommend to
25  other anesthesiologists to use ketamine.

83

1    Q.  Now, you say here, "The" -- under
2  paragraph 42, "Summary," line 3, "The choice of York
3  as a provider is suspicious."  Okay?
4       What do you mean by "suspicious"?
5    A.  Well, in her CV, she portrays herself as
6  a PTSD expert.  Yet when she treated Danyale, she'd
7  only been out of school for one month.  She'd only
8  been a licensed provider for one month as a mental
9  health therapist when she started treating -- or,
10  you know, diagnosing Blackmore with PTSD.
11       And then she claims that she's an expert
12  in PTSD after graduating on -- or becoming licensed
13  on March 17th of 2022, and then seeing Danyale for
14  the first time on April 12th, 2022, less than one
15  month after receiving her license.  She's now an
16  expert in PTSD, when she's wrongfully diagnosed
17  Blackmore with PTSD.
18    Q.  Okay.  You are aware that when Danyale
19  first came in, Elizabeth York was working under
20  another provider?
21       Were you not aware of that?
22    A.  Repeat that question.
23    Q.  Well, she was in the -- Dr. York --
24  Ms. York was in the Ascend clinic.  I think it's
25  called Ascend.

84

1    A.  Yes.
2    Q.  But she wasn't working independently,
3  she was working under another mentor or supervisor.
4    A.  That's because she just graduated --
5    Q.  Right.
6    A.  -- 26 days before she saw Blackmore for
7  the first time.
8    Q.  How many days -- when you have that kind
9  of education, how many days does it take to get
10  ready to see a patient by yourself?
11    A.  Well, in my experience, after graduating
12  medical school, after four years of medical
13  training, it required three more years of residency
14  training before I could see a patient by myself.
15    Q.  Okay.
16    A.  So seven years is the answer to that
17  question.
18    Q.  Seven years.  So you think that Ms. York
19  should wait another three years after her -- after
20  she got her degree and her licensure to see a
21  patient?
22       Is that what you're saying?
23    A.  No.  I'm saying to sell yourself as an
24  expert in PTSD and to put on your resumé that you
25  specialize in PTSD, when she just graduated and has

85

1  only been seeing patients for less than one month
2  and claims on her CV to be an expert in this field,
3  it's suspicious.
4    Q.  Well, that resumé was --
5    A.  And that's where I -- why I use the word
6  "suspicious" in that case.
7    Q.  The resumé was three years after this
8  treatment.
9    A.  Yes.
10    Q.  Don't you think she could be an expert
11  now, three years later, or she'd need another three
12  years?
13    A.  She certainty wasn't an expert at the
14  time that she provided this treatment because she
15  wrongfully diagnosed Blackmore.
16    Q.  Okay.
17    A.  I don't know what her education and
18  training is at this point in time, in 2025.  But I
19  can tell you in 2022, when she saw Blackmore, she
20  inappropriately diagnosed her.
21    Q.  Okay.  Now, you also say here in
22  paragraph 42, lines 3 and 4, "York's testimony and
23  CV state that she specializes in 'Personal injury
24  PTSD services and comprehensive case analysis.'"
25       That's in quotation marks that you

86

1  wrote, right?
2      A.  She wrote that.
3      Q.  No.  I'm reading what you wrote in your
4  report.
5      A.  It's in quotation marks because those
6  are her words off of her --
7      Q.  You wrote that in your report, right?
8      A.  It's in the report.
9      Q.  Right.  And next you say, "This type of
10  clinical/legal work does not allow York to have a
11  clinical detachment from Blackmore allowing for
12  objective understanding and providing objective
13  clinical treatment."
14          That's what you wrote, right?
15      A.  That's what I wrote.
16      Q.  So you say that she can't be objective
17  because she provides services to attorneys, or the
18  client has possible PTSD.
19      A.  No.  The client has a financial gain.
20  She's providing expert testimony for financial gain,
21  and she's treating the patient for financial gain.
22      Q.  Well, how do you know she's treating the
23  patient for financial gain?
24      A.  Well, she's certainly getting paid to
25  testify for PTSD.

87

1      Q.  Are you getting paid to testify?
2      A.  I am.  But I'm not treating the patient.
3      Q.  Yeah.  How much do you charge for your
4  services?
5      A.  $500 an hour.
6      Q.  500 an hour?
7      A.  Yes.
8      Q.  She's charging $200.
9      A.  She's overcharging you.
10      Q.  Okay.  And you're not?
11      A.  No.  I'm a physician.  I make $500 an
12  hour.
13      Q.  All right.  You charge $500 an hour.
14          How much has Frank Mylar paid you so
15  far?
16      A.  I don't recall.  I have the invoice on
17  my phone.
18      Q.  Go ahead, look it up.
19      A.  I have access to that information.
20      Q.  Please.
21      A.  I should have been prepared for this
22  question.
23          (A discussion was held off the record.)
24          MR. SYKES:  I'm almost done, Frank.
25          MR. MYLAR:  All right.

88

1          THE WITNESS:  $6,150.
2      Q.  (BY MR. SYKES)  That's so far?
3      A.  Yes.
4      Q.  But you have no secondary gain involved
5  in this, do you?
6      A.  I have no financial interest in the
7  outcome of this lawsuit.
8      Q.  Well, do you think Ms. York has a
9  financial interest in the outcome of the lawsuit?
10      A.  Well, she's still going to continue to
11  treat the patient after the lawsuit is over.
12      Q.  Well --
13      A.  And it's more than likely that if the
14  lawsuit is unsuccessful, that she will -- that
15  Blackmore may or may not return to York for
16  treatment.
17      Q.  Well, she saw her -- Blackmore saw York
18  three times in, I think, April and May of 2022.
19      A.  Yes.
20      Q.  Never saw her again.
21          Does that indicate, in your judgment, a
22  financial interest in how the lawsuit turns out?
23      A.  Well, I certainly think that Ms. York
24  has a patient relationship with Blackmore.
25      Q.  She did.

89

1      A.  Did she fire her?
2      Q.  Well --
3      A.  I did not see any information
4  that -- where Blackmore -- or York fired Blackmore
5  or Blackmore fired York.
6      Q.  Well, if Blackmore -- I mean, you charge
7  Mr. Mylar regardless of the outcome of the case,
8  don't you?
9      A.  Yes.
10      Q.  You expect -- you can put 12 or 13 or
11  14 hours in, bill $12,000?
12      A.  Yes.
13      Q.  Yeah.  But that's not --
14      A.  12,000?
15      Q.  How much is it?
16      A.  6,100.
17      Q.  $6,000.  Okay.  12 hours of time, right?
18  Thereabouts, right?
19      A.  Yes.
20      Q.  But that's not a financial interest for
21  you in the lawsuit, but it is for Elizabeth York,
22  where she saw her three times in April and May of
23  2022 and not since?
24          So Ms. York has a financial interest,
25  but you don't?

90

1    A.    My comment in my report is not
2  pertaining to getting paid as an expert witness,
3  it's pertaining to treating the patient and being an
4  expert for that patient at the same time.  You don't
5  have an objective -- you can't be objective when
6  you're treating the patient.
7        Q.    Okay.
8        A.    As an expert, it's important, I feel,
9  that you have the ability to be objective, to see
10  both sides of the story.
11       But if you're treating the patient, you
12  have responsibility to care for that patient and
13  take care of that patient.  And because you have
14  that responsibility to care for the patient and
15  treat the patient, you have an interest in making
16  sure that the patient wins the lawsuit.  Because it
17  could be detrimental to the patient if the patient
18  doesn't win the lawsuit.
19       Q.    Okay.
20       MR. SYKES:  What exhibit number is next?
21  Is it 54?
22       THE WITNESS:  Since you're caring for
23  that patient, you're clinically interested or owe a
24  duty to the patient to do everything you can to
25  benefit the patient.

91

1        Being an expert witness for a patient
2  that you have a doctor-patient relationship with --
3  or in her case, a therapist relationship -- the
4  relationship between the patient and the provider is
5  one of the provider wanting beneficial outcome for
6  the patient.
7        You should not be indifferent to the
8  outcome of the patient.  You want the patient to get
9  better.  You want the patient to have the best
10  outcome possible.  And York wants the best outcome
11  for Blackmore.
12       Q.    (BY MR. SYKES)  She does or doesn't?
13       A.    She does.
14       Q.    Yeah.
15       A.    She has a duty to.
16       Q.    There's nothing wrong with that, is
17  there?
18       You want the best outcome for your
19  patients, don't you?
20       A.    If I have a doctor-patient relationship,
21  I want the best outcome for the patient.  That's the
22  purpose of that.
23       Q.    That's not a conflict of interest, is
24  it?
25       A.    No.  But it's a conflict of interest to

92

1  go to court, and you're no longer objective.  You're
2  100 percent invested in making sure that your
3  patient has the best outcome possible.
4        Q.    Stop talking for a minute, and let her
5  mark this.
6        (Deposition Exhibit 56 was
7        marked for identification.)
8        Q.    (BY MR. SYKES)  Tell me what Exhibit 56
9  is.
10       A.    This is a list of the depositions and
11  court appearances that I have had.
12       Q.    Okay.  Going back how long?
13       A.    Well, it looks like 2016.
14       Q.    Okay.  So nine years, give or take?
15       A.    Yes.
16       Q.    And it looks to me like there is
17  about -- how many are there?
18       A.    25 cases.
19       Q.    25 cases.  Okay.  And then looking this
20  over, on page 12, the Gardner case, it looks like
21  you were a witness for Frank Mylar?
22       A.    That's correct.
23       MR. MYLAR:  Oh, where is that?  Oh,
24  okay.
25       Q.    (BY MR. SYKES)  Matthew -- I don't know.

93

1        A.    Mglej.
2        Q.    "MAC-GLEE"?
3        MR. MYLAR:  "MAC-GLAY."
4        Q.    (BY MR. SYKES)  Mglej vs. Gardner.
5  Okay.  And it looks like on page 13, in the Estate
6  of Madison case, you were a witness for Frank Mylar.
7  In Paugh vs. Uintah County, a witness for Frank
8  Mylar, right?
9        A.    Correct.
10       Q.    And Goich.  I saw a decision on that, by
11  the way, in favor of the -- Frank lost one.
12       MR. MYLAR:  Well, that's the first
13  stage.
14       Q.    (BY MR. SYKES)  And Goich vs. Terry
15  Thompson.  Do you see that?  Witness for Frank
16  Mylar?
17       A.    Yes.
18       Q.    Well, that's four out of 25 cases.  And
19  then also on page 12, a guy named James Maruna.
20       Do you see that?
21       A.    Yes.
22       Q.    And there's one there -- it's Scott
23  Peters, Spencer Martin, James Maruna and Andrew
24  Flowers.
25       Do you see that?



94
1    A.  Yes.
2    Q.  And then on page 13, another James
3  Maruna on a case from Sherman Morissette?
4    A.  Yes.
5    Q.  So out of 25 cases listed there, you've
6  got four for Frank Mylar, right?
7    A.  Yes.
8    Q.  That's what, 16 percent of the 25?
9    A.  Roughly.
10    Q.  And four for James Maruna.  Now, does
11  that make you somehow untrustworthy because you
12  worked for, you know, eight of your 25 cases --
13    A.  No.
14    Q.  -- for just two attorneys?
15    A.  No.
16    Q.  The rules are different for you, right?
17  They're different?
18    A.  What rules?
19    Q.  Exactly.  And then trial testimony, two
20  of these were for Frank Mylar, were they not?
21    A.  Yes.
22    Q.  Okay.  So you do a lot of work for
23  Mr. Frank Mylar?
24    A.  No.
25    Q.  Okay.  Well, four out of 25, and two out

96
1    Q.  How much?
2    A.  About four hours.
3    Q.  Four hours.  All right.  Another $2,000.
4  So you're up to $8,000, give or take, right, so far?
5    I'm going to pay you for the time in the
6  deposition today, so don't count that.
7    A.  Well, okay.
8    Q.  Yeah.  So that's a lot of money for one
9  attorney.
10    And you're always hired by the defense,
11  aren't you?
12    A.  No.  I've done plaintiff work.
13    Q.  Well, not for Frank Mylar, have you?
14    A.  No.
15    Q.  Or not for James Maruna?
16    A.  No.
17    MR. SYKES:  Okay.  Let's take a short
18  break.  I think I'm done.  I just want to ask my
19  simple country paralegal if I have anything more to
20  add here.
21    (A recess was taken.)
22    MR. SYKES:  I have no further questions.
23    MR. MYLAR:  Okay.  I just have a few
24  clarifying questions.
25    ///

95
1  of four trials for Frank Mylar.
2    Does that mean that you're biased?
3    A.  No.
4    Q.  He's paid you $12,000 so far?
5    MR. MYLAR:  $6,000, he said.
6    MR. SYKES:  What?
7    MR. MYLAR:  $6,000 is what he said.
8    Q.  (BY MR. SYKES)  I'm sorry.  Is it
9  $12,000 or $6,000?
10    A.  $6,151 so far.
11    Q.  So far.  When is the last time you
12  billed him?
13    MR. MYLAR:  It was a couple weeks ago.
14    Q.  (BY MR. SYKES)  So he may have -- if you
15  billed him a couple of weeks ago -- Frank said a
16  couple of weeks ago.  He said it on the record.
17    MR. MYLAR:  Maybe it was a month ago.
18    Q.  (BY MR. SYKES)  So you would --
19    A.  I billed him on -- February 12th, 2025,
20  is when I billed him.
21    Q.  So two weeks ago?
22    A.  That's when I wrote the report.
23    Q.  Have you done work since?
24    A.  I have done work preparing for this
25  deposition.

97
1    EXAMINATION
2  BY MR. MYLAR:
3    Q.  Okay.  So you were asked about the fact
4  that Ms. Blackmore was considered to be intoxicated,
5  by the jail.
6    In your opinion, would that affect -- if
7  someone is intoxicated, would that affect how they
8  perceive and understand things that go on in
9  someplace like a booking area?
10    A.  Yes.
11    Q.  All right.  And in what way would that
12  affect it?
13    A.  When patients are intoxicated, their
14  ability to form memories is impaired, their ability
15  to -- their memory during intoxication is impaired,
16  and their ability to think clearly is impaired.
17    Q.  Okay.  Could they have potentially not
18  remembered very much about the booking?
19    A.  When you're intoxicated, your
20  recollection and memory is altered, and you don't
21  have precise, factual information, based on how
22  intoxicated you are.  Intoxication is a scale --
23    Q.  Um-hmm.
24    A.  -- of, you know, severely intoxicated,
25  where you can't form any memories; or you are

98

1  blackout, and the next morning you wake up and don't
2  even remember anything that happened; to mildly
3  impaired, where you don't remember details, but you
4  remember generalities of what happened the night
5  before.
6      Q.  And you said your memory is impaired.
7  Could it be that you could distort something like
8  thinking a strip search happened when, in fact, it
9  didn't happen?
10     A.  That's possible.
11     Q.  All right.  And let me see.  I can't
12  read my own writing here.
13         So is it significant to you at all that
14  the nurse in the jail evaluated Ms. Blackmore and
15  determined that -- if she was going to remain in the
16  jail, that she had to be in a detox cell?  Is that
17  significant?
18     A.  Well, the nurse would have put her in a
19  detox cell because she indicated on the intake form
20  that she was intoxicated, that she had been drinking
21  alcohol.  And anytime a patient comes into the jail,
22  it's expected of the nursing staff to monitor them
23  for alcohol withdrawal.
24         Many patients lie about how much alcohol
25  they consume or how often they consume it, and we

99

1  find in the jail frequently that, you know, a
2  patient says they've had two drinks, and they don't
3  drink daily.  But later we find out that they have
4  severe withdrawals, and, you know, were not truthful
5  when they booked into jail about the amount of
6  drinking they had.
7         So because we know a lot of patients
8  withdraw like that, we're cautious, and we would put
9  them in detox.  Because she was intoxicated when she
10  came in.
11     Q.  All right.  And you were asked also
12  about these forms.  I think they were Exhibits 14,
13  15 and 16.  And they seemed to be property forms
14  that -- you said they look like property forms from
15  other jails.
16         Let me ask you this:  Have you seen
17  those property forms filled out in a jail, and yet
18  found the person in street clothes when you would go
19  to see them?
20     A.  Yes.
21     Q.  How often does that happen?
22     A.  All the time.  So, for instance, I will
23  be going to Wasatch County today to see some
24  patients after the deposition.  And many times, the
25  patients are booked into jail, and they're in

100

1  holding -- what we consider holding.
2         Holding is an area where they have not
3  received jail clothing yet because we don't know
4  whether or not they're going to stay in jail or book
5  out.  So the officers will leave them in their
6  street clothing, book them in, but place them in
7  holding.  And I will see them, and they'll still be
8  in their street clothing, not in jail clothes, but
9  yet the property forms were filled out as to what
10  property they came into jail with.
11        So even though the property form may say
12  that they have a T-shirt and socks, they're still
13  wearing them.
14     Q.  All right.  And that's common that you'd
15  see that?
16     A.  That is common that I see that.
17     Q.  And so if an inmate is going to bail out
18  or they think they're going to bail out, would they
19  ever be changed into jail clothing?
20     A.  So it's my experience that once the
21  patient -- it's determined that the patients are
22  going to stay the night in jail or going to be there
23  for some time, then they're changed into jail
24  clothing and moved to housing.
25        As long as they're in booking, then

101

1  they're not in jail clothes, they're in their street
2  clothes.  But once they move to what's considered
3  housing, then they will be moved into jail clothes.
4  You can't be in street clothing in housing.
5      Q.  Now, there's some questions that he had
6  about Ms. York being able to diagnose PTSD.  And I
7  think you mentioned that she had actually had a
8  license -- wasn't her license just as an associate
9  mental health provider?
10     A.  Yes.  I believe she became licensed in
11  May of -- or March of 2022 -- March 17th, 2022, as
12  an associate.
13     Q.  And do you know whether or not you can
14  even diagnose on your own when you're just an
15  associate?
16     A.  I don't -- I don't know the legal -- the
17  legal aspects of that, but typically -- in a typical
18  situation, it requires a preceptor or an overseeing
19  provider when you first come out of -- when you
20  first get your license.
21     Q.  You said you looked at the records where
22  she saw her in April and May.  Did it indicate that
23  she had any license at that time, in the records?
24     A.  No.  The records -- as you look at the
25  medical records from April and March, her name is

102

1  listed without credentialing and as the clinician.
2  And then below, where it says "clinician," and it
3  says "supervisor," and it indicates that the
4  supervisor had credentials, but she did not.
5      Q.   All right.  And is ketamine -- is that a
6  normal treatment for depression or anxiety?
7      A.   No.
8      Q.   Is it -- is it considered an efficacious
9  treatment for either depression or anxiety by the
10 medical community?
11     A.   No.
12     Q.   Is it considered a valid treatment for
13 PTSD?
14     A.   No.
15     Q.   Can death of a loved one or relative,
16 could that cause PTSD?
17     A.   Yes, depending on the relationship
18 between the person and the deceased.  Certainly, if
19 your father -- if you find your father dead or your
20 son or your -- a close relative, and you have a
21 close relationship with them and the effects of
22 death were traumatic to the person, that can cause
23 PTSD.
24     Q.   Now, you said that you also viewed the
25 arrest videos of the Hurricane police officers; is

103

1  that correct?
2      A.   DeMille and Carlson?
3      Q.   Yes.
4      A.   Yes.
5      Q.   Did anything in those videos raise any
6  red flags that Mrs. Blackmore might have been
7  intoxicated?
8      A.   Yes.
9      Q.   And what were those kinds of movements
10 or things that you observed?
11     A.   Well, when they -- when she came out of
12 the room down the hallway -- when she came down the
13 hallway, she was immediately confrontational with
14 the person who had broken into the hotel.
15          And then as the officers stepped between
16 her and that individual, she was still yelling at
17 them, raising her voice.  And then they cornered her
18 over kind of by the elevator, and she was still
19 yelling.
20          And then when they put her into the
21 police vehicle, she was acting very excitable and
22 appeared to be intoxicated.
23     Q.   Did you note from what you read that she
24 was kicking the cage of the police vehicle?
25     A.   I couldn't see from the video that she

104

1  was kicking the -- anything, but there was other
2  indication.  And then there were officer
3  reports -- or the depositions, I believe.  The
4  deposition that I read indicated that she was acting
5  that way.
6      Q.   All right.  And that it was checked on
7  the -- some of the booking records that she was
8  combative.
9          Do you remember that?
10     A.   Yes.
11     Q.   And are those potential signs, what you
12 observed, that -- what you just described, are those
13 potential signs of also being intoxicated?
14     A.   Yes.  Erratic behavior, aggressive
15 behavior, belligerent behavior, not following
16 directions or not following commands are all
17 indicative of an intoxicated person.
18          MR. MYLAR:  All right.  I don't have any
19 more questions.
20          MR. SYKES:  I do.
21          FURTHER EXAMINATION
22 BY MR. SYKES:
23     Q.   Do you think it's important for jails to
24 have accurate booking records?
25     A.   Yes.

105

1      Q.   You would never encourage or support
2  filling out false forms, would you?
3      A.   No, I would not.
4      Q.   That would be improper, would it not?
5      A.   When you say "false forms," like making
6  stuff up?
7      Q.   Stuff that's not true.
8      A.   Right.  The booking records should be
9  accurate.
10     Q.   Now, I don't know anything about -- you
11 are going to a jail today in --
12     A.   Wasatch County jail.
13     Q.   Wasatch County.  Okay.  And so you're
14 not showing us any of the forms that they have
15 there, are you, today?
16     A.   I did not bring a -- present a form
17 from -- a property form.
18     Q.   And so I can't really comment on that,
19 and you can't comment because you don't have them
20 here, right?
21          You don't have those forms here?
22     A.   No.
23     Q.   But we do know about the forms used at
24 the Washington County jail, right?
25     A.   Yes.

106

1    Q.  And there was a form -- Exhibit 16, I
2  think it was -- that said that they took -- the word
3  "take" or "taken" was in there, I think, four times.
4         MR. SYKES:  Would you grab that for me?
5         THE WITNESS:  Three times.  "Taken" was
6  twice, and "take" was once.
7    Q.  (BY MR. SYKES)  And this form doesn't
8  say that they were just left in their clothes.
9         The form says "prebooking take,"
10 correct?
11   A.  That's what it says, yes.
12   Q.  Yeah.  And down below it uses the word
13 "taken" two more times, right?
14   A.  That's what I said.
15   Q.  Yeah.  And by the way, it says that she
16 was combative but not intoxicated.
17        See that?  Bottom left?
18   A.  It does not say she wasn't intoxicated.
19   Q.  Intoxicated is not checked, in other
20 words?
21   A.  Yeah.
22   Q.  Now, if this form actually means the
23 prebooking not take -- and put the word "not" in
24 there -- this form, as it is, would be a false form,
25 wouldn't it, a false record?

107

1         MR. MYLAR:  Objection.  Lack of
2  foundation.
3    Q.  (BY MR. SYKES)  Because they didn't
4  actually take anything?
5         MR. MYLAR:  Objection.  Lack of
6  foundation.  Calls for speculation.  And exceeds his
7  opinions in his report.
8    Q.  (BY MR. SYKES)  I always know I have a
9  good question because of what Frank objects to.
10        All right.  But going back to the
11 question -- I'm curious about this because this --
12   A.  I understand what you're asking.
13   Q.  With -- what this means is that -- it
14 means the prebooking not take.  Here, I'll write the
15 word "not" in there, okay, in red.  That's my copy
16 of it.
17        See that "not" up there?  It's a carat
18 and a "not"?
19   A.  I see that.
20   Q.  Yeah.  So if what this really means is
21 they didn't take that property, it would be a false
22 form to put in the record, would it not?
23        MR. MYLAR:  Objection.  Lack of
24 foundation.
25   Q.  (BY MR. SYKES)  They say they -- they

108

1  say they took, but they didn't take.
2         MR. MYLAR:  Objection.  Lack of
3  foundation.
4    Q.  (BY MR. SYKES)  That's a false form,
5  right?
6         MR. MYLAR:  Lack of foundation.  Calls
7  for speculation.  Exceeds the scope of his opinions.
8         THE WITNESS:  This form, in my expert
9  opinion, is poorly worded, and it is vague.
10   Q.  (BY MR. SYKES)  It's vague?
11   A.  It's vague and poorly worded.
12   Q.  In other words, saying that we "took" or
13 "taken" three times is vague?  That's vague?
14   A.  Well, it would be a better form if it
15 said these items were -- she came into jail with and
16 retained -- she retained them, but she's in jail
17 with them.
18        And there was another line that said
19 these were placed in her property locker.  But this
20 doesn't differentiate between whether she was able
21 to keep them or not, it just says, "take."
22   Q.  Okay.  And then Exhibit 14, it says,
23 "Property stored."
24        See that?
25   A.  I see that.

109

1    Q.  Yeah.  So I'm going to just write a
2  carat in here too and write the word "not" up here.
3         So what they're saying is -- it should
4  have said "property not stored," right?
5         MR. MYLAR:  Objection.
6         THE WITNESS:  Or retained.
7         MR. MYLAR:  Objection.
8    Q.  (BY MR. SYKES)  Or retained?
9    A.  Or retained, yeah.
10        MR. MYLAR:  Asked and answered, number
11 one.  And objection.  Lack of foundation.  Calls for
12 speculation.  And exceeds his --
13   Q.  (BY MR. SYKES)  I must have asked a
14 really good question.
15        Okay.  Then it says, "I, DANYALE
16 BLACKMORE, certify that on the above date and time,
17 the following personal property was accepted into
18 storage."
19        See that?
20   A.  I see that.
21   Q.  Yeah.  So maybe the form, to be
22 truthful, according to what the defendants say, "I
23 certify that the property" -- "the above" -- "the
24 property was not accepted into storage" is what it
25 should say, right?

**110**

1          MR. MYLAR: Objection. Asked and
2 answered. And the additional objections I said
3 earlier.
4          THE WITNESS: I guess my answer to the
5 whole line of questioning is I'm not an expert in
6 Spillman forms.
7     **Q. (BY MR. SYKES) All right. But as a**
8 **corrections medical expert, you would never advise**
9 **the people you work for in the jail to put false**
10 **forms in the record, would you?**
11     A. No.
12          MR. SYKES: No further questions.
13          MR. MYLAR: All right. He wants the
14 opportunity to read and sign the deposition.
15          REPORTER: And do you need a copy?
16          MR. MYLAR: I do need an electronic
17 copy.
18          (The deposition concluded at 1:09 p.m.)
19
20
21
22
23
24
25

**112**

1   Case: Blackmore vs. Carlson, et al.
    Case No: 4:21-CV-00026-DN-PK
2   Reported by: Karen Christensen, RPR, RMR, RDR
    Date Taken: February 25, 2025
3
              WITNESS CERTIFICATE
4
          I, KENNON TUBBS, M.D., HEREBY DECLARE:
5       That I am the witness in the foregoing
    transcript; that I have read the transcript and know
6   the contents thereof; that with these corrections I
    have noted, this transcript truly and accurately
7   reflects my testimony.
8
    PAGE/LINE   CHANGE/CORRECTION              REASON
9
     ___/___   _____    _____
10   ___/___   _____    _____
     ___/___   _____    _____
11   ___/___   _____    _____
     ___/___   _____    _____
12   ___/___   _____    _____
     ___/___   _____    _____
13   ___/___   _____    _____
     ___/___   _____    _____
14   ___/___   _____    _____
     ___/___   _____    _____
15   ___/___   _____    _____
16       I, KENNON TUBBS, M.D., deponent herein, do
    hereby certify and declare under penalty of perjury
17  the within and foregoing transcription to be true
    and correct.
18
19   _____
              KENNON TUBBS, M.D., Deponent
20
21  STATE OF _____)
                             :
22  COUNTY OF _____)
23       SUBSCRIBED and SWORN to by KENNON
    TUBBS, M.D. at _____
24  this_____day of_____, 2025.
25   _____
              Notary Public

**111**

1              REPORTER'S CERTIFICATE
2   STATE OF UTAH      )
                       :ss
3   COUNTY OF SALT LAKE )
4
5        I, Karen Christensen, a Registered
    Professional Reporter, a Registered Merit Reporter,
6   and a Registered Diplomate Reporter, hereby certify:
         THAT I reported the taking of the deposition
7   of the witness, KENNON TUBBS, M.D. commencing on
    this 25th day of February 2025.
8        THAT prior to being examined, the witness
    was, by me, duly sworn to testify to the truth.
9   That I thereafter transcribed my said steno notes
    into typewriting and that the typewritten transcript
10  of said deposition is a complete, true, and accurate
    transcription of said steno notes.
11       I further certify that I am in no way
    related to any of the parties, nor am I in any way
12  interested in the outcome thereof.
         (X) Review and signature was requested.
13       ( ) Review and signature was not reserved.
         ( ) Review and signature was waived.
14       The transcript was thereafter sent to
    Mr. Mylar.
15       IN WITNESS THEREOF, I have subscribed my
    name this 24th day of March 2025.
16
17
18
         _Karen Christensen_
19       KAREN CHRISTENSEN, RPR, RMR, RDR,
         Nevada CSR #1015
         California CSR #14810
20
21
22
23
24
25

**Exhibits**

Tubbs Exhibit 50 3:10 5:8 40:24 61:22
Tubbs Exhibit 51 3:11 5:13 14:25
Tubbs Exhibit 52 3:12 5:19
Tubbs Exhibit 53 3:14 20:13
Tubbs Exhibit 54 3:15 25:6,14
Tubbs Exhibit 55 3:17 44:18
Tubbs Exhibit 56 3:18 92:6,8

**$**

$10 10:13
$10,000 25:21
$12,000 89:11 95:4,9
$2,000 96:3
$200 87:8
$500 87:5,11,13
$6,000 89:17 95:5,7,9
$6,150 88:1
$6,151 95:10
$8,000 96:4

**0**

02:09 49:25
08 39:1

**1**

1 36:18 46:11
10 45:11
10,000 17:12
100 92:2
10:25 4:1
10:30 76:7
11 15:5,7,11,17 61:25
12 26:2,3 89:10,17 92:20 93:19
12,000 89:14
12:30 76:7,13,14
12th 62:1 83:14 95:19
13 27:16 29:19 61:23 89:10 93:5 94:2

134- 4:22
13584 4:22
14 53:7,9,11,12 62:2 65:3 73:12 89:11 99:12 108:22
15 15:3,14,20 25:17 53:9 55:21 63:9,15 73:12 99:13
159 47:19
16 25:17 45:17 49:14 53:9 54:5 73:13 94:8 99:13 106:1
168 55:14,15,18 56:14 58:3
17 66:21
17th 83:13 101:11
18 45:16,19
18th 62:1
19 45:21
1:09 110:18

**2**

2 5:25 31:7 36:17 41:5 47:7 49:19 50:6
20 40:10,14,16
2016 92:13
2020 6:4 7:6 8:21 49:25
2022 62:1,2 66:1 83:13,14 85:19 88:18 89:23 101:11
2024 47:19
2025 4:1 85:18 95:19
21 45:24 69:12,15
22 45:25
25 4:1 17:13 92:18,19 93:18 94:5,8,12,25
26 84:6
27 65:1
2:10 8:22
2:15 8:22

**3**

3 41:5 43:9 56:3 61:23 63:15 66:21 69:17 83:2 85:22
30 47:20
31 62:2
31st 65:2,25

**4**

4 72:12 85:22
40- 10:16
41 78:15

42 83:2 85:22
45 11:22
45-bed 10:16
47 80:24,25

**5**

5 26:3 30:9,19 43:9 46:20 47:10,11 72:12
5-0 5:5
50 5:5,6,8 11:22 25:1 40:20,22,24,25 61:22 77:2
500 87:6
51 5:13 14:25
52 5:18,19,23
53 20:13
54 20:12 25:3,4,5,6,13,14 90:21
55 44:17,18
56 92:6,8

**6**

6 6:4 32:19
6,100 89:16
67 44:23 45:10
68 44:23 46:11
6th 7:6 8:21 49:25 65:3

**7**

7 32:24 37:15 80:25
7th 47:19

**8**

84020 4:23

**A**

a.m. 4:1 8:22
ability 90:9 97:14,16
Absolutely 45:5
abuse 23:6
abusing 82:19
accept 12:1
accepted 54:22 109:17,24
access 87:19
accident 71:5
accurate 6:5 104:24 105:9
accusing 81:9

act 47:23 69:10
acting 34:11 103:21 104:4
actual 21:1
add 96:20
added 41:2
addicted 78:21 79:3,13,19
addiction 78:18 79:5,10 82:18
additional 110:2
address 4:15,21
admission 45:25
admit 16:24
admits 36:3
admitted 30:10 31:13,17 32:17 35:8 78:19,24 79:5 82:8
advise 110:8
affect 97:6,7,12
affected 27:7,21
aggravated 34:5
aggressive 47:12 104:14
agree 14:24 16:11 17:7 59:19 69:8
ahead 17:6 27:10 28:16 33:11 34:10 42:24 50:16,19 58:21,24 59:15 74:10 87:18
aid 23:12
alcohol 28:21 29:8,12,15,17 30:2 31:17,18,21,24 32:16,17 33:3,17 34:16,19 35:1,7,19,20 36:3,6,19 37:3,15,16,20 38:5,7,10,15,17 39:4,10 98:21,23,24
alcoholic 29:12 31:10,14 37:23
alcoholics 29:14
allegedly 12:5 66:13
alleges 72:13
Allen 66:20 67:19 78:18,20,24 79:5,13 80:4,15 81:1,17 82:7
allowed 57:22
allowing 86:11
altered 97:20
America 24:20
amount 17:9 77:1 99:5
amputation 71:2
analysis.' 85:24
Andrew 93:23
anesthesiologist 67:7 82:21

**anesthesiologists** 67:9, 16 78:17 79:9,18 82:17,24, 25
**angry** 34:6
**anxiety** 23:4,19,25 24:17, 18 67:23 68:7,16 102:6,9
**anxiety-like** 23:15
**anxious** 66:13
**anytime** 98:21
**apparently** 56:14
**Appeals** 59:2
**appearances** 92:11
**appeared** 63:24 64:4,6,16 103:22
**appearing** 27:24
**appears** 39:10
**approximately** 8:22
**April** 61:25 62:1 83:14 88:18 89:22 101:22,25
**area** 10:4 97:9 100:2
**areas** 9:3
**argument** 59:4,7
**argumentative** 28:15 74:4,24
**arm** 71:2
**arrest** 12:6,10 13:24 14:3 27:23 28:1 33:25 34:14 35:5 41:9,19 102:25
**arrested** 25:19 26:11 28:20 42:10
**arresting** 43:11
**Ascend** 83:24,25
**aspects** 101:17
**assault** 21:8 47:23 69:9
**asserted** 51:2
**assessment** 48:3
**assignments** 15:17
**associate** 101:8,12,15
**assume** 18:14 41:22
**assumption** 36:10
**attorney** 96:9
**attorneys** 86:17 94:14
**audio** 63:7
**avoid** 66:7,8,17,18
**avoidance** 66:6,16
**aware** 9:21,22 10:19,20,25 11:1,9,10,11,12,13,16 12:18,19,20 13:7,10 32:24 33:6 41:21,22,24 42:2,13 44:24 45:3,22 46:23,24 48:7,12,14,21 62:7,10,13, 16,21 67:6,11 68:18 83:18, 21

**awful** 26:15 27:18,24

**B**

**BAC** 34:25
**back** 4:9 25:13 71:19 92:12 107:10
**background** 9:14,16,23 26:1
**bad** 21:12 40:5 82:22
**bag** 18:18
**bail** 25:20 42:11 100:17,18
**bailed** 42:11
**bailiwick** 14:1
**barely** 35:14,15
**base** 61:19
**based** 60:23 61:8 97:21
**basically** 81:9
**beer** 36:6,9
**behalf** 4:4
**behavior** 104:14,15
**believed** 64:19
**believes** 7:11,12
**belligerent** 104:15
**Bench** 5:2
**beneficial** 91:5
**benefit** 90:25
**beverage** 31:10,14
**biased** 95:2
**big** 37:1
**bill** 89:11
**billed** 95:12,15,19,20
**bipolar** 23:4
**black** 68:1,2,3,9
**Blackmore** 16:12 24:25 25:17 41:11 43:12 47:22 48:18 54:18 55:6 56:4 59:24 63:10 65:22 68:25 69:18 72:13,17 73:4 74:17 79:25 82:16 83:10,17 84:6 85:15,19 86:11 88:15,17, 24 89:4,5,6 91:11 97:4 98:14 103:6 109:16
**Blackmore's** 49:21 55:11
**blackout** 98:1
**bless** 24:20
**blood** 34:25 39:4
**body** 45:1,13,24 46:2,22 47:1,3
**bogs** 30:20
**book** 36:14 100:4,6

**booked** 17:12 18:2,4,6 41:25 57:20 99:5,25
**booking** 6:3 18:7 33:15,25 41:9,20 43:11 44:22 50:7 69:18 97:9,18 100:25 104:7,24 105:8
**bottom** 50:5,6 51:24 66:22 106:17
**box** 36:18,23 68:1,2,3,10
**Boy** 5:1
**boyfriend** 25:23
**bra** 18:19 54:12 56:11
**brain** 71:2
**Brangham** 47:13
**break** 23:11 44:10 76:12, 14,16,19 96:18
**breath** 28:21 31:11,18,21 35:8 36:3
**bring** 105:16
**broken** 103:14
**brother** 25:23,24
**brother's** 25:23
**brought** 51:11
**built** 10:3
**businesswoman** 24:5 70:1

**C**

**C-H-R-I-S-T-O-P-H-E-R** 4:21
**cage** 103:24
**call** 11:6 21:16 22:11 25:18
**called** 4:4 10:16 67:21 83:25
**calls** 14:12 17:4,23 18:25 19:14,16 24:8 27:8 32:4,8, 9 33:8,9 50:17 52:10,14 53:2,22 58:19,23 60:1 61:7 62:12 73:15 107:6 108:6 109:11
**car** 7:23 27:25
**carat** 107:17 109:2
**care** 41:10 43:3,10 90:12, 13,14
**caring** 90:22
**Carlson** 11:7 13:7 30:25 31:1 47:12 48:18 103:2
**Carolina** 4:22
**cars** 7:24,25 8:1
**case** 4:13 59:11 66:11 80:5,8 85:6,24 89:7 91:3 92:20 93:6 94:3
**cases** 92:18,19 93:18 94:5,

12
**catchall** 23:17
**caused** 24:7 69:9
**cautious** 99:8
**cavity** 45:1,24 46:2,22 47:1,3
**cell** 13:4,8,18 98:16,19
**certainty** 41:8 85:13
**certify** 56:4 109:16,23
**cetera** 45:15
**chance** 69:20
**change** 57:20,22,24 58:2
**changed** 75:12 100:19,23
**charge** 12:12 77:14 87:3, 13 89:6
**charges** 12:15
**charging** 87:8
**chart** 32:13,15
**check** 26:12
**checked** 33:3 37:2,5 39:11,13,16 104:6 106:19
**chest** 71:3
**choice** 83:2
**Christopher** 4:17,20
**circumstances** 48:17
**City** 11:7
**claimed** 44:25
**claims** 83:11 85:2
**Clarify** 35:25
**clarifying** 96:24
**clear** 80:12
**client** 86:18,19
**clinic** 67:20 83:24
**clinical** 86:11,13
**clinical/legal** 86:10
**clinically** 90:23
**clinician** 102:1,2
**close** 64:25 102:20,21
**clothes** 18:18 19:9 29:21 45:12 57:12,24 58:2,3 75:8,12,16 99:18 100:8 101:1,2,3 106:8
**clothing** 57:21 60:11 73:9 74:2 75:4 100:3,6,8,19,24 101:4
**collided** 7:24
**combative** 104:8 106:16
**commands** 104:16
**comment** 12:11 54:9 90:1 105:18,19

**commenting** 44:22
**committing** 21:11
**common** 36:13 100:14,16
**community** 102:10
**compare** 54:6
**comparing** 14:15
**comparison** 78:16 79:8
**competent** 9:19
**completed** 72:16 73:3
74:16
**completely** 26:14 27:16,
23 45:6
**completes** 29:24
**comprehensive** 85:24
**concerns** 48:18
**concluded** 69:18 110:18
**conclusion** 58:20
**conduct** 12:4 42:19
**conflict** 80:25 81:17 91:23,
25
**confrontation** 47:25
**confrontational** 103:13
**consequence** 66:6
**considered** 97:4 101:2
102:8,12
**consistent** 41:10,20 52:21
54:16
**consume** 98:25
**consuming** 31:13,17
**consumption** 33:1 34:16
**content** 39:4
**context** 48:10
**continue** 29:18 88:10
**contradict** 64:6
**contrary** 64:12
**contributing** 28:10
**control** 47:24
**convenient** 80:14
**copied** 44:10
**copies** 44:6
**copy** 25:9,10 32:20 44:5
63:2 107:15 110:15,17
**corner** 36:7,10
**cornered** 103:17
**correct** 8:24 9:1 11:5
12:13 15:8,18 17:3 24:2
41:16 43:14 47:5 56:20
63:23 66:15 67:5 68:6,8
69:14,22 92:22 93:9 103:1
106:10
**correction** 15:16

**correctional** 8:25 12:14
15:1 17:13 39:22
**corrections** 41:21 58:16
110:8
**costs** 66:18
**counselor** 78:12
**count** 15:10 96:6
**counting** 8:14
**country** 35:11,17,25 50:22
58:10,11,13 60:24 75:2
81:15 96:19
**County** 41:12 46:21 93:7
99:23 105:12,13,24
**couple** 26:23 95:13,15,16
**court** 4:23 59:2 77:24 92:1,
11
**Court's** 47:18
**courts** 42:9
**credentialing** 102:1
**credentials** 102:4
**crime** 12:4 21:11,18 81:9
**criminal** 11:12,13,16,19,
24 14:9 69:10
**criteria** 20:1,2,3,8,18,22
21:24 22:2,3,8,10,12,13,14
23:23 69:11 70:22 71:10
72:1
**Criterion** 69:16
**critiquing** 5:25 6:8
**crying** 26:14 27:17,23
**curious** 107:11
**curtain** 57:22
**CV** 83:5 85:2,23

**D**

**dad** 25:18
**daily** 37:6 99:3
**damage** 7:24 8:1
**damaged** 9:4,5
**damages** 8:4,5
**Danyale** 7:4 8:20 16:12,25
17:18 18:14,23 19:10
27:21 28:6 31:16 33:20
34:22 38:4,20 41:11 49:21
54:18 55:5,10 56:4,18
59:24 61:24 62:19 65:22
68:25 69:25 71:21 79:25
80:13,16 82:16 83:6,13,18
109:15
**Danyale's** 9:14 31:11
66:11 71:6
**date** 49:23 50:8 109:16
**daughter** 25:8 27:14 30:1

**day** 37:25
**days** 24:20 37:15 84:6,8,9
**dead** 102:19
**deadline** 5:21
**deadly** 20:5,6
**deal** 39:23
**deals** 40:5
**dealt** 17:11
**death** 21:1 69:20 102:15,
22
**deceased** 102:18
**decide** 6:18
**decision** 93:10
**Declaration** 44:7 46:6
**Declaration's** 46:8
**defendant** 44:3
**defendants** 109:22
**defense** 96:10
**deference** 48:5
**Define** 10:5,7 68:2
**definition** 29:16 68:9
71:15 75:7 77:9
**degree** 41:8 84:20
**delirium** 37:22
**Demille** 103:2
**denies** 37:6
**depending** 102:17
**deposed** 44:25
**deposition** 5:8,13,19 9:17,
20 20:13 21:20 24:23,24
25:6,14 26:3 28:25 29:18
38:22 43:23 44:3,18 46:5,7
62:23,24 63:3 66:25 69:24
75:20 78:25 81:22 92:6
95:25 96:6 99:24 104:4
110:14,18
**depositions** 92:10 104:3
**depression** 23:4,19,25
24:18 67:17 68:5,12,14
80:13 102:6,9
**depression-like** 23:15
**describes** 65:5
**describing** 63:11,21
**designed** 57:23
**detachment** 86:11
**details** 98:3
**detained** 41:11
**determine** 41:7
**determined** 98:15 100:21
**detox** 28:19 98:16,19 99:9
**detrimental** 90:17

**developed** 5:1 49:16
**diagnose** 39:21 40:12
101:6,14
**diagnosed** 20:20 21:22
22:10,21 23:23 62:17
83:16 85:15,20
**diagnosing** 83:10
**diagnosis** 22:2 40:9
**diagnostic** 20:1
**die** 33:24
**difference** 60:15,16 79:25
**differentiate** 108:20
**differently** 72:11
**directions** 104:16
**directly** 26:25
**disagrees** 59:2
**discredit** 16:22
**discussion** 44:1 87:23
**disease** 23:4
**diseases** 23:6
**dismiss** 48:25
**disorder** 19:22,25 20:18,
21 21:23 72:1
**disorderly** 12:4 42:19
**disorders** 23:1,19
**disrobe** 8:11 58:7,17 59:5,
24 60:7,13,17,20 61:2,5,
11,16,18 72:13 74:1 75:5,
14
**disrobed** 73:21,22 75:5
**distort** 98:7
**distress** 24:16
**doctor** 5:15 12:14 15:3
58:10,11 60:24 78:12
**doctor-patient** 91:2,20
**document** 47:19
**documents** 61:12 73:8
**dollars** 10:8
**double** 57:8
**drank** 36:8 38:20
**Draper** 4:23 58:13
**drink** 29:5,8,11,14 37:24
38:10,15 99:3
**drinking** 28:22,23 29:2
31:20 32:15,17 35:8 36:4
37:6,21 38:24 98:20 99:6
**drinks** 29:6 99:2
**drug** 40:2,5 68:4 78:18,21
79:10,13 82:17
**drugs** 33:3,17 34:16 37:14
79:19

**drunk** 37:10
**DSM-5** 20:10
**duly** 4:5
**duty** 90:24 91:15

## E

**earlier** 41:13 69:23 71:19 73:20 110:3
**East** 5:2
**eat** 76:11
**edit** 49:4
**education** 84:9 85:17
**effects** 102:21
**efficacious** 102:8
**electronic** 110:16
**elevator** 103:18
**Elizabeth** 61:23 62:6,14, 16,25 63:3 83:19 89:21
**email** 59:11
**embarrassing** 26:16 27:19
**Emily** 24:25 25:17,22
**Emily's** 24:23
**emotion** 28:10
**emotional** 8:7,9,10,15,17 9:9,10 14:11,17 17:2,9,17 18:1,3,22 19:20 24:16 28:7 65:21 70:8,9,17,19,20 71:7,12,22 72:3,9
**emotionally** 17:14
**encourage** 105:1
**end** 54:21
**enormous** 77:1
**entire** 9:16
**Erratic** 104:14
**erratically** 34:12
**essentially** 13:4
**Estate** 93:5
**evaluated** 98:14
**evening** 28:8,23 34:23 36:4
**event** 7:15,19 14:23 18:3 19:20 20:4,5 22:9 24:12 27:5 30:2 45:17 64:25 66:5,9,11 69:16 70:23,24 71:24
**events** 63:11 72:10
**evidence** 6:19 12:23 19:3 68:14,15,20 69:19 72:15, 24 73:2,19 74:15 75:13
**EXAMINATION** 4:7 97:1 104:21

**examine** 69:6
**examined** 4:6 68:25
**examining** 69:3
**exceeds** 107:6 108:7 109:12
**excellent** 80:11
**excessive** 32:25 33:17,23 34:15
**excessively** 34:22
**excitable** 103:21
**exhibit** 5:4,8,13,19 14:25 20:13 25:6,14 30:9,18 32:19 36:17 40:24 44:16, 18 49:14 53:7 54:5,12 55:21 61:22 90:20 92:6,8 106:1 108:22
**Exhibits** 73:12 99:12
**exist** 40:4
**expect** 17:1 27:12 89:10
**expected** 98:22
**experience** 19:20 23:21 24:6 40:1,2 72:10 84:11 100:20
**experiences** 17:9
**experiencing** 23:18
**expert** 9:19 49:1,7 65:14, 16,18 69:5 73:16 80:5,6,7 83:6,11,16 84:24 85:2,10, 13 86:20 90:2,4,8 91:1 108:8 110:5,8
**expertise** 5:24
**experts** 6:1,9
**explain** 7:22 74:23 75:1
**explained** 9:15
**exposure** 20:23,24 22:8, 11,22
**extreme** 71:7,14,15
**extremely** 39:24

## F

**faced** 17:10
**fact** 6:14 8:20 16:15 24:5 48:11 79:22 80:11 97:3 98:8
**facts** 14:13 18:24 19:18
**factual** 6:16 47:21 97:21
**fail** 34:19
**fair** 36:10
**fairly** 10:1 11:6,24 12:15
**falling** 34:17
**false** 72:19 105:2,5 106:24, 25 107:21 108:4 110:9

**familiar** 51:14
**family** 8:23 76:25 77:6,14
**fashion** 72:15
**father** 102:19
**favor** 93:11
**fear** 37:22
**February** 4:1 95:19
**feel** 80:14 90:8
**female** 8:10
**field** 85:2
**filed** 30:25 47:19
**filled** 36:17 99:17 100:9
**filling** 105:2
**financial** 86:19,20,21,23 88:6,9,22 89:20,24
**find** 37:21 48:17 99:1,3 102:19
**findings** 47:22 48:10
**fingers** 15:9
**finish** 30:7 34:8 79:23
**fire** 89:1
**fired** 89:4,5
**first-line** 68:23 80:12
**Fitting** 55:9,10 56:17
**flags** 103:6
**floor** 36:7
**Flowers** 93:24
**folder** 43:23
**forced** 8:10 18:11,13,15 72:13
**forget** 45:13 59:20,22
**fork** 7:1
**form** 33:1,2 38:2 39:9,10, 15 40:11 49:15 50:7,9,15, 23,24 51:16,19,25 52:18, 19 53:16,25 54:9 55:1,22 60:10,11 73:23 97:14,25 98:19 100:11 105:16,17 106:1,7,9,22,24 107:22 108:4,8,14 109:21
**forms** 49:2,4,8 51:8,14 52:22 60:10 74:3,15,20 75:3,18 99:12,13,14,17 100:9 105:2,5,14,21,23 110:6,10
**found** 62:14 99:18
**foundation** 24:9 27:9 32:9 33:10 50:13 52:15 53:2,24 55:17 56:23 57:6 58:5,22 60:1,22 61:7 62:12 64:2 73:11,15 74:9,22 75:18 107:2,6,24 108:3,6 109:11
**fourth** 42:22

**fractured** 71:4
**Frank** 9:20 13:22 16:18 30:22 35:13 59:11,22 87:14,24 92:21 93:6,7,11, 15 94:6,20,23 95:1,15 96:13 107:9
**Frank's** 26:24
**frequently** 40:4 67:9,13 99:1
**front** 8:11,21 14:19 19:9 21:4 63:12 66:12,14 72:14 75:8,14
**full** 4:14
**fun** 19:8

## G

**gain** 27:13 86:19,20,21,23 88:4
**gang** 40:1
**Gardner** 92:20 93:4
**gave** 5:22 55:11
**generalities** 98:4
**girlfriend** 25:25
**give** 5:22 21:15 27:6,20 34:25 41:14 59:10 80:19, 23 92:14 96:4
**giving** 48:5 80:15
**God** 24:20
**Goich** 93:10,14
**good** 4:9 32:22 54:2,3 55:20 107:9 109:14
**goodness** 35:16
**grab** 106:4
**graduated** 84:4,25
**graduating** 83:12 84:11
**guess** 58:16 78:3 110:4
**guessing** 40:10
**guest** 11:8
**gunshots** 40:5
**guy** 93:19

## H

**half** 4:10,13 64:25
**hall** 48:19
**hallway** 103:12,13
**hand** 13:3
**hands** 13:17,19
**happen** 7:9,11,12,20 98:9 99:21
**happened** 6:11,22 7:2,8, 16 8:16,18 10:24 14:8

17:21 18:20 19:5,6 25:18
29:25 31:2 75:6 98:2,4,8
**harm** 69:20 71:1
**harmful** 33:1,18,23 34:16
**harmfully** 34:23
**He'll** 16:20
**health** 23:6 33:18 76:24
77:1,3,5,8,10,11,13,15,16,
22,23,24,25 78:4,7 83:9
101:9
**hear** 12:22
**hearing** 23:12
**hearsay** 64:23
**held** 42:9 44:1 87:23
**helpful** 69:4,7
**helps** 68:14
**heroin** 39:11,14,17
**high** 15:10 39:12,16 78:17
79:9 82:17
**high-risk** 82:23
**Hill** 4:22
**hired** 96:10
**history** 14:9 37:21,24
**hit** 7:23,25
**holding** 63:10 100:1,2,7
**home** 14:21
**homes** 10:4
**honest** 60:24
**horrific** 40:3,18
**hospital** 33:20
**hotel** 10:16,17,20,23 11:2
12:5 25:19 103:14
**hour** 87:5,6,12,13
**hours** 76:5 89:11,17 96:2,3
**house** 58:12
**housewife** 24:5 70:1
**housing** 100:24 101:3,4
**huge** 16:8
**humble** 9:19
**hundreds** 10:3 67:15
**Huntsville** 58:12
**Hurricane** 10:4 11:7
102:25
**husband** 11:4
**hyphen** 81:18
**hypothetical** 18:25 19:17
24:10 33:9 53:3
**hypothetically** 18:14,21
19:6,13 42:15

**I**

**idea** 21:12 82:22
**identical** 41:1
**identification** 5:9,14,20
20:14 25:7,15 44:19 92:7
**Ignore** 19:1
**illegal** 42:3,6
**immediately** 103:13
**impaired** 97:14,15,16
98:3,6
**imply** 79:16
**important** 27:6,11,20
71:20 90:8 104:23
**impression** 24:4 32:10
33:10
**improper** 42:3,7 105:4
**inappropriate** 42:18
48:23
**inappropriately** 85:20
**incarcerated** 16:9
**incest** 40:6
**inches** 50:6 56:4
**incidence** 32:13
**incident** 26:7
**includes** 56:11
**including** 54:12
**incomplete** 18:25 19:17
24:9 33:9 53:2
**inconsistent** 34:12
**independently** 84:2
**indicating** 37:10 81:21
**indication** 80:12 104:2
**indicative** 104:17
**indifferent** 91:7
**individual** 103:16
**individuals** 21:10 36:15
**inference** 31:19
**influence** 33:16,22,23
**information** 6:16 27:7,12,
21 64:11,14,20 87:19 89:3
97:21
**inject** 82:9
**injected** 82:13
**injections** 78:19,25 79:6
**injured** 9:6,7
**injury** 21:2 71:3 85:23
**inmate** 45:8 51:15 100:17
**instance** 99:22
**intake** 36:16 98:19

**intended** 33:14 82:5
**intent** 33:15
**interaction** 14:22
**interest** 81:1,17 88:6,9,22
89:20,24 90:15 91:23,25
**interested** 59:16 90:23
**interesting** 54:8
**interpreting** 53:24
**intoxicated** 28:7,11,18
29:3,4,7,9,13,16 31:6,15,
22 32:3,7 33:6 34:23,24
35:5,9,21 36:5,11,13,14
37:11 38:4,7,10,16,17
39:5,7,8,11 72:17,21 73:25
97:4,7,13,19,22,24 98:20
99:9 103:7,22 104:13,17
106:16,18,19
**intoxication** 37:13 38:18
97:15,22
**intrudes** 21:20
**intrusion** 21:19
**invested** 92:2
**invoice** 87:16
**involved** 88:4
**issue** 59:21
**items** 50:2,6,9,24 51:11,25
52:4 56:8 108:15

**J**

**jail** 13:20 14:5,9,18 16:1,2,
4,14,16,25 17:12 18:2,4,6
24:6 25:25 26:6 27:15
33:15 36:12,15,18 38:1
41:12,25 44:24 50:14
51:11 57:21 58:15 61:3
77:24 97:5 98:14,16,21
99:1,5,17,25 100:3,4,8,10,
19,22,23 101:1,3 105:11,
12,24 108:15,16 110:9
**jails** 15:4,6,11,17,24 43:2
51:9 52:22 57:20 77:1
99:15 104:23
**James** 93:19,23 94:2,10
96:15
**January** 6:4 7:6 8:21
49:25
**Jardine** 36:17
**Jared** 11:7 13:7 30:25 31:1
**JERGENSEN** 5:5,12 25:2,
5,9 40:22 43:25 44:6
**Jesse** 55:9,10 56:17
**Judge** 48:8,12,14
**Judge's** 48:1,6
**judgment** 88:21

**June** 47:19 65:3
**jury** 6:18 7:11,12 47:21
48:16
**justified** 13:25 14:3

**K**

**K-E-N-N-O-N** 4:20
**Kennon** 4:3,17
**ketamine** 67:3,10,13,16,
24 68:1,11,13,14 78:19,24
79:2,6,13 80:10,11 81:2,6,
11,13,18,20,22 82:8,9,13,
19,21,25 102:5
**kicking** 103:24 104:1
**kidding** 39:25
**kind** 7:1 15:25 17:10 29:24
35:12 84:8 103:18
**kinds** 13:14 103:9
**knowledge** 38:19 43:4
61:19

**L**

**La-norma** 44:3,8,20 46:6
**labeled** 69:15
**lack** 24:9,18 27:9 32:9
33:10 50:12 52:15 53:1,24
55:16 56:23 57:5 58:4,22
59:25 60:21 61:6 62:11
64:1 73:10,14 74:8,21
75:17 107:1,5,23 108:2,6
109:11
**language** 46:21 65:8
**lasting** 22:25
**lawsuit** 88:7,9,11,14,22
89:21 90:16,18
**lawyer** 9:20 35:11,17,25
42:25 50:22 58:8 75:2
81:15
**laying** 26:12
**lead** 39:23
**leave** 100:5
**left** 41:3 50:6 106:8,17
**legal** 39:1 42:22 43:8
48:10,23 58:20 59:4,7
71:15 101:16,17
**legality** 42:5 43:1
**lethal** 20:4,6
**license** 77:18 78:8,11
83:15 101:8,20,23
**licensed** 77:11,16 78:6,11,
12 83:8,12 101:10
**licensure** 84:20

lie 98:24

lies 16:20

life 35:12

lightning 59:21

likewise 48:16

limit 39:1

lines 85:22

list 50:2 92:10

listed 50:6 54:12 94:5
102:1

listen 66:22

listened 63:7

lists 54:4

literature 67:3 68:19

live 40:6

lives 39:24 40:2

lobby 12:5

location 55:13,15

locked 11:8 12:4

locker 29:21 55:14,15,18
56:14 58:3 108:19

log 46:3

logged 45:20,21,23 46:1

long 4:25 18:8 58:15 76:9
92:12 100:25

longer 15:14 75:25 92:1

looked 49:3 101:21

Lori 36:17

lost 93:11

lot 10:6,7 29:15 36:12,14
75:24 76:1,21 94:22 96:8
99:7

loved 102:15

lunch 76:2,9

**M**

M.D. 4:3

MAC-GLAY 93:3

MAC-GLEE 93:2

Maddie 26:4

made 69:13

Madison 93:6

mainstay 68:22

majority 16:9 57:19 82:24

make 44:6 47:21 49:9 54:8
79:25 87:11 94:11

makes 29:4

making 14:2 35:14,15
48:10 90:15 92:2 105:5

male 58:1 63:12 72:14

males 8:11,12

managed 11:3

mania 23:5,19

March 83:13 101:11,25

mark 5:6 30:11,12,13,15
53:14 92:5

marked 5:9,14,20 20:14
25:7,9,10,15 44:19 92:7

marks 85:25 86:5

Martin 93:23

Maruna 93:19,23 94:3,10
96:15

materials 69:18

Matthew 92:25

Mckenna 26:5

meaning 26:10 33:24

means 26:10 29:16 39:10
50:10 52:9 53:5,21 54:2
66:16 71:1 81:3 106:22
107:13,14,20

meant 50:14 65:19

medical 15:17 33:19 41:8
52:8,24 53:4,23 65:19,20,
21 67:3 68:18 79:24 84:12
101:25 102:10 110:8

medication 80:16

medications 77:22

medicine 8:25 15:1,16
17:13 39:23 58:15,16
77:18 78:8,12

medicines 81:11

meet 20:2,3,18,19,21
21:23 22:2,7,15 69:11
71:10 72:1

meets 22:9

memorable 14:23 18:12
24:12 71:24

memories 17:9 18:2
97:14,25

memory 18:3,8 97:15,20
98:6

men 8:21 14:19 21:5 66:12
75:9,14

mental 23:1,6,18 32:9
33:10 76:23 77:1,2,4,8,9,
11,13,15,16,22,23,24,25
78:4,6 83:8 101:9

mentioned 66:20 101:7

mentor 84:3

met 19:11 47:11

Mglej 93:1,4

middle-aged 11:24

mild 12:15

mildly 98:2

million 10:13

millions 10:8

mind 59:9

mine 81:14

minor 42:10

minute 5:23 45:13 92:4

miserably 34:20

misstates 14:13 18:24
19:18 45:4,6 70:3

mixed 34:3

mom 26:5 27:5

money 10:6 25:20,24 96:8

monitor 98:22

month 83:7,8,15 85:1
95:17

months 65:1,4

Morissette 94:3

morning 7:5 10:24 26:10,
11 27:5 30:1 98:1

mother 25:19 27:14

Motion 48:25

motor 71:4

move 48:18 101:2

moved 100:24 101:3

movements 103:9

muddled 34:3

muddling 35:12

multiple 38:13 63:12

Mylar 5:22 9:20 14:12
17:4,23 18:24 19:14,16
24:8,24 27:8 28:15 30:13,
17,20,23 32:4,8,22 33:8
34:8 35:13 42:21 44:5
45:4,6 46:10,17 48:2,4,9,
22,25 50:12,17 51:1 52:10,
14 53:1,10,12,22 55:16
56:22 57:5,14 58:4,19
59:4,7,9,14,17,25 60:14,21
61:6 62:11 63:16 64:1 70:3
73:10,14 74:4,8,12,17,21,
24 75:17,24 76:2,6,8,12,
15,18 87:14,25 89:7 92:21,
23 93:3,6,8,12,16 94:6,20,
23 95:1,5,7,13,17 96:13,23
97:2 104:18 107:1,5,23
108:2,6 109:5,7,10 110:1,
13,16

**N**

naked 18:11,13,15 19:8
21:4 75:14

named 9:20 80:7 93:19

nature 69:11

nebulous 71:14

needed 6:18

negative 57:8

night 10:23 12:3 38:20
98:4 100:22

normal 34:13 102:6

note 103:23

notes 37:9 65:19,20,21
66:5

notice 5:16,17,22

noticed 58:14

notify 33:18

nowadays 11:23

nude 27:3 29:23

number 44:15 90:20
109:10

numbered 5:4

numbers 41:2,3

nurse 28:17 36:18 37:18
38:3 98:14,18

nurses 37:19

nursing 98:22

**O**

object 42:21 48:4,9

objection 14:12 17:4,23
18:24 19:14,16 24:8 27:8
28:15 32:4 33:8 45:4
46:10,17 48:2 50:12 51:1
52:10,14 53:1,22 55:16
56:22 57:5,14 58:4,19
59:4,7,25 60:21 61:6 62:11
63:16 64:1 70:3 73:10,14
74:4,8,21 75:17 107:1,5,23
108:2 109:5,7,11 110:1

objections 48:22 51:2
60:14 110:2

objective 86:12,16 90:5,9
92:1

objectively 43:10

objects 107:9

observed 31:10 38:3
103:10 104:12

occurred 20:16 71:7

odor 31:10

offer 43:8

offering 7:4,7,10 61:14,17

office 62:8

officer 11:7 13:7 30:25
32:1,2 35:19 36:2,5 104:2

**officers** 28:20 31:17 47:12 58:1 63:12 72:14 100:5 102:25 103:15

**Okie-dokie** 61:20

**older** 11:23

**opine** 6:23 50:14 72:4 77:23

**opining** 6:10 19:4

**opinion** 7:8,10,12,13 10:11,12 14:2 22:16 28:6 31:16 35:4,7 41:14 43:8 47:19 48:6 52:8,16,24 53:5 59:23 60:3,5,12,16,24 61:4,10,14,17 62:18,19,22 64:8 69:4 71:16 75:21,22, 23 80:4 97:6 108:9

**opinions** 7:4,15 73:17 75:18 107:7 108:7

**opportunity** 110:14

**order** 20:20 21:22 41:7 48:20 53:8

**outcome** 7:19 88:7,9 89:7 91:5,8,10,18,21 92:3

**overcharging** 87:9

**oversee** 51:9

**overseeing** 101:18

**overview** 47:7

**owe** 90:23

**owned** 10:20 11:2

**P**

**p.m.** 49:25 110:18

**packed** 18:18

**paid** 86:24 87:1,14 90:2 95:4

**Palau** 31:2

**panties** 18:19

**pants** 45:15 54:15

**paragraph** 41:2,5 43:9 47:11 61:23,25 62:2 63:9, 15 65:2 66:21 69:12,15 78:15 80:25 83:2 85:22

**paralegal** 96:19

**part** 20:7 34:13 69:24

**past** 37:15

**patient** 14:23 18:4 37:5 39:15,23 51:11 65:22 84:10,14,21 86:21,23 87:2 88:11,24 90:3,4,6,11,12, 13,14,15,16,17,23,24,25 91:1,4,6,8,9,21 92:3 98:21 99:2 100:21

**patients** 16:9 18:7 40:1,4, 10,18 43:3 57:19 66:8 67:23 69:6 77:24 85:1

**91:19 97:13 98:24 99:7,24, 25 100:21

**Paugh** 4:13 93:7

**pay** 96:5

**peanuts** 76:11

**pencil** 13:11

**pending** 74:9

**people** 13:13,19 15:25 17:8,12 19:9 22:11 35:13 36:12 44:25 66:10 70:21 110:9

**perceive** 97:8

**percent** 40:10,14,16 77:2 92:2 94:8

**period** 18:9

**person** 6:24 10:14 14:17 16:24 18:5 28:7 32:7 36:3, 8 37:19,25 41:25 42:15,16 66:13 99:18 102:18,22 103:14 104:17

**person's** 29:2

**personal** 56:7 85:23 109:17

**pertaining** 90:2,3

**Peters** 93:23

**phone** 13:5,9,18 49:11 87:17

**phrase** 23:17

**physical** 47:25 69:20 71:1

**physician** 8:23 9:2 31:19 41:21 76:25 77:6,11,13,14 78:11 81:10 87:11

**physicians** 78:17 79:9,20

**place** 5:1 10:17 100:6

**placing** 82:22

**plaintiff** 6:1,2 96:12

**plaintiffs** 4:5

**plaintiffs'** 6:1,9

**pleading** 48:5

**point** 82:4 85:18

**police** 11:7 27:25 102:25 103:21,24

**poorly** 108:9,11

**population** 39:23

**portrays** 83:5

**posed** 59:18

**position** 39:19

**positive** 39:14

**possibly** 33:19

**posttraumatic** 19:22,25 20:17,21 21:23 72:1

**potential** 104:11,13

**potentially** 97:17

**practice** 8:23 52:18 77:18 78:8

**prebooking** 49:17 50:8 51:4,10,14,22 52:3 106:9, 23 107:14

**preceptor** 101:18

**precise** 97:21

**prepared** 87:21

**preparing** 95:24

**prescribe** 81:10

**prescribes** 81:12

**present** 105:16

**pressured** 34:6

**previous** 73:23

**previously** 16:10

**printed** 20:10

**prior** 14:9 24:6 79:7

**prison** 13:11 15:12,13,15, 21 39:22 40:11 58:16

**prisoner** 32:23 33:14

**prisons** 77:2

**probable** 32:11

**problem** 16:8

**procedures** 41:9,20 44:22

**process** 18:7 50:8 52:3

**professional** 4:15 31:16 76:24 77:5,8,10,17 78:1,5, 7

**professionals** 33:19

**progress** 66:5

**proper** 32:12

**property** 51:12,15,19 52:19,21 53:16,20 54:11 55:5,9,12,25 56:7,16,18 57:2,21 73:8 99:13,14,17 100:9,10,11 105:17 107:21 108:19,23 109:4,17,23,24

**proponent** 80:15

**prosecute** 21:16

**provide** 43:2 76:25 77:22, 23

**provided** 43:10 80:3 85:14

**provider** 77:11 83:3,8,20 91:4,5 101:9,19

**providers** 77:13

**providing** 86:12,20

**psychologically** 9:4

**PTSD** 6:2 22:6,10,16,21 23:5,21,22,24 24:1 39:21 40:4,9,11,17 62:17,20 66:7 67:3 69:8 83:6,10,12,16,17 84:24,25 85:24 86:18,25

**101:6 102:13,16,23

**PTSD-LIKE** 22:4,17,18,23 23:2 24:7,14

**published** 68:19

**purpose** 91:22

**put** 27:24 28:18 29:21 33:7 49:12 51:12 57:4 58:3 79:21,24 84:24 89:10 98:18 99:8 103:20 106:23 107:22 110:9

**puts** 65:8

**Q**

**question** 6:14 16:6,7 19:2 26:18,21,24 27:2 29:20 30:4 32:24 33:12,13 37:14 40:8 46:15 50:20 57:8 59:17,18 71:16 74:9,12,25 78:10 80:2 83:22 84:17 87:22 107:9,11 109:14

**questioning** 110:5

**questionnaire** 32:24 33:14

**questions** 39:20 42:22 56:23 76:22 96:22,24 101:5 104:19 110:12

**quickly** 41:4

**quotation** 85:25 86:5

**quote** 74:15

**R**

**raise** 103:5

**raised** 48:17

**raising** 103:17

**Ramirez** 43:23 44:4,8,21

**Ramirez's** 46:6

**rape** 21:8 40:2,6

**rate** 78:17 79:9 82:17

**read** 9:17 16:12 21:19 31:3 35:15,16 44:3,7 46:5,6,7, 18 47:20 57:2 59:20,23 62:23,24,25 75:20,22 98:12 103:23 104:4 110:14

**reading** 46:4 82:6 86:3

**ready** 84:10

**real** 46:9

**reason** 16:22

**reasonable** 41:8 43:10 47:21 48:16

**recall** 46:4 87:16

**Receipt** 53:20 55:25

**received** 5:16 41:2 55:9 56:18 100:3

**receives** 80:20,23

**receiving** 78:19,24 79:6 83:15

**reception** 4:25

**recess** 44:12 76:20 96:21

**Recidivism** 16:8

**recidivist** 16:13

**recollection** 26:8 97:20

**recommend** 82:24

**record** 4:15 11:12,13,17, 19,25 28:12,13,14 30:10, 20 35:2 44:1 87:23 95:16 106:25 107:22 110:10

**recorded** 50:8

**recording** 44:11

**records** 28:17 41:7 101:21,23,24,25 104:7,24 105:8

**red** 103:6 107:15

**referred** 62:7,9

**referring** 65:12

**regular** 40:15

**related** 23:5,18

**relates** 6:2,3

**relationship** 88:24 91:2,3, 4,20 102:17,21

**relative** 102:15,20

**releasing** 43:11

**reliving** 66:18

**remain** 98:15

**remember** 18:7 38:23 45:17 46:16 66:9 98:2,3,4 104:9

**remembered** 97:18

**remembers** 21:21 30:1

**removed** 18:18,19

**repeat** 50:20 57:7 83:22

**report** 6:13,17 30:25 31:3 40:23 41:16 47:6 50:14 52:16 53:24 58:20 60:2 61:22 64:12 65:8,13,16,17, 18 66:21 67:2 78:14 79:24 82:16 86:4,7,8 90:1 95:22 107:7

**reported** 23:20

**REPORTER** 44:17 110:15

**reports** 73:16 104:3

**represent** 25:16

**request** 48:20

**required** 22:1 58:7,17 84:13

**requires** 101:18

**residency** 84:13

**resisting** 12:6,10

**respect** 41:10

**responsibility** 90:12,14

**rest** 22:3 40:3

**restroom** 76:16,18

**result** 17:22

**results** 6:24

**resumé** 84:24 85:4,7

**retained** 6:6 108:16 109:6, 8,9

**retention** 51:16

**return** 55:22 60:10 61:13 88:15

**returned** 55:25 56:8,17 57:2,3 73:9

**review** 12:8 35:2

**reviewed** 12:23 28:17 41:7 69:17

**ribs** 71:4

**rings** 49:11

**risk** 79:18 82:21,22

**road** 7:1

**roadside** 34:19

**rod** 59:21

**rodeo** 16:3

**room** 57:23,24 103:12

**rough** 39:24

**roughly** 64:24 94:9

**row** 42:23

**RTF** 34:21

**rubdown** 45:1

**rules** 94:16,18

---

**S**

**safe** 25:21,22

**safety** 48:17

**sanitized** 46:8

**Satori** 67:21

**scale** 97:22

**schizophrenic-like** 23:16

**school** 83:7 84:12

**scope** 50:13 52:16 53:23 58:20 60:2 73:16 108:7

**Scott** 93:22

**search** 6:11,21 17:22 20:1, 16 21:9 26:19 42:7 43:1 45:1,2,24 46:2,12,14,21, 22,25 47:2,3 58:18 59:1,6 62:20 71:6 72:14,16,24 73:3 74:16 75:7 98:8

**searched** 6:25 7:5 8:3,21 14:6,18 17:2 18:16,17 24:5 26:6,16,17,19,23 41:15,18 43:3 59:21

**searches** 45:1,7

**searching** 42:6

**second-line** 68:23

**secondary** 88:4

**seizures** 37:22

**self-treats** 81:1,3,8,17,20 82:3,11,18

**sell** 84:23

**send** 59:11

**sentence** 54:21 79:7,8,23

**services** 85:24 86:17 87:4

**severe** 29:14 69:19 70:1,6, 15,20 71:1,5 99:4

**severely** 97:24

**severity** 72:7

**sexual** 21:2,3,5,8,9 40:6 69:9,11

**shaking** 63:10 65:6,10 66:4

**she'd** 28:22 83:6,7 85:11

**sheriff** 21:16

**Sherman** 94:3

**shirt** 45:15 54:15

**short** 44:9 96:17

**shortly** 31:2

**shout** 47:23

**shoved** 12:6,9

**show** 30:18 44:13 53:7 64:16 73:20

**showing** 105:14

**siblings** 26:22

**sic** 25:24

**sides** 6:17 90:10

**sign** 55:1,3 110:14

**signature** 55:11

**signed** 55:10

**significant** 13:18 17:2,8, 17 19:15 71:5,12,22,25 98:13,17

**significantly** 33:16

**signs** 56:17,18 104:11,13

**silent** 49:12

**similar** 65:8

**simple** 35:11,16,25 50:21, 22 75:1 81:15 96:19

**simply** 19:7 23:7 58:2 75:6 79:5

**single** 37:25

**situation** 17:10 66:19 101:18

**situations** 66:8

**sleep** 24:19

**slip** 13:22

**smart** 35:12 81:15

**smell** 31:21

**smelled** 28:21 31:18 32:16

**smells** 35:19,20 36:2,5

**social** 77:12 78:13

**socks** 54:13 100:12

**someone's** 36:3

**someplace** 97:9

**son** 102:20

**sounds** 35:10,18,21 78:23 79:12,14

**South** 4:22

**speaking** 34:13 36:21

**specialize** 84:25

**specializes** 85:23

**specializing** 9:3

**specialty** 14:25

**specific** 20:1

**specifically** 19:11 38:18 41:6 57:23 65:12

**speculation** 14:13 17:5,24 18:25 19:17 24:9 27:9 32:5,8 33:9 50:18 52:11,15 53:2,23 58:23 60:1 61:7 62:12 73:15 107:6 108:7 109:12

**speech** 34:3,6,12

**spell** 4:18

**Spencer** 93:23

**spilled** 36:6,9

**Spillman** 49:2,3,8,15 110:6

**Spillmans** 49:17

**stabbed** 13:13

**staff** 98:22

**stage** 93:13

**stand** 34:18

**standard** 41:10 48:5,23

**started** 83:9

**state** 4:14 15:4,11,13,14, 21 77:19,21 78:9 85:23

**stated** 28:22,25 64:3,18 80:22

**statement** 6:5 12:1 72:19, 20 75:11,13 82:7

**statements** 32:12 69:13

**states** 31:9

**stay** 100:4,22

**staying** 14:21

**stepped** 103:15

**stipulate** 11:18

**stop** 44:10 92:4

**stopped** 15:23

**storage** 54:22 109:18,24

**store** 60:10 61:13

**stored** 53:17,18,20,21 54:1,2 55:5 57:13 73:9 74:3,5 75:4 108:23 109:4

**stories** 40:18

**story** 27:13 90:10

**straight** 34:20

**street** 99:18 100:6,8 101:1, 4

**stress** 19:22,25 20:17,21 21:23 72:1

**strip** 6:11,21,25 7:5 8:3,20 14:6,18 17:2,22 18:16 20:1,16 21:9 24:5 26:15, 17,18,23 41:15,18 42:5,7 43:1,3 45:12 46:12,14,21, 25 58:18 59:1,6,20 62:20 71:6 72:14,16,24 73:2 74:16 75:6,7 98:8

**strip-search** 41:22 42:3, 19

**strip-searched** 6:25 27:15,18,19 28:2,5 42:1, 12,16,17 43:17,21 45:12 57:12,16 60:18 61:15 64:9, 13 66:12 71:21 75:21

**strip-searching** 42:14 69:25

**stripped** 18:17 26:19 27:1, 3 29:23

**stripping** 21:4

**strong** 31:10

**stuff** 45:22 76:11 105:6,7

**Substance** 23:6

**substances** 38:17

**suffered** 62:20

**suggested** 21:13

**suggesting** 21:14 78:20, 25 79:12 82:10,19,20

**suggestion** 79:2

**Summary** 83:2

**supervisor** 84:3 102:3,4

**support** 105:1

**supports** 68:19

**supposed** 55:3

**surprise** 24:4,6,11,13,15

**suspicious** 83:3,4 85:3,6

**swap** 25:11,12

**swapped** 75:16

**sweats** 13:2

**sworn** 4:5

**SYKES** 4:8 5:3,6,10,15,17, 21 14:16 17:16 18:10 19:1, 15,21 20:9,15 24:13,22,25 25:4,8,12,16 27:10 28:16 30:3,6,9,15,18,21,24 32:6, 18,20,23 33:11 34:10 40:20,23 42:24 43:22 44:2, 9,13,15,20 45:5,9 46:11,20 47:17,18 48:3,7,12,24 49:1,12,14 50:16,19 51:3 52:12,20 53:6,11,13 54:2 55:20 56:24 57:9,17 58:6, 21,24 59:5,8,10,15,19 60:5,19,23 61:8 62:14 63:19 64:5 70:7 73:6,7,12, 19 74:5,10,14,19,23 75:1, 19 76:1,4,7,10,14,17,21 87:24 88:2 90:20 91:12 92:8,25 93:4,14 95:6,8,14, 18 96:17,22 104:20,22 106:4,7 107:3,8,25 108:4, 10 109:8,13 110:7,12

**symptoms** 21:19 22:3,4, 18,20,23,24 23:2,5,15,16, 17,20,21,24 24:7,14

**system** 29:17 31:24

---

**T**

**T-SHIRT** 100:12

**T-U-B-B-S** 4:21

**takes** 29:12 52:25

**taking** 51:23

**talk** 17:25 30:2 34:1,13,15 65:21 66:14

**talked** 15:2 18:5

**talking** 18:1 27:4 28:1,2,3 34:17 62:25 65:25 66:4 70:24 92:4

**teenager** 27:4

**telling** 8:23 9:2 16:16 26:15 27:14,17 30:5 35:6

**tells** 31:20

**ten** 15:24

**term** 18:15,16 47:1 71:14

**terminology** 22:24

**Terry** 93:14

**test** 34:19 35:1

**testified** 4:6 63:9 67:25 80:19 82:12

**testify** 86:25 87:1

**testimony** 5:25 13:8 21:17 65:14 70:4 72:17 73:3 75:15 78:18 85:22 86:20 94:19

**text** 70:23

**themself** 82:22

**therapist** 77:12 83:9 91:3

**Thereabouts** 89:18

**thing** 10:24 32:13 46:9

**things** 13:14 40:3 45:25 50:11 54:4 97:8 103:10

**thinking** 98:8

**Thompson** 93:15

**thought** 6:17 11:3 28:18 32:2 64:19 65:19

**thoughts** 21:21

**threaten** 47:23

**threatened** 21:1

**three-page** 38:2

**thumb** 54:19

**time** 5:1 16:16 18:9 23:11 29:10 35:13 38:12,14 39:2 40:14 48:18 49:23 50:8 52:17 58:15 67:21 72:18, 21 76:4 83:14 84:7 85:14, 18 89:17 90:4 95:11 96:5 99:22 100:23 101:23 109:16

**times** 38:13 40:17 58:9 61:25 88:18 89:22 99:24 106:3,5,13 108:13

**today** 96:6 99:23 105:11, 15

**told** 26:9 30:1 42:15 58:9

**top** 41:5 51:22 53:18

**touting** 80:10

**traditionally** 79:19

**trained** 37:18,19,21

**training** 84:13,14 85:18

**transformed** 48:19

**trauma** 8:7,9,10,15,17 9:9, 10 13:18 14:11,14,17,21 17:3,17,21 18:1,22 19:10, 15,20 69:19 70:2,6,8,9,15, 17,19,20 71:1,3,5,7,12,23 72:3

**traumatic** 17:14 66:11 69:16 70:23,24 102:22

**traveler** 31:1

**treat** 67:10,13,23 68:5,7,11 88:11 90:15

**treated** 81:5 83:6

**treating** 81:19 83:9 86:21, 22 87:2 90:3,6,11

**treatment** 6:2 68:22,23,24 77:15,23 80:2,11,12 85:8, 14 86:13 88:16 102:6,9,12

**treatments** 67:16 80:17 81:23

**treats** 81:18 82:1

**trembling** 63:10 65:6,10 66:4

**tremens** 37:22

**trial** 13:21 21:11 94:19

**trials** 95:1

**triggers** 66:9

**Tristan** 26:5

**true** 12:1 72:23 75:20 79:11 105:7

**truthful** 63:25 64:4,7,17,19 99:4 109:22

**Tubbs** 4:3,17,21 25:10 74:2

**Tubbs'** 5:24

**tumultuously** 47:23

**turns** 88:22

**type** 19:10 52:18 72:15 86:9

**typed** 54:11

**types** 51:8 69:6 72:10

**typical** 101:17

**typically** 66:15 69:5 101:17

---

**U**

**Uintah** 93:7

**Um-hmm** 54:24 70:11 97:23

**undergoes** 80:17

**undergone** 81:22

**understand** 7:21 9:14 10:1,15 28:3 39:18 71:16 72:2 97:8 107:12

**understanding** 86:12

**understood** 30:7

**underwear** 54:14 56:12

**undress** 8:11 63:12

**unproven** 68:13

**unsuccessful** 88:14

**untrustworthy** 94:11

**upset** 26:14 27:17,24 65:21

**Utah** 4:23 15:6,11,13,14,21 16:8 77:19 78:9

**V**

**vague** 71:17 108:9,10,11, 13
**valid** 102:12
**vehicle** 71:4 103:21,24
**verge** 47:25
**video** 12:7,8,24 27:22 33:25 35:5 63:4 66:24 103:25
**videos** 102:25 103:5
**view** 82:4
**viewed** 27:22 102:24
**views** 17:14
**violation** 42:10,20
**violence** 21:2,3,5,8,9,10 40:1,7 69:10
**visual** 45:1,13,24 46:2,22 47:1,3 63:8
**vitae** 5:11 14:25
**voice** 103:17

**W**

**wait** 68:9 84:19
**wake** 98:1
**walk** 34:1,20
**walking** 34:18
**wall** 12:9
**wanted** 30:6
**wanting** 91:5
**Wasatch** 99:23 105:12,13
**Washington** 41:11 46:20 105:24
**watch** 63:4
**watched** 66:24,25 67:1
**watching** 35:4 58:2
**wealthy** 10:2,5,10,14
**weapon** 12:17,19,21,23,25 13:8,10,11,15 47:22
**wearing** 61:3 100:13
**wedding** 4:25
**week** 26:7 40:17
**weeks** 4:24 26:23 95:13, 15,16,21
**well-supported** 67:4
**whatsoever** 14:22
**win** 90:18
**wine** 29:1 38:24
**wins** 90:16

**withdraw** 99:8
**withdrawal** 37:22 98:23
**withdrawals** 38:1 99:4
**witnesses** 5:22
**woke** 25:23
**woman** 9:3 10:2 11:24 14:8 17:17 75:8
**women** 19:7,8,19 72:9
**wondered** 44:21
**word** 9:5,7,8 17:8 18:1 26:18,22 28:5 32:25 33:2 39:8,9 59:20 70:5,7 85:5 106:2,12,23 107:15 109:2
**worded** 108:9,11
**words** 63:13,17,18,20,21 81:14,20 86:6 106:20 108:12
**work** 15:14 31:14 77:2 86:10 94:22 95:23,24 96:12 110:9
**worked** 15:13,19 94:12
**worker** 77:12 78:13
**working** 32:1 83:19 84:2,3
**world** 31:1 40:6
**worry** 24:18
**worth** 10:13
**wouldn'0t** 24:13
**write** 32:11 49:4 65:13 82:15 107:14 109:1,2
**writing** 98:12
**written** 15:2 18:8 48:8,13, 14 63:2 76:22
**wrong** 91:16
**wrongfully** 83:16 85:15
**wrote** 63:19 69:21 82:5 86:1,2,3,7,14,15 95:22
**Wyoming** 15:4,5,6 77:21

**Y**

**year** 4:10,13
**years** 15:14,20,24 17:13 32:1 64:25 65:3 84:12,13, 16,18,19 85:7,11,12 92:14
**yelled** 31:11
**yelling** 103:16,19
**yesterday** 20:10
**York** 61:23 62:7,9,14,16,25 63:1,9,22 64:3,7,17,18,23 65:5,13 83:2,19,23,24 84:18 86:10 88:8,15,17,23 89:4,5,21,24 91:10 101:6
**York's** 63:3,17,20 85:22

**young** 11:23